UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
UNITED STATES OF AMERICA,

    - against -

DONAL O'SULLIVAN, HELEN
O'SULLIVAN, and PADRAIG NAUGHTON,

    Defendants.
----------------------------------------------------------x

**MEMORANDUM & ORDER**
20-CR-272 (PKC)

PAMELA K. CHEN, United States District Judge:

    Defendants Donal O'Sullivan, Helen O'Sullivan, and Padraig Naughton move to compel production of certain material that the government retrieved from the computer hard drive of a cooperating witness in this case identified as "John Doe." (Dkt. 59.) The government asserts that the material is protected by John Doe's attorney-client privilege. For the reasons discussed below and based on the evidence offered by the parties and adduced at the hearing on December 17, 2020, the Court concludes that John Doe has waived his attorney-client privilege with respect to the materials at issue,[1] and accordingly grants Defendants' motion to compel.

---

[1] The exact scope of the materials at issue is not entirely clear. Although Defendants' actual motion appears to be focused specifically and solely on material on John Doe's computer hard drive (*see* Dkt. 59, at 2–3), the government seems to construe Defendants' motion as pertaining to potentially privileged materials on John Doe's hard drive *and* in his Hotmail email account (*see* Dkt. 62, at 1–2). Defendants' later filings compound the ambiguity by simply referring to "documents from John Doe that the government has withheld as potentially privileged" (Dkt. 71, at 1) and "communications between John Doe and his criminal defense and immigration attorneys" (Dkt. 83, at 1). It is unclear to the Court the extent of overlap between the potentially privileged material on the hard drive and the potentially privileged material in the Hotmail account, although it is clear that the hard drive and Hotmail account are distinct items that were physically obtained by the government at different times and stored on separate hardware devices. Since there is little reason to distinguish between the two sources of material with respect to John Doe's assertion of privilege, except as discussed *infra*, the Court's decision herein applies to both the material on John Doe's hard drive and in his Hotmail account.

1

**BACKGROUND**

The Indictment charges Defendants with participating in an alleged scheme between 2011 and 2017 to evade making required payroll contributions to certain benefits funds for union employees. (Dkt. 1, ¶ 11.) According to the Indictment, Defendants fraudulently funneled payroll funds through a consulting firm owned and operated by John Doe ("Consulting Firm") to make it appear as if Defendants' employees were paid by the Consulting Firm. (*Id.* ¶¶ 8, 12–13.)

By the end of 2015, John Doe was cooperating with the government in its investigation of the alleged scheme. (*See* Dkt. 62-5, at ECF[2] 2.) On April 27, 2017, in response to a grand jury subpoena, John Doe met with the government for a proffer session that included Federal Bureau of Investigation ("FBI") Special Agent Samantha Lockery and Assistant United States Attorney ("AUSA") Martin Coffey, who is assigned to this case. (*See* Dkt. 62-1, at ECF 2, 4.) At that proffer session, in the presence of his criminal defense attorney, Alain Massena, John Doe signed written consent forms permitting the government to search both the hard drive of a computer he used at the Consulting Firm and his Hotmail email account. (*Id.* at ECF 4, 6–7.) John Doe told the government that the Hotmail account contained communications with Massena and John Doe's immigration attorney, Neil Weinrib. (*Id.* at ECF 2.) Nonetheless, neither of the written consent forms executed by John Doe at the April 27, 2017 proffer session specifies any limits or exceptions with respect to privileged materials. Although the consent form for the Hotmail account explicitly restricts the government's search to the period of "Jan. 1, 2011 – Dec. 31, 2011," it otherwise permits "a complete search" by the FBI. (*Id.* at ECF 7.) The consent form for the hard drive similarly authorizes "a complete search" by the FBI, without any explicit time-period or other

---

[2] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

restriction. (*Id.* at ECF 6.) Both forms indicate that John Doe was advised of his right to refuse consent and that he "voluntarily" gave permission for the searches. (*Id.* at ECF 6–7.)

