UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
UNITED STATES OF AMERICA,

    - against -

DONAL O'SULLIVAN, HELEN
O'SULLIVAN, and PADRAIG NAUGHTON,

                  Defendants.
------------------------------------------------------x

**MEMORANDUM & ORDER**
20-CR-272 (PKC)

PAMELA K. CHEN, United States District Judge:

      Defendants Donal O'Sullivan, Helen O'Sullivan, and Padraig Naughton are charged with conspiring to participate, and participating, in a multi-year scheme to avoid making required payroll contributions to certain benefits funds for union employees. They presently move to dismiss, in whole or in part, Counts Eight, Nine, Ten, and/or Eleven of the Indictment. (Dkt. 141.) Separately, the Government moves to be allowed to introduce certain evidence at trial as direct evidence of the charged crimes or, alternatively, as evidence of prior bad acts under Federal Rule of Evidence ("Rule") 404(b). (Dkt. 82.) As discussed below, both motions are granted in part and denied in part.

## BACKGROUND

      On July 29, 2020, a grand jury returned an indictment in this case. (Indictment, Dkt. 1.) According to the Indictment, Navillus Tile, Inc. d/b/a Navillus Contracting ("Navillus"), one of the largest construction companies in New York City, was a party to collective bargaining agreements ("CBAs") with several labor unions. (*Id.* ¶¶ 1–2.) Under these CBAs, Navillus was required to employ union members on construction projects and make periodic contributions to benefits funds for these employees (the "Benefits Funds") based on the number of hours worked

by the employees, accompanied by reports detailing each employee's number of hours worked (the "Remittance Reports").  (*Id.* ¶¶ 4–5.)

Defendants were all high-ranking employees at Navillus.  Donal O'Sullivan was the owner and President of the company and "controlled its overall operations."  (*Id.* ¶ 1.)  Helen O'Sullivan was "in charge of the payroll department and employee benefit matters" and, among other responsibilities, "processed payroll checks for Navillus's employees and submitted Remittance Reports and Navillus's accompanying monetary contributions to the Benefits Funds."  (*Id.* ¶ 6.)  Padraig Naughton was Navillus's comptroller and oversaw the accounting department.  (*Id.* ¶ 7.)

Between 2011 and 2017, Defendants allegedly "conspired to execute, and executed, a scheme to evade making" required contributions to the Benefits Funds.  (*Id.* ¶ 11.)  In particular, according to the Indictment, Defendants fraudulently funneled payroll funds through a consulting firm that was not a party to the CBAs (the "Consulting Firm") so that it appeared that Navillus employees performed work for, and were paid by, the Consulting Firm.  (*Id.* ¶¶ 12–13.)  In turn, the Consulting Firm allegedly issued false invoices to Navillus to make it appear that the payroll funds were payments for "masonry" and "consulting" work that the Consulting Firm had performed for Navillus.  (*Id.* ¶ 13.)  Defendants also allegedly submitted "one or more false Remittance Reports" to the Benefits Funds that failed to disclose certain employees as having performed work covered under the CBAs.  (*See id.* ¶¶ 31–32, 34.)

The Indictment charges Defendants with eleven violations of federal law.  Count One of the Indictment charges conspiracy under 18 U.S.C. § 1349 to commit mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.  (*Id.* ¶¶ 17–18.)  Counts Two through Seven charge several substantive acts of mail fraud and wire fraud under 18 U.S.C. §§ 1341 and 1343.  (*Id.* ¶¶ 19–24.)  Count Eight charges conspiracy under 18 U.S.C. § 371 to embezzle or steal from

employee benefit funds in violation of 18 U.S.C. § 664. (*Id.* ¶¶ 25–27.) Count Nine charges a substantive violation of 18 U.S.C. § 664. (*Id.* ¶¶ 28–29.) Count Ten charges conspiracy under 18 U.S.C. § 371 to submit false remittance reports in violation of 18 U.S.C. § 1027. (*Id.* ¶¶ 30–32.) Finally, Count Eleven charges a substantive violation of 18 U.S.C. § 1027. (*Id.* ¶¶ 33–34.)

## DISCUSSION

### I.    Defendants' Partial Motion to Dismiss the Indictment

Defendants advance three grounds in support of their motion to dismiss, in whole or in part, Counts Eight, Nine, Ten and/or Eleven of the Indictment. (Defendants' Memorandum of Law in Support of Motion to Dismiss ("Defs.' MTD"), Dkt. 141-1, at 1–2.) First, Defendants argue that Counts Eight and Nine should be dismissed entirely as not legally cognizable, because the terms of 18 U.S.C. § 664 do not reach the alleged conduct in those counts, which respectively charge a conspiracy to violate 18 U.S.C. § 664 and an actual violation of 18 U.S.C. § 664. (*Id.* at 1, 4–8.) Second, Defendants argue that if Count Eight is not dismissed, the embezzlement conspiracy charged in Count Eight and the false-remittance-report conspiracy charged in Count Ten are multiplicitous, and the Government should be required to elect one to dismiss before trial. (*Id.* at 1–2, 8–12.) Third, Defendants argue that both Count Nine, which charges a violation of 18 U.S.C. § 664, and Count Eleven, which charges a violation of 18 U.S.C. § 1027, must be partially dismissed to the extent that they charge conduct outside of the five-year statute of limitations period, *i.e.*, prior to July 29, 2015. (*Id.* at 2, 12–16.) The Government concedes that part of Count Nine should be dismissed as time-barred, but otherwise opposes Defendants' motion. (Government's Memorandum of Law in Opposition to Motion to Dismiss ("Gov.'s MTD Opp."), Dkt. 145, at 1.)

For the reasons set forth below, except as to the pre-July 29, 2015 conduct charged in Counts Nine and Eleven, Defendants' motion is denied.

## A.    Legal Standard

Rule 12 of the Federal Rules of Criminal Procedure "authorizes defendants to challenge the lawfulness of a prosecution on purely legal, as opposed to factual, grounds." *United States v. Benitez-Dominguez*, 440 F. Supp. 3d 202, 205 (E.D.N.Y. 2020) (quoting *United States v. Ahmed*, 94 F. Supp. 3d 394, 404 (E.D.N.Y. 2015)).  "A defendant faces a high standard in seeking to dismiss an indictment, because an indictment need provide the defendant only a plain, concise, and definite written statement of the essential facts constituting the offense charged." *United States v. Taveras*, No. 20-CR-240 (PAE), —F. Supp. 3d—, 2020 WL 7059493, at *3 (S.D.N.Y. Dec. 2, 2020) (quoting *United States v. Smith*, 985 F. Supp. 2d 547, 561 (S.D.N.Y. 2014)); *see also United States v. Nunez*, 375 F. Supp. 3d 232, 238 (E.D.N.Y. 2018) ("[A]n indictment . . . need not be perfect, and common sense and reason are more important than technicalities." (quoting *United States v. De La Pava*, 268 F.3d 157, 162 (2d Cir. 2001))).  Nevertheless, "[a] charge in an indictment is insufficient and must be dismissed when it does not describe conduct that is a violation of the criminal statute charged." *Benitez-Dominguez*, 440 F. Supp. 3d at 205 (citations omitted); *see also United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012) ("Since federal crimes are solely creatures of statute, a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute." (internal quotation marks and citations omitted)).