The government physically retrieved John Doe's hard drive from the offices of the Consulting Firm on May 12, 2017, imaged it, and returned it on May 15, 2017.[3] (Dkt. 90, at 8–9 (citing production documents NAVILLUS_000113121–22).)

Subsequently, on May 18, 2017, Special Agent Lockery emailed John Doe's attorney, Massena, about obtaining the password to access the Hotmail account. (Dkt. 62-4, at ECF 5.) In his reply on Friday, May 19, 2017, Massena stated that John Doe was "in the process of segregating any attorney correspondence that he may have on that email account." (*Id.*) On Monday, May 22, 2017, Massena emailed the password information. (*Id.* at ECF 7.) Data from the Hotmail account was extracted and placed on a CD by the FBI on May 25, 2017. (Dkt. 62-1, at ECF 8.)

After the privilege issue was raised by defense counsel in this matter, the government acknowledged that John Doe "didn't" segregate or "wasn't successful in" segregating any potentially privileged emails from the Hotmail account. (Transcript of October 23, 2020 Status Conference ("Oct. 23 Tr."), Dkt. 87, at 17:6–11.) The government also acknowledged encountering potentially privileged material in its review of the hard drive. (*See* Dkt. 62, at 2.) Furthermore, the record provided to the Court, even before the December 17, 2020 hearing, indicates that John Doe twice forwarded a communication between him and his immigration attorney to one of the AUSAs working on this case (*see* Dkt. 66-1), and he also evidently forwarded communications with the same attorney to his payroll manager at the Consulting Firm identified as "Jane Doe" (*see* Dkt. 83, at 10; *see also* Dkt. 83-6). It also appears that in August 2017, John

---

[3] The hard drive image is stored on a Seagate 500 GB Barracuda hard drive in the government's possession. (Dkt. 62-2, at ECF 4.)

3

Doe, through Massena, authorized the government to speak with his immigration attorney, Weinrib. (Dkt. 90-3, at ECF 2–4.)

Nevertheless, the government represents that, throughout its investigation, it never understood John Doe to have waived his attorney-client privilege. (*See* Dkt. 62, at 1; Dkt. 66 at 1–2.) Thus, when Special Agent Lockery encountered potentially privileged material during her review of John Doe's hard drive, she stopped and instead ran targeted searches so that she could limit her review to non-privileged material. (Dkt. 62, at 2.) An FBI "taint agent" also ran targeted search terms through John Doe's hard drive and Hotmail account in an attempt to screen out potentially privileged material.[4] (*Id.*)

Additionally, the government has attempted to confirm, or ascertain, on several occasions—including after the privilege issue was raised by defense counsel in this case—whether John Doe has waived, and continues to waive, his attorney-client privilege. In July 2019, two of the AUSAs on this case left a voice message with Massena. (*See* Dkt. 62-4, at ECF 11.) Several days later, on July 17, 2019, Massena responded by email, saying: "[John Doe] would prefer that your office not view his privileged communication with his immigration attorney[,] Neil Weinrib . . . [John Doe] also would prefer that my privileged communications with him remain private[.]" (*Id.* at ECF 10.) On February 3, 2020, one of the AUSAs emailed Massena about the Hotmail account:

---

[4] Even after the searches were run and documents were screened from review, government attorneys encountered an email in the Hotmail account that appeared to contain material protected by John Doe's attorney-client and spousal privileges, and the searches had to be re-run with an additional search term. (Dkt. 62, at 2 n.1.) It is not clear when these searches were performed. The government's September 1, 2020 discovery production letter references the searches. (Dkt. 43, at 2.) The search terms themselves were not produced until October 6, 2020. (*See* Dkt. 53, at 2 (citing production document NAVILLUS_000113135).)

> Just wanted to confirm one thing with you: based on our previous discussions, we understand that [John Doe] is <u>not</u> consenting to waive the attorney-client privilege with respect to any email communications he had previously provided to the government; but we do understand that, with that one caveat, [John Doe] is otherwise consenting to the government's access to the emails and to our reviewing any non-privileged emails for any relevant information. Can you confirm that is correct? Happy to discuss — I think a previous consent provided by [John Doe] may have had some date restrictions on it, and we just wanted to ensure that, with the exception of the non-waiver of privilege, we were otherwise clear to review the email communications.