In evaluating a motion to dismiss the indictment, "[a] court must accept the facts alleged in the indictment as true and determine only whether the indictment is valid on its face." *Nunez*, 375 F. Supp. 3d at 238 (internal quotation marks and alterations omitted) (quoting *United States v. Brooks*, No. 06-CR-550 (JS), 2009 WL 3644122, at *2 (E.D.N.Y. Oct. 27, 2009)).

## B.  Government's Theory Under 18 U.S.C. § 664

Section 664 of Title 18 of the United States Code provides:

> Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith, shall be fined under this title, or imprisoned not more than five years, or both.

18 U.S.C. § 664.  The term "employee welfare benefit plan or employee pension benefit plan" is defined as "any employee benefit plan subject to any provision of title I of the Employee Retirement Income Security Act of 1974 [*i.e.*, ERISA]."  *Id.*  As the parties agree, the Second Circuit's decision in *Rahm v. Halpin* (*In re Halpin*), 566 F.3d 286, 287, 290–91 (2d Cir. 2009), dictates that, in general, employer contributions to an ERISA employee benefit plan are not "assets" of the plan until they are actually paid.[1]  (*See* Defs.' MTD, Dkt. 141-1, at 5; Gov.'s MTD Opp., Dkt. 145, at 7.)  Accordingly, because unpaid employer contributions generally are not "assets" of an ERISA benefits plan, the charge in Counts Eight and Nine of the Indictment is that Defendants conspired to, and did in fact, "embezzle, steal and unlawfully and willfully abstract and convert . . . the *right to collect monies* owed to the Benefits Funds," not any actual monies.  (*See* Indictment, Dkt. 1, ¶¶ 26, 29 (emphasis added).)  Defendants argue that a "right to collect" benefits payments cannot be an object of a charge under 18 U.S.C. § 664—that is, it is legally impossible to "embezzle," "steal," "abstract," or "convert" a *right to collect* payments within the meaning of the statute—and therefore, Counts Eight and Nine of the Indictment must be dismissed.  (Defs.' MTD, Dkt. 141-1, at 1, 4–8.)

---

[1]  The exception to the general rule is if relevant plan documents provide otherwise.  *See Halpin*, 566 F.3d at 287, 290–91.  There is no indication that any plan document here provides that unpaid employer contributions are assets of the Benefits Funds.

The Court is not persuaded by Defendants' argument. To start, the Second Circuit has at least implicitly endorsed the Government's charging theory under 18 U.S.C. § 664. In *United States v. LaBarbara*, 129 F.3d 81, 88 (2d Cir. 1997), the Second Circuit affirmed the conviction of the defendant, LaBarbara, for aiding and abetting a violation of 18 U.S.C. § 664. There, as here, an employer, Strathmore Concrete Company ("Strathmore"), whose owner was one Al Barone, was a party to CBAs that obligated it to make contributions to various union benefits funds. 129 F.3d at 83. Barone, however, used a second company that was not a party to the CBAs, Ju-Lin Building Corporation ("Ju-Lin"), to pay employees for all hours worked over thirty, so that Strathmore avoided making contributions to the benefits funds for those hours. *Id.* To secure the union's cooperation in this scheme, Barone agreed to pay defendant LaBarbara, the principal officer of the union. *See id.* at 82–83. In affirming LaBarbara's conviction for aiding and abetting a violation of 18 U.S.C. § 664, the Second Circuit concluded that "[o]nce wages were paid to [union] members, Strathmore had contractual obligations to the [benefits] [f]unds that constituted 'assets' of the [f]unds by any common definition." *Id.* at 88. The Second Circuit accordingly held that "LaBarbara's acquiescence in the use of Ju-Lin as a vehicle to *convert* those assets to Barone and to conceal Strathmore's contractual obligations aided or abetted a violation of Section 664." *Id.* (emphasis added).

By affirming LaBarbara's aiding-and-abetting conviction, the Second Circuit necessarily concluded that there was a violation of 18 U.S.C. § 664. *See United States v. Best*, 219 F.3d 192, 199 (2d Cir. 2000) ("To convict a defendant on a theory of aiding and abetting, the government must prove that the underlying crime was committed by a person other than the defendant and that the defendant acted—or failed to act in a way that the law required him to act—with the specific purpose of bringing about the underlying crime." (collecting cases)). Indeed, the Tenth Circuit

has said that the Second Circuit in *LaBarbara* "held that the defendant's concealment of the plan's contractual right aided and abetted Strathmore's *conversion* of plan assets." *United States v. Smith*, 641 F.3d 1200, 1206 (10th Cir. 2011) (emphasis altered) (citing *LaBarbara*, 129 F.3d at 88). In other words, an employer's intentional and fraudulent use of another company to avoid its obligation to make contributions to an ERISA benefits fund can constitute a conversion of the fund's contractual rights that violates 18 U.S.C. § 664. This is precisely the Government's prosecution theory with respect to Navillus and Defendants in this case. (*See* Indictment, Dkt. 1, ¶¶ 12–13, 25–29; *see also* Gov.'s MTD Opp., Dkt. 145, at 5 ("[Defendants'] alleged conduct here is the same as that of the employer company in *LaBarbara*.").)

Even if *LaBarbara* does not foreclose Defendants' argument, the Court independently concludes, as a matter of statutory interpretation, that the terms of 18 U.S.C. § 664 encompass the allegations in Counts Eight and Nine of the Indictment that Defendants conspired to, and did, embezzle, steal, or unlawfully and willfully abstract or convert a "right to collect monies owed to the Benefits Funds." (*See* Indictment, Dkt. 1, ¶¶ 26, 29.) In interpreting the terms of the statute, the Court begins, as it must, "with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Aleynikov*, 676 F.3d at 76 (quoting *United States v. Albertini*, 472 U.S. 675, 680 (1985)).

As noted, Section 664 punishes "[a]ny person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any [employee benefit plan under ERISA]." 18 U.S.C. § 664. The parties focus on the term "converts," and whether that term can apply to a "right to collect monies." (*See* Gov.'s MTD Opp., Dkt. 145, at 5–12; Defendants' Reply in Support of Motion to Dismiss ("Defs.' MTD Reply"), Dkt. 146, at 2–4.)