(*Id.* at ECF 12). Massena on the same day simply replied, "Confirmed." (*Id.*) Recently, on September 8, 2020, the government met with John Doe, with Massena present, and John Doe informed the government that he was not waiving his attorney-client privilege with respect to his communications with Weinrib. (*See* Dkt. 62-5, at ECF 81.)

At the December 17, 2020 evidentiary hearing, the Court heard testimony from Massena and Special Agent Lockery.[5] Massena testified that he and John Doe had attempted to segregate privileged communications in the Hotmail account into a separate folder, but determined that such an attempt would be futile given that the government had access not only to the Hotmail account but also to John Doe's hard drive, on which John Doe's Hotmail emails presumably still remained. (Transcript of December 17, 2020 Hearing ("Dec. 17 Tr."), at 19:21–20:10, 56:14–57:1.) Although asserting that there was an understanding with the government that it would not review any privileged materials, Massena confirmed that such an understanding was never reduced to

---

[5] The Court also ordered John Doe's payroll manager, Jane Doe, to testify at the evidentiary hearing. (Dkt. 92, at 2.) However, given certain circumstances that came to light following the Court's order, the Court excused Jane Doe from testifying at the evidentiary hearing and deferred ruling on whether she would be required to testify after the hearing. (12/11/2020 Docket Order as to Donal O'Sullivan, Helen O'Sullivan, and Padraig Naughton.) In light of the Court's decision to grant Defendant's motion to compel, the Court finds that Jane Doe's testimony is unnecessary.

5

writing—even though other limitations, such as the time-period restriction initially placed on the Hotmail account, were put into writing. (*Id.* at 22:22–23:10, 52:25–53:24.) Special Agent Lockery, the case agent on the investigation of this case and one of the people present at the April 27, 2017 proffer session with John Doe, testified that there was no assertion of attorney-client privilege when John Doe executed the written consent forms for the hard drive and Hotmail account. (*Id.* at 133:17–134:5.) Special Agent Lockery also testified that she did not recall any written agreement of any kind regarding John Doe's attorney-client privilege. (*Id.* at 134:6–8.) Rather, it was the AUSAs assigned to the investigation who directed Special Agent Lockery to conduct limited searches of John Doe's hard drive and Hotmail account to avoid reviewing potentially privileged material. (*Id.* at 153:3–5.) Indeed, in one of her interview reports, Special Agent Lockery expressed the view that John Doe did not personally seem concerned about asserting or protecting any attorney-client privilege. (*Id.* at 115:9–17.)

John Doe has not appeared or intervened in this case to assert his attorney-client privilege, or any other privilege, with respect to the materials at issue. At a status conference on October 23, 2020, the government stated that it had been in touch with Massena and that Massena was "asserting the privilege on these materials." (Oct. 23 Tr., Dkt. 87, at 14:3–5.) In addition, one day before the December 17, 2020 hearing, Massena submitted a letter on John Doe's behalf asserting attorney-client privilege as to all such privileged communications (Dkt. 110), and at the hearing, Massena testified that he had been authorized by John Doe to assert the attorney-client privilege as to both himself and attorney Weinrib (Dec. 17 Tr., at 93:6–16).