Conversion, as used in criminal and tort law, is "an act or series of acts of willful interference, without lawful justification, with an item of property in a manner inconsistent with another's right, whereby that other person is deprived of the use and possession of the property." Black's Law Dictionary (11th ed. 2019). Although conversion traditionally applied only to tangible property, it is generally recognized that conversion has evolved to include conduct that substantially interferes with or prevents the exercise of intangible rights. *See* Restatement (Second) of Torts § 242(2) (1965) ("One who effectively prevents the exercise of intangible rights of the kind customarily merged in a document is subject to liability similar to that for conversion, even though the document is not itself converted."); *see also Pearson v. Dodd*, 410 F.2d 701, 707 n.34 (D.C. Cir. 1969) (noting that the modern rule is that "any intangible generally protected as personal property may be the subject matter of a suit for conversion"). The Supreme Court and the Second Circuit, moreover, have broadly construed the crime of conversion in federal theft statutes. *See Morissette v. United States*, 342 U.S. 246, 272 (1952) ("Conversion may include misuse or abuse of property. It may reach use in an unauthorized manner or to an unauthorized extent of property placed in one's custody for limited use."); *United States v. Girard*, 601 F.2d 69, 71 (2d Cir. 1979) ("[C]onversion is the 'misuse or abuse of property' or its use 'in an unauthorized manner'[.]" (quoting *Morissette*, 342 U.S. at 272)[2]; *see also United States v. Van Elsen*, 652 F.3d 955, 961 (8th Cir. 2011) ("The Supreme Court . . . broadly construe[s] Congress's use in a federal theft statute of the word 'conversion'[.]"). Under the broad reading of "conversion" that Congress

---

[2] *Morissette* and *Girard* were cases specifically involving 18 U.S.C. § 641, not § 664. *See Morissette*, 342 U.S. at 248; *Girard*, 601 F.2d at 70. Section 641, however, shares very similar wording with Section 664—punishing "[w]hoever embezzles, steals, purloins, or knowingly converts to his use or the use of another" any federal government property—and, notably, is situated at the beginning of the chapter of the United States Code where Section 664 also resides. *Compare* 18 U.S.C. § 641, *with* 18 U.S.C. § 664.

intended, Defendants' allegedly intentional and concrete efforts to substantially interfere with the exercise of the Benefits Funds' rights to collect certain contractually owed employer contributions can constitute a willful conversion within the meaning of 18 U.S.C. § 664.

The language of § 664, when read as a whole, reinforces the conclusion that Defendants' alleged conduct here falls within the statute's ambit. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000) ("The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." (citing *Brown v. Gardner*, 513 U.S. 115, 118 (1994))); *see also Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1481 (2021) ("[C]ontext matters."). Section 664 prohibits a range of ways in which a person may wrongfully take or substantially interfere with the assets of an ERISA benefits plan; it punishes "[a]ny person who embezzles, steals, or unlawfully and willfully abstracts or converts" such assets. 18 U.S.C. § 664. In drafting the statute in this way, Congress was aware of the "surfeit of cases drawing fine distinctions between slightly different circumstances under which one may obtain wrongful advantages from another's property," and Congress therefore wanted to draft a statute "to reach all such instances" and "to avoid gaps and loopholes between offenses." *Morissette*, 342 U.S. at 271–73; *see also United States v. Andreen*, 628 F.2d 1236, 1240–41 (9th Cir. 1980) (relying on *Morissette* in interpreting 18 U.S.C. § 664). Indeed, the history of a closely related and similarly worded theft statute, 18 U.S.C. § 641, *see supra* note 2, suggests that 18 U.S.C. § 664 was meant to apply not only to acts constituting larceny or embezzlement at common law but also to "acts which shade into those crimes but which, most strictly considered, might not be found to fit their fixed definitions." *Morissette*, 342 U.S. at 266 n.28.

In addition to reaching a wide range of theft-like acts, 18 U.S.C. § 664 by its terms protects a wide range of "assets," both tangible and intangible, including "moneys," "funds," "securities,"

"premiums," "credits," "property," and "other assets." *See* 18 U.S.C. § 664. There is no dispute in this case that the "right to collect monies owed to the Benefits Funds" (Indictment, Dkt. 1, ¶¶ 26, 29) qualifies as an asset under § 664, although Defendants appear to consider it in the nebulous category of "other assets" (*see* Defs.' MTD, Dkt. 141-1, at 4–6). In fact, the Funds' right to collect—and Defendants' concomitant obligation to remit contributions—comfortably falls within the category of "credits." *See Propper v. Clark*, 337 U.S. 472, 480 (1949) (stating that the "ordinary meaning" of "credit" is "the obligation due on accounting between parties to transactions"); *Robinson v. United States*, 30 F.2d 25, 28 (6th Cir. 1929) (stating that the term "credits" in a statute prohibiting willful misapplication of bank funds "refers to obligations or debts of others to the bank"); *cf. LaBarbara*, 129 F.3d at 88 (observing that an accounting audit of a benefits fund certainly would have to include an employer's fixed obligations to remit contributions as assets).[3] Here, the Indictment alleges that Defendants intentionally devised a scheme to make it appear as if certain Navillus employees worked for and were paid by a different firm, thereby actively depriving the Benefits Funds of their ability to exercise their rights to collect contributions with respect to those employees' wages. (*See* Indictment, Dkt. 1, ¶¶ 11–16.) Such conduct fits within the ambit of a statue whose terms broadly reach "[a]ny person who embezzles, steals, or unlawfully and willfully abstracts or converts . . . any of the moneys, funds, securities,

---

[3] The Court notes that the common law has long recognized that a defendant may convert "credits" by actively preventing the owner from collecting upon them. *See Plunkett-Jarrell Grocery Co. v. Terry*, 263 S.W.2d 229, 233–34 (Ark. 1953) (holding that defendants converted plaintiff's accounts receivables by depriving plaintiff of the records required to collect upon them); *see also Pioneer Com. Funding Corp. v. United Airlines, Inc.*, 122 B.R. 871, 884–85 (Bankr. S.D.N.Y. 1991) (concluding that, where the defendant "kept the funds it allegedly was required to transfer," the plaintiff was not simply alleging the failure to satisfy a debt but rather had a viable claim of "conversion of funds represented by accounts receivable").

10

premiums, credits, property, or other assets of any [ERISA employee benefit plan]." *See* 18 U.S.C. § 664.