## DISCUSSION

Before discussing the merits of whether the materials at issue are discoverable because any privilege over them has been waived or is otherwise inapplicable, the Court briefly addresses the issue of standing. Defendants rightly argue that the government lacks standing to assert John

Doe's privilege, and the government concedes as much. (*See* Dkt. 59, at 2–3; Dkt. 66, at 2.) Indeed, the attorney-client privilege "can be asserted only by the client (or one authorized to do so on the client's behalf)." *In re Sarrio, S.A.*, 119 F.3d 143, 147 (2d Cir. 1997); *see also United States v. Martoma*, 962 F. Supp. 2d 602, 605 (S.D.N.Y. 2013) (holding that the government lacked standing to assert a third party's attorney-client privilege where the third party had moved to intervene to assert those rights, and did not authorize the government to assert them on his behalf). While the government does not dispute that it lacks standing to assert John Doe's privilege, it represents that Massena "is . . . asserting the privilege." (Oct. 23 Tr., Dkt. 87, at 14:5.) Moreover, as previously noted, on the eve of the evidentiary hearing, Massena filed a letter with the Court avowing that his client "is not silent as to the issue of his attorney-client privilege" and "has asserted his attorney-client privilege in relation to all attorney client communications from the inception of the attorney-client relationship" with Massena. (Dkt. 110.) At the hearing, Massena testified that he was authorized to assert the privilege on John Doe's behalf with respect to the materials at issue. (Dec. 17 Tr., at 93:6–16.) In light of the representations and record before the Court, the Court finds it appropriate to reach the merits.

The attorney-client privilege, which protects the confidentiality of communications between attorney and client, "endures as the oldest rule of privilege known to the common law." *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989) (citations omitted). Its purpose is "promoting full and frank communications between attorneys and their clients." *United States v. Int'l Brotherhood of Teamsters* (*Teamsters*), 119 F.3d 210, 214 (2d Cir. 1997) (quoting *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985)). At the same time, the privilege stands "as an obstacle to the investigation of the truth," and therefore, it "ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle." *In re*

*Horowitz*, 482 F.2d 72, 81 (2d Cir. 1973) (internal quotation marks and citations omitted); *accord Teamsters*, 119 F.3d at 214 (citations omitted). "The burden of establishing the existence of an attorney-client privilege, in all of its elements, rests with the party asserting it." *Teamsters*, 119 F.3d at 214 (citing *Schwimmer*, 892 F.2d at 244).

The central question here is whether John Doe has waived his attorney-client privilege with respect to the materials on the hard drive and in the Hotmail account by permitting the government to conduct a "complete search" and "take any" evidence or items from them. (*See* Dkt. 62-1, at ECF 6–7.) As the holder of the privilege, John Doe is the only one who may waive it. *See In re von Bulow*, 828 F.2d 94, 100 (2d Cir. 1987) ("[T]he privilege belongs solely to the client and may only be waived by him."). Such waiver may be expressed or implied. *See id.* at 100–01; *see also In re Grand Jury Proceedings*, 219 F.3d 175, 182–83 (2d Cir. 2000) (discussing various instances of implied waiver). Most relevant here, "a waiver can occur when the client or her attorney, with the consent of the client, voluntarily produces a purportedly privileged document to a third party." *In re Leslie Fay Cos., Inc. Sec. Litig.*, 161 F.R.D. 274, 282 (S.D.N.Y. 1995) (citing *Eigenheim Bank v. Halpern*, 598 F. Supp. 988, 991 (S.D.N.Y. 1984)); *see also Horowitz*, 482 F.2d at 81 ("We deem it clear that subsequent disclosure to a third party by the party of a communication with his attorney eliminates whatever privilege the communication may have originally possessed[.]" (citations omitted)); *Local 851 of the Int'l Brotherhood of Teamsters v. Kuehne & Nagel Air Freight, Inc.*, 36 F. Supp. 2d 127, 129–30 (E.D.N.Y. 1998) ("Voluntary disclosure of privileged communications to a third party results in waiver of the attorney-client privilege and, where applicable, work product immunity." (collecting cases)); *Aramony v. United Way of Am.*, 969 F. Supp. 226, 235 (S.D.N.Y. 1997) ("If a party voluntarily discloses a document, it waives any claim

of attorney-client privilege and cannot later seek to keep the document confidential." (citation omitted)).