Finally, the Court notes that 18 U.S.C. § 664 "plainly evinces an intent broadly to protect the wealth of employee welfare benefit plans." *United States v. Panepinto*, 818 F. Supp. 48, 50 (E.D.N.Y. 1993); *see also United States v. Santiago*, 528 F.2d 1130, 1133 (2d Cir. 1976) ("The legislative history of § 664 clearly indicates that its intended purpose was to preserve welfare funds for the protection of those entitled to their benefits." (citing H.R. Rep. No. 87-998 (1961), *as reprinted in* 1962 U.S.C.C.A.N. 1532)). Defendants' interpretation of the statute would lead to the "anomalous result" whereby employers who take funds directly from benefits plans are punished, but employers who actively and fraudulently divert or prevent funds from reaching such plans are not. *See Panepinto*, 818 F. Supp. at 50. The imperative to avoid this "anomalous result" further buttresses the Court's conclusion that the terms of the statute reach the present allegations in the Indictment.

Defendants resist this conclusion by casting the alleged conduct as "concealment" of the Benefits Funds' right to collect contributions and arguing that the statute by its terms does not reach "concealment." (*See* Defs.' MTD, Dkt. 141-1, at 6–7.) Defendants argue, pointing to 18 U.S.C. § 641, that Congress knows how to criminalize concealment explicitly, and therefore, because 18 U.S.C. § 664 does not explicitly include concealment, the statute cannot reach the conduct alleged in the Indictment. (*Id.* at 7.) The Court disagrees with Defendants' reading of 18 U.S.C. § 641 in relation to 18 U.S.C. § 664. As noted above, *supra* note 2, § 641—using similar language to § 664—punishes "[w]hoever embezzles, steals, purloins, or knowingly converts to his use or the use of another" any property of the Federal Government. The statute then goes on, in a second paragraph, to punish a separate group of wrongdoers—"[w]hoever receives, conceals, or

retains the same with intent to convert it to his own use or gain, knowing it to have been embezzled, stolen, purloined or converted." 18 U.S.C. § 641; *see also United States v. Fairley*, 880 F.3d 198, 204–05 (5th Cir. 2018) (noting that the second paragraph of § 641 was "intended to reach a new group of wrongdoers," *i.e.*, those "knowingly receiving stolen United States property" (citations omitted)). Given that the part of § 641 that explicitly includes the term "conceals" is aimed at those receiving stolen property, § 641 says little about the absence of the term "conceals" from § 664, which covers the initial act of stealing from ERISA benefits funds. Notably, the analogous part of § 641—the part that punishes stealing from the United States—does not include the term "conceals." *Compare* 18 U.S.C. § 641, *with* 18 U.S.C. § 664. To the extent § 641 says anything about concealment, it suggests that concealment is not entirely distinct from conversion and that conversion may be accomplished by concealment. Indeed, it would be odd for § 641 to reach "[w]hoever . . . conceals . . . with intent to convert" if there could be no overlap between concealment and conversion. *See* 18 U.S.C. § 641. Thus, if anything, § 641 indicates that some acts of concealment may constitute conversion. The conduct alleged in the Indictment is one such instance.

Defendants' reliance on the Tenth Circuit's decision in *United States v. Smith*, 641 F.3d 1200, 1206 (10th Cir. 2011), is similarly unavailing. (*See* Defs.' MTD, Dkt. 141-1, at 6–7; Defs.' MTD Reply, Dkt. 146, at 3–4.) In *Smith*, the Tenth Circuit rejected an argument—made by the Government to a sufficiency-of-the-evidence challenge—that "implicitly equate[d] 'concealment' or 'defeat' with embezzlement, theft, abstraction or conversion" under 18 U.S.C. § 664. 641 F.3d at 1205–06. The evidence adduced at trial as to the defendant's conduct in *Smith*, however, is significantly different from Defendants' alleged conduct in this case. Unlike here, the employer in *Smith*, a non-profit organization that received state and federal funds, was not under any CBA

that obligated contributions to a benefits fund; rather, the employer had a profit-sharing plan where the employer's board of directors decided on an annual basis whether to contribute to the plan. *Id.* at 1202. The contributions at issue in *Smith* were approved by the board, but they were never made because the organization did not receive funds it had been expecting from the state government. *Id.* As the evidence showed, checks were made out to the profit-sharing plan during each of the relevant fiscal years, but the defendant directed that the checks be held until there were adequate funds to cover them. *Id.* When the expected funds did not materialize by the end of the fiscal year, the defendant had the checks voided, "so that it did not appear as an outstanding obligation in an audit," and had new checks written the following fiscal year. *Id.* at 1202–03. The defendant never informed the board that the plan contributions were not made, but he did notify the board of "cash-flow issues." *Id.* at 1203. In short, as the *Smith* defendant successfully argued on appeal, "the evidence showed only that there was insufficient money to fund the plan." *Id.* at 1205.

The allegations in this case are plainly different. According to the Indictment, Defendants actively devised a fraudulent scheme to funnel payroll funds through the Consulting Firm and make it appear as if Navillus employees performed work for, and were paid by, the Consulting Firm, not Navillus. (*See* Indictment, Dkt. 1, ¶¶ 11–16.) Such alleged conduct is materially different from the conduct of the defendant in *Smith*, and much more akin to the conduct of Strathmore, the employer in *LaBarbara*. *See Smith*, 641 F.3d at 1202–03; *LaBarbara*, 129 F.3d at 83. As already discussed, and as the Tenth Circuit in *Smith* even recognized, the Second Circuit in *LaBarbara* necessarily concluded that Strathmore's conduct constituted conversion within the meaning of 18 U.S.C. § 664. *See supra*; *Smith*, 641 F.3d at 1206 ("[The Second Circuit] held that [LaBarbara]'s concealment of the plan's contractual right aided and abetted Strathmore's *conversion* of plan assets." (emphasis altered) (citing *LaBarbara*, 129 F.3d at 88)).

Finally, and perhaps more fundamentally, Defendants' "concealment" argument is largely a red herring to the extent it is based on *Defendants'* characterization of the Government's theory of liability under 18 U.S.C. § 664 as one of concealment, when, in fact, the Government argues that Defendants violated 18 U.S.C. § 664 by "convert[ing]" the unions' rights to collect benefits funds. (*See* Indictment, Dkt. 1, ¶¶ 26, 29.) As discussed, conversion is conduct specifically proscribed by the statute.

In sum, Second Circuit precedent supports the Government's prosecution theory with respect to Counts Eight and Nine, and in any event, the Court concludes, as a matter of statutory interpretation, that 18 U.S.C. § 664 encompasses the alleged conduct relating to those counts. Defendants' motion to dismiss Counts Eight and Nine as incognizable is accordingly denied.