That the third-party recipient of privileged material is the government does not materially alter the analysis. In *In re Steinhardt Partners, L.P.*, the Second Circuit determined that a party's voluntary disclosure of a memorandum to the Enforcement Division of the Securities and Exchange Commission ("SEC") during the course of an SEC investigation waived any work-product protection associated with the memorandum. 9 F.3d 230, 234–36 (2d Cir. 1993). In reaching its holding, the Second Circuit relied on decisions in the context of the attorney-client privilege and noted that "privilege ceases when the client does not appear to have been desirous of secrecy." *Id.* at 235 (quoting *Permian Corp. v. United States*, 665 F.2d 1214, 1220 (D.C. Cir. 1981)). Voluntary disclosure while cooperating with a government investigation is one such instance. *See id.* ("Voluntary cooperation with government investigations may be a laudable activity, but it is hard to understand how such conduct improves the attorney-client relationship." (quoting *Permian*, 665 F.2d at 1221)). A client, moreover, "cannot be permitted to pick and choose among his opponents, waiving the privilege for some and resurrecting the claim of confidentiality to obstruct others, or to invoke the privilege as to communications whose confidentiality he has already compromised for his own benefit." *Id.* (quoting *Permian*, 665 F.2d at 1221).

Nonetheless, the Second Circuit in *Steinhardt* "decline[d] to adopt a *per se* rule that all voluntary disclosures to the government waive work product protection." *Id.* at 236. Instead, it suggested that protection might not be lost where "the disclosing party and the government may share a common interest in developing legal theories and analyzing information" or where "the [government] and the disclosing party have entered into an explicit agreement that the [government] will maintain the confidentiality of the disclosed material." *Id.* At least one court

9

in this circuit has applied *Steinhardt*'s dicta in the context of the attorney-client privilege to find no waiver. *See Leslie Fay*, 161 F.R.D. at 284 (citing *Steinhardt*, and concluding that a party had not waived its attorney-client privilege over materials by disclosing them to the U.S. Attorney's Office "pursuant to confidentiality agreements intended to preserve any privilege applicable to the disclosed documents").

In this case, during a proffer session in response to a grand jury subpoena, John Doe signed broad consent forms voluntarily permitting the government to search and retrieve material from both his hard drive and his Hotmail account, without any explicit agreement that privileged material would be kept confidential. (*See* Dkt. 62-1, at ECF 4, 6–7.) Special Agent Lockery, who was present at the April 27, 2017 meeting when John Doe signed the consent forms, remembers no assertion of John Doe's attorney-client privilege during the meeting, and she does not recall any written agreement of any kind regarding John Doe's attorney-client privilege. (Dec. 17 Tr., at 134:3–8.) Likewise, the interview report of the April 27, 2017 meeting does not indicate any assertion of John Doe's privilege.[6] (*See* Dkt. 62-1, at ECF 2–3.)

Additionally, the conduct of John Doe following the April 27, 2017 meeting does not indicate the existence of an explicit confidentiality agreement, nor is it consistent with the behavior

---

[6] Though Massena testified that he asserted John Doe's attorney-client privilege during the April 27, 2017 meeting with the government, his notes from the meeting do not confirm that. (*See* Dkt. 122, at ECF 3; *see also* Dec. 17 Tr., at 40:2–4, 43:9–13.) It is also evident from Massena's testimony that his memory regarding certain aspects of his and John Doe's communication and interaction with the government from several years ago is tentative. (*See, e.g.*, Dec. 17 Tr., at 27:7-9, 62:16–18, 78:19–24, 80:22–81:3.) Given the passage of time and considering that Massena's recollection is not supported by Special Agent Lockery, the FBI interview report, or anything else in the record, the Court does not credit Massena's testimony that John Doe's attorney-client privilege was asserted at the April 27, 2017 proffer session. Indeed, Special Agent Lockery testified that she would have noted any such assertion of privilege in an FBI 302 interview report—as it would have been extremely relevant to the FBI's handling of its search and review of the materials. (*See* Dec. 17 Tr., at 128:22–25.)