## C. Multiplicity of Counts Eight and Ten

Defendants argue that Count Eight, which charges a conspiracy under 18 U.S.C. § 371 to violate 18 U.S.C. § 664, and Count Ten, which charges a conspiracy under 18 U.S.C. § 371 to submit false remittance reports in violation of 18 U.S.C. § 1027, are multiplicitous. (*See* Defs.' MTD, Dkt. 141-1, at 8–12.) Defendants contend that the Government must elect one count to dismiss before trial. (*Id.* at 12; *see also* Defs.' MTD Reply, Dkt. 146, at 4–8.)

"An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999). The reason for dismissing multiplicitous counts from an indictment is that the Double Jeopardy Clause of the Fifth Amendment "protects against both multiple punishments and successive prosecutions for the same offense, regardless of whether a first prosecution resulted in conviction or acquittal." *See United States v. Basciano*, 599 F.3d 184, 196 (2d Cir. 2010). But "[w]here there has been no prior conviction or acquittal, the Double Jeopardy Clause does not protect against simultaneous prosecutions for the same offense,

so long as no more than one punishment is eventually imposed." *United States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006) (per curiam). Indeed, in *Josephberg*, the Second Circuit reversed the pre-trial dismissal of a potentially multiplicitous count from a 17-count indictment, holding that dismissal "was at best premature." *See id.* at 355–56.

This is not to say that a district court can never dismiss multiplicitous counts prior to trial. "[I]f an indictment is multiplicitous on its face, then the multiplicitous count(s) should be dismissed pre-trial." *United States v. Miller*, 26 F. Supp. 2d 415, 422 (N.D.N.Y. 1998) (citing *United States v. Reed*, 639 F.2d 896, 904 (2d Cir. 1981)); *see also Reed*, 639 F.2d at 904 n.6 (noting that "[a]n indictment that is multiplicitous is not fatal and does not require dismissal," but that the trial court has the discretion to require the prosecution to elect among multiplicitous counts, particularly "when the mere making of the charges would prejudice the defendant with the jury"). At the same time, "[w]hether an aggregate of acts constitute a single course of conduct and therefore a single offense, or more than one, may not be capable of ascertainment merely from the bare allegations of an information and may have to await the trial on the facts." *Miller*, 26 F. Supp. 2d at 422–23 (quoting *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 224 (1952)). Where multiple conspiracies are charged, "the question of whether the evidence shows a single conspiracy or more than one conspiracy is often not determinable as a matter of law or subject to bright-line formulations." *United States v. Jones*, 482 F.3d 60, 72 (2d Cir. 2006); *see also United States v. Robinson*, No. 16-CR-545 (ADS) (AYS), 2017 WL 5135598, at *8 (E.D.N.Y. Nov. 1, 2017) (concluding that whether the defendant engaged in multiple conspiracies to rob different individuals was "a question of fact properly submitted to a jury").

Here, it is not clear from the face of the Indictment that Counts Eight and Ten are multiplicitous. Although both counts reference the general conspiracy statute, 18 U.S.C. § 371,

Count Eight on its face charges a conspiracy to steal or convert assets of the Benefits Funds in violation of 18 U.S.C. § 664, whereas Count Ten on its face charges a conspiracy to submit false remittance reports in violation of 18 U.S.C. § 1027. (*See* Indictment, Dkt. 1, ¶¶ 26, 31.) Additionally, the alleged overt acts in Count Eight involve the issuance of a number of checks from Navillus to the Consulting Firm, whereas the alleged overt acts in Count Ten include the submission of several allegedly false remittance reports to the Benefits Funds. (*See id.* ¶¶ 27, 32.) This is, moreover, not a case where "the mere making" of the charges themselves would prejudice Defendants with the jury, given that Defendants are also charged with substantive violations of 18 U.S.C. § 664 and 18 U.S.C. § 1027, which means that all of the same evidence likely will be introduced at trial even if either conspiracy charge in Count Eight or Ten is dismissed. *See Reed*, 639 F.2d at 904 n.6. Thus, the Court does not find it appropriate to exercise its discretion and require the Government to elect between Counts Eight and Ten prior to trial.

Defendants' motion to dismiss Count Eight or Count Ten as multiplicitous is denied without prejudice to renewal after trial.

### D. Statute of Limitations as to Count Eleven

Defendants argue that Counts Nine and Eleven must be dismissed to the extent that they charge conduct that occurred outside the five-year statute of limitations, *i.e.*, prior to July 29, 2015. (*See* Defs.' MTD, Dkt. 141-1, at 12–16.) The Government does not oppose dismissing the conduct charged in Count Nine that preceded July 29, 2015. (Gov.'s Opp., Dkt. 145, at 1.) But the Government does object to dismissing as time-barred any part of Count Eleven, which charges Defendants with submitting false Remittance Reports in violation of 18 U.S.C. § 1027. (*See id.* at 1; *see also* Indictment, Dkt. 1, ¶ 34.) The Government argues that 18 U.S.C. § 1027 criminalizes concealment of facts, and therefore is a "continuing" offense. (*See* Gov.'s Opp., Dkt. 145, at 20–21.)

In general, a five-year statute of limitations applies to noncapital federal offenses such as the one charged in Count Eleven. *See* 18 U.S.C. § 3282(a); *United States v. Eppolito*, 543 F.3d 25, 46 (2d Cir. 2008). This limitations period begins to run when the offense is "complete," which "depends largely on the nature of the crime." *Eppolito*, 543 F.3d at 46 (internal quotation marks and citations omitted). Some offenses are "continuing" offenses—that is, they "involve[] a prolonged course of conduct," such that their "commission is not complete until the conduct has run its course." *United States v. Rivera-Ventura*, 72 F.3d 277, 281 (2d Cir. 1995) (citations omitted). The doctrine of continuing offenses, however, "should be applied in only limited circumstances," namely when: (1) "the explicit language of the substantive criminal statute compels such a conclusion"; or (2) "the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." *Toussie v. United States*, 397 U.S. 112, 115 (1970); *accord Rivera-Ventura*, 72 F.3d at 281. Conspiracy, for example, "is generally a continuing crime." *Eppolito*, 543 F.3d at 47 (citing *Toussie*, 397 U.S. at 122; *United States v. Kissel*, 218 U.S. 601, 607–08 (1910)).

Count Eleven does not charge a continuing offense. The statutory provision on which Count Eleven is based, 18 U.S.C. § 1027, states:

> Whoever, in any document required by [ERISA] to be published, or kept as part of the records of any employee welfare benefit plan or employee pension benefit plan, or certified to the administrator of any such plan, makes any false statement or representation of fact, knowing it to be false, or knowingly conceals, covers up, or fails to disclose any fact the disclosure of which is required by such title or is necessary to verify, explain, clarify or check for accuracy and completeness any report required by such title to be published or any information required by such title to be certified, shall be fined under this title, or imprisoned not more than five years, or both.