of someone "desirous of secrecy" with respect to the material on the hard drive or in the Hotmail account. *See Steinhardt*, 9 F.3d at 235 (quoting *Permian*, 665 F.2d at 1220); *see also von Bulow*, 828 F.2d at 101 ("[I]t is the client's responsibility to insure continued confidentiality of his communications."); *Urban Box Office Network, Inc. v. Interfase Managers, L.P.*, No. 01-CV-8854 (LTS) (THK), 2004 WL 2375819, at *3 (S.D.N.Y. Oct. 21, 2004) ("A party which seeks to uphold the privilege must take affirmative measures to maintain the confidentiality of attorney-client communications." (collecting cases)). The first indication of any effort by John Doe to protect his privileged communications is on May 19, 2017, after the government had already obtained and imaged his computer hard drive. (*See* Dkt. 62-4, at ECF 5; *see also* Dkt. 90, at 3, 8–9.) On Friday, May 19, 2017, in an email to Special Agent Lockery, Massena noted that John Doe was "in the process of segregating any attorney correspondence that he may have on" the Hotmail account. (Dkt. 62-4, at ECF 5.) Evidently, as Massena testified, it was impossible at that point to segregate the emails, given that the government also had full access to John Doe's hard drive. (Dec. 17 Tr., at 56:14–57:1.) But rather than take any further steps to protect his privilege, John Doe simply authorized Massena to email Special Agent Lockery the password to the Hotmail account a few days later, on the following Monday. (Dkt. 62-4, at ECF 7.) Such conduct is inconsistent with preservation of the attorney-client privilege. *Cf. Horowitz*, 482 F.2d at 82 ("It is not asking too much to insist that if a client wishes to preserve the [attorney-client] privilege [when privileged documents are indiscriminately mingled with other documents], he must take some affirmative action to preserve confidentiality."). Then, in August 2017, John Doe, through Massena, authorized the government to speak with his immigration attorney, Weinrib.[7] (*See* Dkt. 90-3, at

---

[7] Massena's notes from an August 8, 2017 meeting between John Doe and the government indicate that there was a discussion at the meeting regarding waiver of privilege. (Dkt. 122, at ECF 4–5.) Although it is unclear how that discussion concluded, Massena's testimony makes

ECF 2–4; *see also* Dec. 17 Tr., at 85:5–18.) Furthermore, since 2017, John Doe has forwarded communications with his attorneys to third parties, including one of the AUSAs working on this case. (*See* Dkt. 66-1.) All of these circumstances compel the conclusion that John Doe has waived any privilege with respect to the materials on the hard drive and in the Hotmail account.

The Court agrees with Defendants that *United States v. Martoma*, No. 12-CR-973 (PGG) (S.D.N.Y. 2013), a case with similar facts to this one, is particularly instructive. In *Martoma*, as here, a cooperating witness voluntarily signed a consent-to-search form during a proffer session, permitting the government to make a forensic copy of his computer without any confidentiality agreement regarding privileged material. Oral Argument Transcript at 10:17–12:7, No. 12-CR-973 (S.D.N.Y. Dec. 20, 2013), ECF No. 193. The witness, through counsel, "repeatedly asserted privilege" and an "intent not to waive." *Id.* at 19:3–5. Yet, the court concluded that naked assertions of privilege held "little legal effect," and determined that the witness had waived any attorney-client and spousal privileges with respect to materials on the forensic copy. *Id.* at 32:5–24. Likewise here, by signing consent forms voluntarily permitting the government to search and retrieve material from his hard drive and Hotmail account, without any explicit confidentiality agreement at the time and no demonstrated or real effort to preserve the privilege thereafter, John Doe has waived his privilege.

---

clear that John Doe, through Massena, eventually authorized the government to speak with attorney Weinrib. (Dec. 17 Tr., at 85:5–18.) Moreover, Special Agent Lockery testified that she recalls no assertion of John Doe's privilege at the August 8, 2017 meeting, and her report of that meeting includes a description of John Doe's communications with his immigration attorney. (*Id.* at 148:10–149:8.) In any event, the Court concludes that John Doe waived his attorney-client privilege over the materials on the hard drive and in the Hotmail account by voluntarily signing the consent forms on April 27, 2017, without any explicit agreement to maintain the confidentiality of privileged material. The events of August 2017, if anything, only confirms such waiver.