18 U.S.C. § 1027. In short, the statute punishes anyone who knowingly makes a false statement, or knowingly fails to disclose material facts, "in any document" required by ERISA. *See id.* Nothing in the explicit language of the statute compels the conclusion that 18 U.S.C. § 1027 is a

continuing offense. *See Toussie*, 397 U.S. at 115; *cf. United States v. Stein*, 233 F.3d 6, 18 (1st Cir. 2000) (citing, *inter alia*, *Sultan v. United States*, 249 F.2d 385, 386 (5th Cir. 1957)) (concluding that bankruptcy fraud under 18 U.S.C. § 152 is a continuing offense because 18 U.S.C. § 3284 expressly provides that bankruptcy concealment is a continuing offense).

Nor is the nature of the offense involved in 18 U.S.C. § 1027 "such that Congress must assuredly have intended that it be treated as a continuing one." *See Toussie*, 397 U.S. at 115. Although the Government argues that 18 U.S.C. § 1027 is a continuing offense because it criminalizes concealment, any such concealment is necessarily linked to the discrete act of submitting a "document," and is necessarily done in connection with a required "disclosure." *See* 18 U.S.C. § 1027 ("Whoever, in any document required by [ERISA] . . . makes any false statement or representation of fact, knowing it to be false, or knowingly conceals, covers up, or fails to disclose any fact the disclosure of which is required by [ERISA] or is necessary to verify, explain, clarify or check for accuracy and completeness any report required by [ERISA] . . . , shall be [punished].").

A comparison with a similar, but broader, provision at 18 U.S.C. § 1001(a) is instructive. That provision punishes anyone who, in connection with a matter within the jurisdiction of the United States government, knowingly and willfully

> (1) falsifies, conceals, or covers up by trick, scheme, or device a material fact;
>
> (2) makes any materially false, fictitious, or fraudulent statement or representation; or
>
> (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry[.]

18 U.S.C. § 1001(a). In *United States v. Dunne*, 324 F.3d 1158, 1165–66 (10th Cir. 2003), the Tenth Circuit held that offenses under this provision are not continuing offenses for purposes of the statute of limitations. As the Tenth Circuit explained, 18 U.S.C. § 1001(a) does not "'clearly

contemplate[] a prolonged course of conduct,'" but rather "contemplates a single act even though there may be continuing effects." *Dunne*, 324 F.3d at 1165 (alteration in original) (quoting *Toussie*, 397 U.S. at 120). The same is true of 18 U.S.C. § 1027.[4] Furthermore, as the Tenth Circuit reasoned in *Dunne*, this Court too finds that "[t]he ability of the government . . . to learn of a particular offense is not a relevant factor under the *Toussie* analysis." *Id.*

The Government points to a couple of cases holding that concealment of information affecting Social Security benefits is a continuing offense. (*See* Gov.'s Opp., Dkt. 145, at 20–21 (citing *United States v. Henrikson*, 191 F. Supp. 3d 999, 1005 (D.S.D. 2016), and *United States v. Lundahl*, 2020 WL 4720046, at *3 (D.S.D. Apr. 15, 2020)).) These cases are unavailing because they involve offenses substantially different in nature from the one here. Specifically, the provisions of the Social Security Act at issue in the Government's cited cases prohibit individuals with knowledge of information that affects their "initial or continued right" to Social Security benefits from concealing or failing to disclose such information with an intent to fraudulently receive undue payments. *See* 42 U.S.C. § 408(a)(4) (provision relating to Social Security Disability Insurance Benefits); *id.* § 1383a(a)(3) (similar provision relating to Supplemental Security Income). In other words, those statutes expressly link concealment with a claimant's *continuing* right to benefits while also not linking such concealment necessarily to the discrete act of submitting a "document," as is the case with the statute here.

---

[4] The D.C. Circuit has held, post-*Toussie*, that an offense charged under the "conceals . . . by . . . scheme" clause of 18 U.S.C. § 1001(a)(1) is a continuing offense. *United States v. Hubbell*, 177 F.3d 11, 13 (D.C. Cir. 1999) (per curiam) (citing *Bramblett v. United States*, 231 F.2d 489, 491 (D.C. Cir. 1956)). According to the D.C. Circuit, concealment by scheme is "a situation comparable to some conspiracies in the sense that the scheme continue[s] over a period of time, as conspiracies often do." *Bramblett*, 231 F.2d at 491. Section 1027, however, has no analogous "conceal by scheme" clause. *Compare* 18 U.S.C. § 1027, *with* 18 U.S.C. § 1001(a).

Accordingly, the Court finds that the offense stated in 18 U.S.C. § 1027 is not a continuing offense, and dismisses as time-barred the portions of Counts Nine and Eleven that charge conduct prior to July 29, 2015.

## II. Government's Motion to Admit Evidence

On November 23, 2020, in response to the Court's directive to identify any Rule 404(b) material that it possessed or of which it was aware, the Government filed a motion to admit certain "other acts" evidence as direct evidence of the alleged crimes or, alternatively, as Rule 404(b) evidence. (*See* 10/23/2020 Minute Entry; Government's Memorandum of Law in Support of Motion to Admit Certain Evidence ("Gov.'s 404(b) Mot."), Dkt. 82.) In particular, the Government sought to admit (1) evidence that starting in or about December 2016 Helen O'Sullivan paid Navillus employees using checks drawn on accounts in her name, and (2) evidence relating to Navillus's use of purported alter-ego companies to avoid making union contributions, which was the subject of recent civil litigation in the United States District Court for the Southern District of New York.[5] (Gov.'s 404(b) Mot., Dkt. 82, at 8–17; *see also* Government's Reply in

---

[5] Defendants Donal O'Sullivan and Helen O'Sullivan, along with others, were named as defendants in a pair of consolidated civil cases brought by the trustees of several union benefits funds alleging that Navillus set up alter-ego companies to avoid making required contributions to the funds. *Moore v. Navillus Tile, Inc.*, No. 14-CV-8326 (CM) (JLC) (S.D.N.Y. filed Oct. 17, 2014); *Gesualdi v. Navillus Tile, Inc.*, No. 15-CV-8441 (CM) (JLC) (S.D.N.Y. filed Oct. 27, 2015). Following a bench trial that spanned two weeks in August 2017, the Honorable Colleen McMahon issued a verdict awarding over $70 million in damages. *See* 276 F. Supp. 3d 110, 166–67 (S.D.N.Y. 2017), *vacated on remand*, 2018 WL 7048697, at *1 (S.D.N.Y. Oct. 26, 2018); *see also* Docket Minute Entries for 8/7/2017–8/21/2017. While the verdict was on appeal to the Second Circuit, the parties reached a settlement agreement, and Judge McMahon's verdict was ultimately vacated so that the parties could consummate the settlement agreement. *See* 2018 WL 7048697, at *1; *see also* Order Declaring Intention to Vacate Judgment, *Moore v. Navillus Tile, Inc.*, No. 14-CV-8326 (CM) (JLC) (S.D.N.Y. Aug. 16, 2018), ECF No. 341. The Government has made clear that it does not seek to introduce Judge McMahon's vacated decision or findings in *Moore* and *Gesualdi*. (Gov.'s 404(b) Reply, Dkt. 140, at 3.)