The government resists this conclusion, arguing that it "has never understood" the consent forms signed by John Doe to serve as a waiver. (Dkt. 62, at 1; Dkt. 66, at 1.) The government also highlights the "effort on the part of both parties to the consent forms to avoid violating John Doe's privilege." (Dkt. 66, at 3; *see also* Dkt. 62, at 2–3.) The government's understanding and efforts, however, are not particularly relevant. John Doe is the only one who holds and may waive the privilege, *see von Bulow*, 828 F.2d at 100, and John Doe voluntarily disclosed privileged material to the government while at a proffer session without any confidentiality agreement (Dkt. 62-1, at ECF 6–7). Moreover, as already discussed, the Court does not find any demonstration of real effort on the part of John Doe to preserve his privilege following the April 27, 2017 proffer session. In particular, the belated and aborted attempt at segregating emails in May 2017, after the government had already imaged the hard drive, does not overcome all of the other factors pointing in favor of waiver, especially when considering the care with which the Court must construe the attorney-client privilege. *See Horowitz*, 482 F.2d at 81–82; *see also* Oral Argument Transcript at 32:11–14, *United States v. Martoma*, No. 12-CR-973 (S.D.N.Y. Dec. 20, 2013), ECF No. 193 ("Because [privileges] deprive the court of relevant information, the law requires that parties . . . jealously guard access to their privileged communications.").

In short, considering the consent forms that John Doe signed in 2017 voluntarily permitting the government to access his hard drive and Hotmail account, the lack of any explicit or written agreement at the time to keep privileged material confidential, and no showing of a genuine effort by John Doe since 2017 to preserve his privilege (and, indeed, conduct to the contrary), the Court finds that John Doe has waived his attorney-client privilege with respect to the materials on his Consulting Firm computer hard drive and in his Hotmail account. No one disputes that such materials are "material to preparing the defense." *See* Fed. R. Crim P. 16(a)(1)(E). Accordingly,

such materials "within the government's possession, custody, or control" that have been withheld on the basis of John Doe's privilege are discoverable and must be produced. *See id.*[8]

## CONCLUSION

For the foregoing reasons, Defendants' motion to compel production of potentially privileged material obtained from John Doe is granted. The government is directed to produce the materials at issue to Defendants, or make them available for inspection, within fourteen (14) days of the date of this order.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: December 29, 2020
Brooklyn, New York

---

[8] Though neither the government nor the defense focuses on this issue, the Court finds that any time restriction on the Hotmail account search (*see* Dkt. 62-1, at ECF 7; Dec. 17 Tr., at 52:25–53:24) has been effectively waived by John Doe. First, as confirmed by Massena at the December 17, 2020 evidentiary hearing, any restriction placed on the government's access to John Doe's Hotmail emails was rendered in effect meaningless, as it appears that the government has all of the emails from the Hotmail account, including emails beyond the one-year period in 2011. (*See* Dec. 17 Tr., at 62:18–22.) It also appears that the date restriction was eventually lifted to allow the government to review all of John Doe's Hotmail emails. (*See* Dkt. 62-4, at ECF 12.) Second, as with any attorney-client privilege, John Doe made no demonstrable effort after executing the Hotmail consent form to enforce or protect any temporal restriction on the government's access to the Hotmail material. For example, when Special Agent Lockery asked Massena for John Doe's Hotmail password, there was no re-invocation or reminder about any time limit on the government's access or search. (*See* Dkt. 62-4, at ECF 3–9.) Other than Massena's testimony at the hearing, there is no indication that this time restriction was anything more than an afterthought over the course of the government's investigation, and Massena did not reference this restriction in his December 16, 2020 letter asserting John Doe's attorney-client privilege as to the hard drive and Hotmail materials. Indeed, the only conclusion the Court can draw from the record is that this temporal restriction on John Doe's Hotmail materials has been almost entirely forgotten and largely ignored.