Further Support of Motion to Admit Certain Evidence ("Gov.'s 404(b) Reply"), Dkt. 140, at 1–12.)

Following extensive briefing (*see* Dkts. 82, 129, 130, 131, 140, 142, 143, 144), the Court held oral argument on this motion, as well as Defendants' motion to dismiss, on April 16, 2021 (*see* 4/16/2021 Minute Entry). At oral argument, the Court ruled from the bench that the Government generally would not be allowed to introduce evidence from the recent civil litigation.[6] (*See id.*)

As discussed below, the Court will allow the Government to introduce evidence of Helen O'Sullivan's use of personal checks to pay Navillus employees. For completeness of the record, the Court also provides a written explanation of its oral ruling generally precluding evidence from the prior civil litigation.

### A.    Legal Standard

Rule 404(b) provides that evidence of "any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). But such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). In this Circuit, other-acts evidence is admissible "for any purpose other than to show a criminal defendant's criminal propensity, as long as the evidence is relevant and satisfies the probative-prejudice balancing test

---

[6] The Court's ruling at oral argument did not encompass evidence of statements made by Defendants in the civil case that are relevant to this case, or the fact of the filing of the civil litigation to show scienter with respect to Helen O'Sullivan. (*See* 4/16/2021 Minute Entry.) The Court reserved decision on these materials and directed the parties to submit additional briefing. (*See id.*) The Court's ruling on these materials is not covered herein and will be the subject of a separate decision.

of Rule 403 of the Federal Rules of Evidence." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (quoting *United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994)). "Under this approach, such evidence must be (1) offered for a proper purpose, (2) relevant, and (3) substantially more probative than prejudicial." *United States v. Flom*, 256 F. Supp. 3d 253, 266 (E.D.N.Y. 2017) (citing *United States v. Moran-Toala*, 726 F.3d 334, 345 (2d Cir. 2013)). Other-acts evidence does not include evidence of uncharged criminal activity "if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *Carboni*, 204 F.3d at 44 (quoting *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997)).

### B.      Helen O'Sullivan's Personal Checks

The Government seeks to introduce evidence that Helen O'Sullivan paid Navillus employees with checks drawn on accounts in her name. (*See generally* Gov.'s 404(b) Mot., Dkt. 82, at 15–17; *see also* Gov.'s 404(b) Reply, Dkt. 140, at 1–3.) More specifically, this evidence purportedly shows that once the Consulting Firm stopped participating in the alleged scheme and ceased accepting payroll funds from Navillus, Helen O'Sullivan began issuing checks drawn on accounts in her name to pay the salaries of Navillus employees who previously had been paid by the Consulting Firm. (Gov.'s 404(b) Mot., Dkt. 82, at 15–17; Gov.'s 404(b) Reply, Dkt. 140, at 2–3.) The Government intends to argue, in part and substance, that Helen O'Sullivan engaged in this conduct as part of the ongoing union benefits fraud scheme alleged in the Indictment. The Court finds that, given the timing and nature of the payments (including the identities of the recipients), this evidence is direct evidence of Helen O'Sullivan's participation in, as well as intent and knowledge of, the alleged scheme, and "is necessary to complete the story of the crime on trial." *See Carboni*, 204 F.3d at 44; *see also United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994) ("When the Indictment contains a conspiracy charge, uncharged acts may be admissible as direct

evidence of the conspiracy itself. 'It is clear the Government may offer proof of acts not included within the indictment, as long as they are within the scope of the conspiracy.'" (internal citations omitted) (quoting *United States v. Bagaric*, 706 F.2d 42, 64 (2d Cir. 1983))).

Defendants argue that this evidence is not actual evidence of the alleged scheme, that only five employees received personal checks from Helen O'Sullivan, and that this evidence therefore is not probative and, instead, highly prejudicial and misleading. (*See* Helen O'Sullivan's Sur-reply to Government's 404(b) Motion ("H. O'Sullivan Sur-reply"), Dkt. 142, at 1–4.) To the contrary, regardless of the number of employees who ultimately received personal checks from Helen O'Sullivan, the Court finds that this evidence is highly probative of the existence and operation of the alleged scheme, which involved paying Navillus employees in a way to keep them off of Navillus's payroll records—first allegedly through the Consulting Firm and later through Helen O'Sullivan's personal checking account. (*See* Indictment, Dkt. 1, ¶ 12.) The checks, moreover, were issued squarely in the 2011–17 period alleged in the Indictment, just after the Consulting Firm stopped participating in the alleged scheme. (*See id.* ¶ 11; Gov.'s 404(b) Reply, Dkt. 140, at 2.) In short, the timing of the payments and their consistency with the alleged scheme's mode of operation make this evidence highly relevant, and the probative value of the evidence clearly is not outweighed by unfair prejudice or danger of misleading the jury. *See* Fed. R. Evid. 403.

Therefore, the Government will be allowed to introduce evidence that Helen O'Sullivan paid Navillus employees with personal checks drawn on accounts in her name.

### C. Evidence Related to Prior Civil Litigation

The Government also moves to introduce evidence related to prior civil litigation against Navillus in the Southern District of New York, including evidence from that litigation tending to establish that Defendant Donal O'Sullivan formed purported alter-ego companies and shuffled employees among them allegedly to avoid making union contributions. (*See* Gov.'s 404(b) Mot.,

Dkt. 82, at 8–15; Gov.'s 404(b) Reply, Dkt. 140, at 3–12.)  As the Court ruled at oral argument, the Government is generally precluded from introducing this evidence at trial.[7]

The Government contends that this evidence "is directly probative of [Defendants]' knowledge and intent with respect to the scheme alleged in the Indictment since it bears on [Defendants]' intent upon entering into the business arrangement with the Consulting Firm." (Gov.'s 404(b) Reply, Dkt. 140, at 8; *see also* Gov.'s 404(b) Mot., Dkt. 82, at 10–15.)  Any probative value of this evidence, however, is substantially outweighed by its unfair prejudice and misleading nature, as well as the undue delay and confusion its introduction will almost certainly precipitate.

When other-acts evidence is offered "for the purpose of establishing the defendant's knowledge or intent," the Government must "identify a similarity or connection between the two acts that makes the prior act relevant to establishing knowledge of the current act."  *United States v. McCallum*, 584 F.3d 471, 475 (2d Cir. 2009) (quoting *United States v. Garcia*, 291 F.3d 127, 137 (2d Cir. 2002)).  Here, the connection that the Government proffers is simply that both the scheme alleged in this case and the use of purported alter-ego companies alleged as part of the double-breasting scheme in the civil case had the "same goal of avoiding contributions to union benefits funds."  (Gov.'s 404(b) Reply, Dkt. 140, at 8; *see also, e.g.*, *id.* at 11 ("In sum, the proffered evidence shows that [Defendants] used several companies to avoid making contributions to union benefits funds and shuffled Navillus employees among them.").)  But double-breasted arrangements, where a business has both union and non-union entities, "are 'neither uncommon

---

[7]  As noted above, the Court reserved decision on the admissibility of statements made by Defendants during the civil case that are relevant to this case and the fact of the filing of the civil litigation as it relates to Helen O'Sullivan's scienter.  Those materials are the subject of additional briefing by the parties, and the Court will rule on those materials separately.  *See supra* note 6 (citing 4/16/2021 Minute Entry).

nor inherently unlawful.'" *United States v. Thompson*, 207 F. Supp. 3d 106, 110 (D. Mass. 2016) (quoting *Mass. Carpenters Cent. Collection Agency v. A.A. Bldg. Erectors, Inc.*, 343 F.3d 18, 22 (1st Cir. 2003)). Indeed, the idea behind such arrangements is that "[t]he non-union company can bid more competitively on jobs that do not require union contractors, while the union company continues to bid on jobs requiring union contractors." *A. Dariano & Sons, Inc. v. Dist. Council of Painters No. 33*, 869 F.2d 514, 517 (9th Cir. 1989). "This type of operation is not inherently illegal." *Id.* The Government provides no explanation why evidence of a double-breasted arrangement as it relates to Defendant Donal O'Sullivan would be probative of criminal intent simply because it was alleged in the civil case that he used such an arrangement to avoid making contributions to unions. Furthermore, the suggestion that just because Defendant Donal O'Sullivan was previously accused of using a double-breasted arrangement to commit union benefits fraud, he therefore committed similar fraud here, though couched in terms of showing intent, is precisely the type of propensity evidence forbidden by Rule 404(b). *See United States v. Mostafa*, 16 F. Supp. 3d 236, 253 ("It is . . . improper to receive evidence ostensibly as probative of knowledge and intent when it is in reality 'propensity evidence in sheep's clothing.'" (quoting *McCallum*, 584 F.3d at 477)). Thus, to the extent this evidence has "probative" value, it is not for a proper purpose.

On the other hand, the Court finds that allowing the Government to introduce such evidence—essentially allowing the Government to establish the alter-ego claim in the civil case from the ground up—would be unfairly prejudicial, confuse the jury, and cause undue delay. *See Arlio v. Lively*, 474 F.3d 46, 53 (2d Cir. 2007) ("Admitting evidence about previous cases 'inevitably results in trying those cases before the jury,' and 'the merits of the other cases would become inextricably intertwined with the case at bar.'" (alterations omitted) (quoting *Kinan v. City*

*of Brockton*, 876 F.2d 1029, 1034 (1st Cir. 1989))).  As the Government illustrates in its own briefing, and made clear at oral argument, allowing the trial to detour into how Donal O'Sullivan used alter-ego companies would necessarily involve introduction of evidence relating to several different entities, none of which are implicated in the charges here, and raise a number of collateral issues, such as the overlap of employees among the various entities.  (*See* Gov.'s 404(b) Mot., Dkt. 82, at 10–13; Gov.'s 404(b) Reply, Dkt. 140, at 8–11; *cf.* Indictment, Dkt. 1, ¶¶ 11–16.)  The Court is unconvinced that such a detour would be brief or enlightening, particularly given that the *bench* trial in the civil case spanned two weeks.  In short, the Court finds that allowing the Government generally to introduce evidence from the prior civil litigation, particularly evidence of Donal O'Sullivan's use of purported alter-ego companies, would improperly turn the trial into a "multi-ringed sideshow of mini-trials on collateral issues" that would cause confusion[8] and undue delay. *See Park West Radiology v. CareCore Nat'l LLC*, 675 F. Supp. 2d 314, 325 (S.D.N.Y. 2009) (citation omitted); *see also* Fed. R. Evid. 403; *United States v. Groysman*, No. 10-CR-459 (SJ) (RML), 2011 WL 6131286, at *2 (E.D.N.Y. Dec. 8, 2011) (denying admission of evidence of a prior alleged scheme because allowing such evidence "would amount to a separate trial to prove the earlier alleged scheme to have in fact been a scheme"); *United States v. Hatfield*, 685 F. Supp. 2d 320, 324 (E.D.N.Y. 2010) (denying a motion to introduce certain evidence because allowing it would require "conducting a 'mini-trial,'" and because, in a trial already likely to last 15–20 weeks and include tens of thousands of pages of witness testimony and exhibits, the evidence "stands a good chance of confusing the jury as to the actual crimes charged, which a curative instruction may not alleviate").

---

[8] An obvious example of such confusion would be the jurors' likely, but mistaken, belief that the fraud alleged in this case was conducted through the alter-ego companies and a double-breasting arrangement, instead of, or in addition to, the Consulting Firm.

Accordingly, except for the limited and discrete materials on which the Court has yet to rule, *see supra* notes 6 and 7, the Government in general will not be allowed to introduce evidence from the prior civil litigation.

## CONCLUSION

Defendants' motion to dismiss in part the Indictment (Dkt. 141) and the Government's motion to admit certain evidence (Dkt. 82) are granted in part and denied in part. Defendants' motion to dismiss is granted with respect to those portions of Counts Nine and Eleven of the Indictment that are based on conduct prior to July 29, 2015. Defendants' motion is otherwise denied. The Government's motion to admit evidence as direct evidence, or alternatively as Rule 404(b) evidence, is granted with respect to evidence that Helen O'Sullivan paid Navillus employees with personal checks drawn on accounts in her name. The motion is denied with respect to evidence from the prior civil litigation, as previously stated on the record at oral argument on April 16, 2021 (*see* 4/16/2021 Minute Entry), and subject to the Court's forthcoming ruling on Defendants' statements and evidence of scienter from the prior civil litigation.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: May 18, 2021
      Brooklyn, New York