UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES OF AMERICA,

      - against -

DONAL O'SULLIVAN, HELEN
O'SULLIVAN, and PADRAIG NAUGHTON,

                 Defendants.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
20-CR-272 (PKC)

PAMELA K. CHEN, United States District Judge:

On September 28, 2021, the Court held a final pretrial conference and ruled from the bench

on the parties' various motions *in limine*. This Memorandum and Order explains the Court's

rulings in more detail.

## BACKGROUND[1]

Defendants Donal O'Sullivan, Helen O'Sullivan, and Padraig Naughton were high-ranking

employees at Navillus Tile, Inc. d/b/a Navillus Contracting ("Navillus"), a construction firm in

New York City mainly operating as a masonry and concrete subcontractor on large union

construction projects. (Indictment, Dkt. 1, ¶¶ 1, 6–7.) Navillus was a signatory to collective

bargaining agreements ("CBAs"), under which it was required to hire union workers on

construction projects and make contributions to union benefits funds (the "Benefits Funds") for

these workers based on the number of hours of covered work.[2] (*Id.* ¶¶ 2–5.) Although the CBAs

---

[1] In resolving the parties' motions *in limine*, the Court relied on the allegations in the Indictment and evidence proffered by the parties in connection with the motions, and thus, despite the trial in this matter having since taken place—resulting in all three Defendants' convictions on all counts in the Indictment—this Memorandum and Order sets forth only the pre-trial allegations and evidence.

[2] The Benefits Funds include funds associated with seven unions: (1) the Bricklayers and Allied Craftworkers Local Union No. 1; (2) the New York City District Council of Carpenters; (3) the Cement Masons Union; (4) the Cement and Concrete Workers District Council; (5) the

required Navillus to employ union workers for covered work, if Navillus employed non-union workers for such work, it was still required to make contributions to the Benefits Funds with respect to that covered work for the benefit of the Benefits Funds. (*Id.* ¶ 4.) Navillus was also required to submit periodic reports to the Benefits Funds ("Remittance Reports") detailing the number of hours worked by each union and non-union worker. (*Id.* ¶ 5.)

The Indictment—unsealed on July 30, 2020—alleges that between 2011 and 2017, Defendants "conspired to execute, and executed, a scheme to evade making" contributions to the "Benefits Funds." (*Id.* ¶ 11.) Defendants purportedly carried out this scheme by fraudulently funneling payroll funds for workers through a consulting firm that was not a party to the CBAs (the "Consulting Firm"), so that it appeared that Navillus did not have to make benefits contributions or submit Remittance Reports to the Benefits Funds with respect to those workers' covered work. (*Id.* ¶¶ 12–13.) The 11-count Indictment charged Defendants with conspiracy to commit mail and wire fraud, several counts of wire fraud and mail fraud, conspiracy to embezzle from employee benefits funds, embezzlement from employee benefits funds, conspiracy to file false remittance reports, and the submission of false remittance reports. (*Id.* ¶¶ 17–34.)

While the case was in discovery, the parties filed several pretrial motions. These included a motion by Defendants to compel the Government to comply with its discovery obligations under *Brady*, *Giglio*, and Rule 16 (*see* Dkt. 81) and a motion by the Government to admit evidence relating to Navillus's use of purported alter-ego companies to avoid making union benefits contributions, which was the subject of recent civil litigation in the United States District Court

---

Mason Tenders District Council; (6) the Pointers, Cleaners and Caulkers; and (7) the International Brotherhood of Teamsters Local 282. (Indictment, Dkt. 1, ¶ 2.)

for the Southern District of New York ("SDNY") (*see* Dkt. 82).[3]  On December 28, 2020, the
Court held oral argument on Defendants' motion to compel and gave the Government 30 days,
*i.e.*, until January 27, 2021, "to review its files and produce any and all remaining Rule 16 material
in its possession, as well as any *Brady* material in its possession"—after which, if material that the
Government had in its possession and that should have been produced came to light, the
Government would have "to justify why such material was not produced earlier and why [it] should
be permitted to introduce [that material] at trial."  (12/28/2020 Minute Entry.)  Additionally, in
light of the "unusual circumstances present in this case," including challenges related to the
COVID-19 pandemic, the Court directed the Government to produce *Giglio* and 3500 materials,
as well as preliminary witness and exhibit lists, at least 60 days before the start of trial—but with
the ability to supplement such lists and materials up to 45 days before the start of trial.  (*Id.*)

As for the Government's motion to admit evidence relating to Navillus's use of purported
alter-ego companies, the Court ruled that the Government would generally be precluded from
introducing this evidence at trial, including the fact of the prior SDNY civil litigation, because the
probative value of such evidence was substantially outweighed by its unfair prejudice, misleading
nature, and the potential for undue delay and confusion of the issues.  *See United States v.*

---

[3]  Defendants Donal O'Sullivan and Helen O'Sullivan, along with others, were named as
defendants in a pair of consolidated civil cases brought by the trustees of several union benefits
funds alleging that Navillus had set up alter-ego companies to avoid making required contributions
to the funds.  *Moore v. Navillus Tile, Inc.*, No. 14-CV-8326 (CM) (JLC) (S.D.N.Y. filed Oct. 17,
2014); *Gesualdi v. Navillus Tile, Inc.*, No. 15-CV-8441 (CM) (JLC) (S.D.N.Y. filed Oct. 27, 2015).
Following a bench trial that spanned two weeks, the Honorable Colleen McMahon issued a verdict
awarding over $70 million in damages to the union benefits funds.  *See* 276 F. Supp. 3d 110, 166–
67 (S.D.N.Y. 2017), *vacated*, 2018 WL 7048697, at *1 (S.D.N.Y. Oct. 26, 2018).  While the
verdict was on appeal, the parties settled, and Judge McMahon's verdict was vacated so that the
parties could consummate the settlement.  *See* 2018 WL 7048697, at *1; *see also* Order Declaring
Intention to Vacate Judgment, *Moore*, No. 14-CV-8326 (CM) (JLC) (S.D.N.Y. Aug. 16, 2018),
ECF No. 341.

*O'Sullivan* (*O'Sullivan I*), No. 20-CR-272 (PKC), 2021 WL 1979074, at *11–12 (E.D.N.Y. May 18, 2021); *United States v. O'Sullivan* (*O'Sullivan II*), No. 20-CR-272 (PKC), 2021 WL 3080330, at *2–3 (E.D.N.Y. July 20, 2021).

On September 1, 2021, the parties filed the various motions *in limine* discussed herein. While the motions were being briefed, Defendants filed a motion on September 14, 2021, requesting that the Court "immediately address" issues related to the Government's trial exhibit and witness lists, as well as its late production of certain materials. (Dkt. 202, at 1.) On September 17, 2021, the Court held a conference ("Discovery Conference") and ordered the Government to produce final exhibit and witness lists by September 22, 2021, which it did. (*See* 9/17/2021 Minute Entry; *see also* Dkt. 223 (letter regarding transmittal of updated exhibit and witness lists and 3500 material).) Because Defendants had failed to demonstrate sufficient prejudice, the Court generally declined to preclude the Government from using materials produced after the Court-imposed January 27, 2021 deadline, including those materials produced in May and July 2021. (*See* 9/17/2021 Minute Entry.) However, the Court found preclusion warranted with respect to 1,422 pages of union-related audit reports that the Government did not produce until September 10, 2021. (*See* 9/22/2021 Order.)

On September 28, 2021, the Court held a final pretrial conference ("FPTC"). At the conference, the Court heard argument from the parties on several of the issues raised in the motions *in limine*, and, as previously mentioned, orally ruled on all of the motions.

## DISCUSSION

### I.    Legal Standards

"A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions *in limine*." *Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 176 (S.D.N.Y. 2008) (citing *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984)). Motions *in limine*

"aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996) (quoting *Banque Hypothecaire Du Canton De Geneve v. Union Mines*, 652 F. Supp. 1400, 1401 (D. Md. 1987)). A court's ruling on a motion *in limine* "is subject to change when the case unfolds." *Luce*, 469 U.S. at 41. Indeed, "even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling." *Id.* at 41–42.

Under the Federal Rules of Evidence, relevant evidence is generally admissible. *See* Fed. R. Evid. 402. Evidence is relevant if it has any tendency to make a fact of consequence "more or less probable than it would be without the evidence." Fed. R. Evid. 401. This is a "very low standard." *United States v. White*, 692 F.3d 235, 246 (2d Cir. 2012) (quoting *United States v. Al-Moayad*, 545 F.3d 139, 176 (2d Cir. 2008)). A court, however, has the discretion to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *see also United States v. Downing*, 297 F.3d 52, 59 (2d Cir. 2002) ("[T]he district court retains broad discretion to balance the evidence's potential prejudice to the defendant against its probative value." (citation omitted)).

Further, "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). But such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Courts in this circuit take an "inclusionary approach," meaning that other-acts evidence is admissible so long as it is "(1) offered for a proper

purpose, (2) relevant, and (3) substantially more probative than prejudicial." *United States v. Flom*, 256 F. Supp. 3d 253, 266 (E.D.N.Y. 2017) (citing *United States v. Moran-Toala*, 726 F.3d 334, 345 (2d Cir. 2013)).  Uncharged criminal conduct does not constitute other-acts evidence falling under Rule 404(b) if the uncharged conduct "arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (quoting *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997)).

## II.    Defendant Donal O'Sullivan's Motions

### A.    Preclude Evidence of *Ordonez* Litigation

Angel Ordonez was a Navillus employee and a member of the International Brotherhood of Teamsters Local 282 who performed covered work and was paid by the Consulting Firm.  (Dkt. 211, at 15.)  In April 2014, Ordonez filed a civil action against Navillus and Donal O'Sullivan in the SDNY alleging a failure to pay overtime wages.  (*Id.* at 15–16.)

Prior to trial, the Government identified two categories of materials from the *Ordonez* litigation that it intended to introduce.  First, the Government intended to introduce certain responses to interrogatories and document requests pertaining to Ordonez's hours and wages in which Navillus and Donal O'Sullivan did not produce payroll records from the Consulting Firm. (*Id.* at 16–17.)  The Government averred that this evidence was relevant and admissible because "Donal O'Sullivan's failure to produce any payroll records from the Consulting Firm regarding compensation to Ordonez is evidence of his fraudulent intent and consciousness of guilt."[4]  (*Id.* at

---

[4]  The Government included with its motion papers the responses to interrogatories and document requests that it wanted to introduce.  (*See generally* Dkts. 211-1 to -3.)  With respect to the document requests, the Government specifically sought to introduce requests and responses for Nos. 2, 3, 8–10, 12–13, 16–19, 22, and 35.  (*See* Dkt. 211, at 17; Dkt. 211-1, at 4–5, 7–15, 20.)

17.)   Second, the Government sought to introduce sections of Donal O'Sullivan's deposition testimony from the *Ordonez* litigation,[5] where Donal O'Sullivan made statements relating to his role at Navillus and that of the other Defendants, his knowledge of Navillus's obligations under the CBAs, his knowledge of Navillus's payroll operations and who performed payroll functions, his knowledge of employees paid by the Consulting Firm, and his explanation for why a Navillus employee like Ordonez was paid with two different checks for the same pay period.  (*Id.* at 17–18.)

As noted, the Court had already decided that the Government would not be permitted to introduce evidence from, or even the fact of, the two other, consolidated civil cases against Navillus and the O'Sullivans pertaining to the alleged use of alter-ego companies to avoid making union benefits contributions.  *See O'Sullivan I*, 2021 WL 1979074, at *11–12; *O'Sullivan II*, 2021 WL 3080330, at *2–3.  Relying on this decision, Donal O'Sullivan argued that the *Ordonez* litigation materials should be excluded as irrelevant and unduly prejudicial.  (*See* Dkt. 191-1, at 8–11; *see also* Dkt. 225, at 2–4.)  Donal O'Sullivan also argued that these materials, which were not produced until August 19, 2021, were untimely noticed.  (*See* Dkt. 191-1, at 3–8.)

The Court agrees with Defendant Donal O'Sullivan that the responses to interrogatories and document requests from the *Ordonez* litigation should be excluded.  Besides the late notice, these materials are minimally probative, if at all, of Donal O'Sullivan's "fraudulent intent and consciousness of guilt."  (*See* Dkt. 211, at 17.)  Indeed, the responses do not even affirmatively

---

With respect to the interrogatory responses, the Government specifically sought to introduce responses for Nos. 1, 4, 5, and 15.  (*See* Dkt. 211, at 17; Dkt. 211-2, at 3–5, 9–10; Dkt. 211-3, at 3–4.)

   [5]  The Government included with its motion papers the deposition transcript, with the specific sections it sought to introduce highlighted.  (*See generally* Dkt. 211-4.)

show that Donal O'Sullivan failed to produce Ordonez's pay records from the Consulting Firm.[6]

On the other hand, introduction of the responses would open the door to all of the problems—

unfair prejudice, jury confusion, and undue delay—that led the Court to preclude evidence from,

and the fact of, the other civil cases brought against Navillus and Donal O'Sullivan.

The deposition testimony, however, is different. As an initial matter, Donal O'Sullivan's

deposition statements are, for the most part,[7] admissible non-hearsay, opposing-party statements.

*See* Fed. R. Evid. 801(d)(2)(A); *see also United States v. Mahaffy*, No. 05-CR-613 (ILG), 2007

WL 1094153, at *6 (E.D.N.Y. Apr. 10, 2007) (concluding that the defendant's prior testimony

before the SEC was admissible as relevant, non-hearsay admissions by a party opponent that were

not unduly prejudicial). Additionally, even though the Consulting Firm is specifically referenced

---

[6] For example, one of the document requests and responses that the Government sought to introduce (No. 13) requested: "All paychecks and paystubs issued to [Ordonez] during the entire period of his employment, for wages paid by defendants or any other entity including, without limitation, Navillus Tile, Inc., Navillus Tile, Inc. d/b/a Navillus Contracting, and/or [the Consulting Firm]." (Dkt. 211-1, at 10.) The response was as follows:

> Defendants object to Document Request No. 13 to the extent that it seeks documents and information already within the Plaintiff's possession. Notwithstanding said objections, and subject to and without waiving the foregoing General Objections, documents responsive to this Request were previously produced to Plaintiff on November 6, 2014 as Bates Numbers NT000001–NT000013 and on December 5, 2014 as Bates Numbers NT000028–NT000201. Defendants are unable to locate any additional documents responsive to this Request.

(*Id.*)

[7] The part of Donal O'Sullivan's deposition testimony implicating Defendant Naughton (*see* Dkt. 211-4, at 9:21–24), however, offends the *Bruton* rule. *See Bruton v. United States*, 391 U.S. 123, 126 (1968) (holding that a defendant's, $D_2$'s, right to confrontation is violated where the prosecution introduces the statement of a non-testifying co-defendant, $D_1$, that facially incriminates $D_2$ as evidence against $D_1$ in a joint trial, even though the jury was instructed not to consider $D_1$'s statement as evidence against $D_2$).

in only two questions and answers,[8] Donal O'Sullivan's general testimony regarding Navillus's payroll operations and why a Navillus employee would be paid with two separate checks for the same pay period is highly probative of his knowledge and intent with respect to the alleged scheme in this case. Accordingly, unlike the evidence of alter-ego companies from the other civil cases, the probative value of this deposition testimony is not substantially outweighed by any potential for unfair prejudice, jury confusion, or undue delay. Indeed, even with respect to evidence from the other civil cases regarding alter-ego companies, the Court specifically reserved decision on Defendants' statements from those cases that are relevant to this case. *O'Sullivan II*, 2021 WL 3080330, at *1 n.2 (citing *O'Sullivan I*, 2021 WL 1979074, at *11 n.6) (noting that the Court had "reserved decision on the admissibility of statements made by Defendants during the civil litigation that are relevant to this case" and further noting that the parties were attempting to reach agreement regarding those statements). Finally, the Court rejects Donal O'Sullivan's argument of undue prejudice from the Government's late production of the deposition testimony. Ordonez was identified as one of the employees paid by the Consulting Firm as early as September 14, 2020, and the Court agrees with the Government that Donal O'Sullivan "has *always* known that he made sworn statements regarding matters directly alleged in the [I]ndictment." (Dkt. 211, at 19.)

Accordingly, it was proper not to permit the Government to introduce at trial the document request and interrogatory responses from the *Ordonez* litigation, but allow it to introduce Donal O'Sullivan's deposition testimony from that litigation.

---

[8] *See* Dkt. 211-4, at 157:22–24 ("Q. Are you familiar with a company called Allied? / A. I've heard the name."); Dkt. 211-4, at 157:25–158:3 ("Q. Do you recall using them to process payroll to pay employees through? / A. I don't recall, no.").

**B.      Preclude Evidence and Argument that Donal O'Sullivan Aided and Abetted, or Is Otherwise Culpable for, John Doe's Visa Fraud**

In his motions *in limine*, while not objecting to John Doe testifying about his recollection of how the alleged payroll scheme started or that John Doe told Donal O'Sullivan about using the scheme to renew his visa, O'Sullivan objected to evidence and argument that he aided and abetted, or is otherwise culpable for, John Doe's visa fraud—*i.e.*, that O'Sullivan knew that John Doe intended to commit visa fraud and helped John Doe do so.  (*See* Dkt. 191-1, at 12–13; Dkt. 225, at 4–5.)  O'Sullivan argued that such evidence was untimely noticed and improper Rule 404(b) evidence, as well as highly prejudicial evidence that should be excluded under Rule 403.  (Dkt. 191-1, at 13–15.)  O'Sullivan specifically asked for a limiting instruction directing jurors that "they may not consider John Doe's testimony for any reason other than assessing his alleged motivation for creating the Consulting Firm payroll—including that they must not consider his testimony in any way as evidence of visa-related wrongdoing by the defendants."  (*Id.* at 15.)  O'Sullivan also requested that the Government be directed to provide a proffer of John Doe's testimony on this subject before he testified.  (*Id.*)

At the FPTC, the Court ruled that the Government could not argue that Donal O'Sullivan "aided and abetted" John Doe to commit visa fraud.  The Court also left open the possibility of instructing the jury that none of the Defendants in this case were charged with visa fraud and that the jury could not infer the guilt of any Defendant based on John Doe's visa fraud.[9]  Otherwise,

---

[9]  The Court ultimately gave the following instruction to the jury:

[Y]ou have heard testimony from a witness, [John Doe], who pleaded guilty to a charge of visa fraud arising out of some of the facts that are relevant to this case. You are not to draw any conclusions or inferences about the guilt of any of the Defendants from the fact that [John Doe] pleaded guilty to visa fraud.  The witness's decision to plead guilty was a personal decision about his own guilt with

O'Sullivan's arguments for preclusion are unavailing. Evidence of how and why the alleged payroll scheme was formed is highly relevant. Therefore, it was proper to allow the Government to elicit testimony from John Doe about the full circumstances surrounding the formation of the alleged scheme, including John Doe's visa-renewal issues and his intention to use the payroll scheme to renew his visa fraudulently, and to allow the Government to make arguments regarding Donal O'Sullivan's knowledge of John Doe's visa issues and how that knowledge demonstrated O'Sullivan's criminal intent.

O'Sullivan's attempt to cast John Doe's testimony as improper Rule 404(b) evidence is misplaced. John Doe's testimony about the formation of the alleged payroll scheme, and the circumstances surrounding it, go to the heart of the charges in this case. *See Carboni*, 204 F.3d at 44; *see also United States v. Wedd*, No. 15-CR-616 (KBF), 2017 WL 11488608, at *5 (S.D.N.Y. Apr. 3, 2017) ("Completing the story of a crime may include background information in a conspiracy case—including how a scheme developed, or how conspirators came to know and trust one another." (citing, *inter alia*, *United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996))).

O'Sullivan's citation to *United States v. Newton*, No. 01-CR-635 (CSH), 2002 WL 230964, at *2 (S.D.N.Y. Feb. 14, 2002), to argue that John Doe's testimony regarding visa fraud is not direct evidence of the alleged crimes is inapposite. In *Newton*, the defendant was charged with making fraudulent "A" referrals for seven Nigerian nationals to procure visas. 2002 WL 230964, at *1. The government sought to admit, among other things, evidence of similar but uncharged "A" referrals. *Id.* at *2. The court considered this evidence to be Rule 404(b) evidence and rejected

---

respect to that charge. His decision to plead guilty may not be used by you in any way as evidence against any of the Defendants here.

(Jury Instructions, Dkt. 261, at 17.)

the argument that the uncharged referrals were "inextricably intertwined" with, and arose from the same series of transactions as, the charged offenses. *Id.* The court also found that the charged crimes were "straightforward and may be fully understood without reference to [the defendant]'s other allegedly false referrals." *Id.* Here, John Doe's testimony concerns the very scheme alleged in the Indictment, and the circumstances of John Doe's visa fraud are inextricably intertwined with the formation of that scheme. Moreover, a jury could reasonably make inferences regarding Donal O'Sullivan's knowledge of the alleged scheme and fraudulent intent based on testimony that, after hearing about John Doe's visa issues, O'Sullivan proposed the payroll scheme as a mutually beneficial solution.

Finally, given that John Doe's testimony as to the circumstances surrounding the formation of the alleged payroll scheme is highly probative of the existence of the scheme and Defendants' (particularly Donal O'Sullivan's) knowledge and intent, such evidence is not substantially outweighed by any unfair prejudice, delay, or potential of misleading the jury. *See* Fed. R. Evid. 403.

Accordingly, it was appropriate to grant Donal O'Sullivan's motion only to preclude the Government from directly arguing that Donal O'Sullivan "aided and abetted" visa fraud, but to otherwise allow the Government to elicit testimony from John Doe as to all of the circumstances surrounding the formation of the alleged payroll scheme, including John Doe's visa issues, and to allow the Government to argue that this evidence establishes Donal O'Sullivan's knowledge and fraudulent intent with respect to the alleged scheme.

## C. Preclude Evidence that Former Navillus Employee L.G. Was Paid Under Another Name

L.G. is one of the Government's witnesses and a former Navillus employee who was paid via the Consulting Firm under the name J.S., one of Donal O'Sullivan's relatives. (*See* Dkt. 191-

1, at 15–16; Dkt. 211, at 10.)  L.G., an undocumented immigrant, began working for Navillus and being paid under the name J.S. in 2008.  (*See* Dkt. 191-1, at 16.)  In his motions *in limine*, Donal O'Sullivan argued that the name under which L.G. was paid is an extraneous fact, untimely and improper Rule 404(b) evidence, and unduly prejudicial.  (*See id.* at 16–19.)  He asserted that the Government's attempt to introduce this evidence is simply "an effort to smear [him] for employing an undocumented immigrant" (Dkt. 225, at 8), and would create a side show regarding laws around payment of undocumented workers (Dkt. 191-1, at 18).  He proposed redacting J.S. from the documents, including paychecks[10] and payroll statements, with Defendants stipulating that those documents relate to L.G.  (Dkt. 225, at 9.)

Despite Donal O'Sullivan's characterization, evidence that L.G. was paid under the name J.S. does not fall within the ambit of Rule 404(b), as this evidence is not intended to demonstrate character or propensity.  *Cf.* Fed. R. Evid. 404(b)(1) ("Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.").  Instead, L.G. is one of the Navillus employees whom Defendants allegedly used the Consulting Firm to pay, and did so under the name J.S.  Thus, at the very least, evidence that L.G. was paid under the name J.S. is "inextricably intertwined with the evidence regarding the charged offense."  *United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007) (quoting *United States v. Towne*, 870 F.2d 880, 886 (2d Cir. 1989)); *see also Carboni*, 204 F.3d at 44 ("[E]vidence of uncharged criminal activity is not considered other crimes evidence under Fed. R. Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense,

_____

[10]  L.G. is one of the individuals who was paid in 2017 with personal checks from Helen O'Sullivan.  (*See* Dkt. 211, at 12.)  *See generally O'Sullivan I*, 2021 WL 1979074, at *10–11.

or if it is necessary to complete the story of the crime on trial." (quoting *Gonzalez*, 110 F.3d at 942.))

Moreover, evidence that L.G. was paid under the name J.S., one of Donal O'Sullivan's relatives, is relevant and probative of O'Sullivan's knowledge and intent with respect to the charged scheme, and not unduly prejudicial.  O'Sullivan argued that L.G. was paid under the name J.S. beginning in 2008, making any argument regarding knowledge, intent, or motive as to the alleged scheme—which allegedly occurred from 2011 to 2017—"chronologically impossible." (Dkt. 225, at 6–7.)  While O'Sullivan was free to make this argument to the jury, it was equally permissible for the Government to argue to the jury that it should infer that Donal O'Sullivan had knowledge of the alleged scheme, given that L.G. was paid by the Consulting Firm under the name of one of Donal O'Sullivan's relatives.  Moreover, the Government agreed not to inquire about L.G.'s immigration status.  (Dkt. 211, at 13.)  O'Sullivan, however, contended that this approach would "leav[e] the jury to speculate (almost certainly unfavorably to the defendants) about why L.G. was paid under the name J.S., while handicapping the defendants' ability to explain the evidence."  (Dkt. 225, at 8–9.)  Even so, this does not merit exclusion.  Evidence that L.G. was paid by the Consulting Firm under the name of O'Sullivan's relative is relevant and probative of O'Sullivan's knowledge and intent, and such probative value is not "substantially outweighed" by any unfair prejudice.  *See* Fed. R. Evid. 403.  Thus, it was appropriate to deny Donal O'Sullivan's motion to preclude evidence that L.G. was paid under the name of his relative J.S.

### D.     Preclude "Speculation" and Lay Opinion Testimony Concerning Donal O'Sullivan

In his motions *in limine*, Donal O'Sullivan sought to preclude certain lay testimony that he characterized as improperly speculative and irrelevant.  *See generally United States v. Kaplan*, 490 F.3d 110, 119 (2d Cir. 2007) ("Rule 701(a) requires that lay opinion testimony be *both* (a) based

14

on the witness's first-hand perceptions *and* (b) rationally derived from those first-hand perceptions."). Specifically, a witness identified as G.S. was expected to testify that he received a telephone call on the day after meeting with the Government, in which he was told to "play dumb" with respect to his employment with Navillus. (*See* Dkt. 191-1, at 20; Dkt. 211, at 40.) G.S. did not tell anyone about his meeting with the Government before receiving this call. (Dkt. 211, at 40 n.8.) The Government argued in response that G.S.'s testimony about receiving a call to "play dumb" would be offered to show state of mind and bolster G.S.'s credibility. (*Id.* at 40) Additionally, another witness, J.B., was expected to testify that an unindicted co-conspirator came to see him about a year ago and asked J.B. to sign something, which J.B. did.[11] (*Id.* at 40.)

The Government has not explained or demonstrated how such testimony from G.S. and J.B. is relevant to the charges here. The Court agrees with Donal O'Sullivan that this testimony appears to seek to do little more than allow the jury to speculate "that defendants engaged in witness tampering," a crime not at issue here. (Dkt. 225, at 10.) Therefore, this evidence was properly excluded as irrelevant under Rule 402 and unduly prejudicial under Rule 403. It was also proper to leave open the possibility that the Government could introduce this evidence at trial if G.S.'s or J.B.'s credibility became an issue.

---

[11]   Donal O'Sullivan pointed out additional statements, including L.G.'s "fears and concerns" that O'Sullivan and his wife, who is an immigration officer, could take adverse action against him with respect to his status as an undocumented immigrant. (Dkt. 191-1, at 20.) The Government responded that it "does not at this time intend to elicit information regarding the other statements contained in [Defendant Donal O'Sullivan]'s motion," although it reserved the right to "take a different position" depending on what happened at trial. (Dkt. 211, at 40.) For example, the Government noted that "it may become relevant to L.G.'s credibility that he harbored a contemporaneous fear while working for Navillus that Donal O'Sullivan's wife was an immigration officer, who might have been able to take action against him." (*Id.* at 40–41.)

E.     **Preclude Evidence that the Paralegal Who Assisted John Doe with His 2016 Visa Application Now Works for Navillus**

Finally, Donal O'Sullivan sought to exclude evidence that the paralegal who assisted with John Doe's fraudulent visa renewal in 2016 now works as an attorney at Navillus. (Dkt. 191-1, at 22.) O'Sullivan argued that this fact is "entirely irrelevant" and unduly prejudicial. (*Id.* at 22–23.) This issue was mooted by the Government's representation that it "does not intend to elicit this fact."[12] (Dkt. 211, at 41.) Therefore, the Court did not need to, and does not now, decide this issue.

## III.    **Defendant Helen O'Sullivan's Motion**

In her motions *in limine*, Helen O'Sullivan moved to preclude the Government from introducing any evidence, including exhibits and testimony, "regarding improper compensation issues unrelated to the Consulting Firm's non-payment of fringe benefits." (Dkt. 198-8, at 1.) These compensation issues included inadequate salary and overtime pay, non-withholding of taxes, failure to compensate workers for time off due to on-the-job injuries, and late payments. (*Id.* at 1–2.) Helen O'Sullivan argued that such evidence, beyond being improper propensity evidence, is irrelevant and unduly prejudicial. (*See generally id.*) The Government argued that evidence regarding the number of hours worked and hourly rates of pay is directly relevant because such evidence establishes the amount of the union benefits contributions that Navillus was required to make under the CBAs and to report to the Benefits Funds in the Remittance Reports. (*See* Dkt. 211, at 6–8.) In other words, evidence of compensation issues is "inextricably intertwined" with direct evidence of the alleged scheme.[13] (*Id.* at 7.) The Government also explained that the rate

---

[12] The Government did not in fact attempt to introduce any evidence at trial regarding the paralegal who assisted John Doe with his 2016 visa renewal.

[13] The Government provided some specific examples—including M.J., who was expected to testify that he received paychecks from both Navillus, for regular and overtime hours that were

paid to an employee is relevant to whether the employee was performing covered work. (*Id.* at 8–9.) Further, the Government pointed out that evidence relevant to Helen O'Sullivan's knowledge and intent of the alleged scheme could incidentally show compensation issues.[14] (*See id.* at 9–10.)

The Court generally agrees with the Government. Although evidence that Defendants failed to pay proper overtime wages in and of itself is irrelevant in this case, evidence as to the amount of contributions Navillus owed to the Benefits Funds is highly relevant, even if such evidence incidentally suggests or shows other compensation improprieties, such as a failure to pay proper overtime wages. Accordingly, it was appropriate to preclude the Government from introducing at trial evidence that merely or solely suggests a compensation delinquency without any connection to establishing the amount of the contributions Navillus owed to the Benefits Funds, but to allow the Government to introduce such evidence where it tends to establish the contributions Navillus owed to the Benefits Funds, even if that evidence incidentally shows or suggests some other compensation issue not directly in dispute.

## IV.    Defendant Naughton's Motions

### A.    Preclude Evidence Regarding Unions Not Specifically Named in the Indictment

The Indictment specifically names seven unions: (1) the Bricklayers and Allied Craft Workers Local Union No. 1; (2) the New York City District Council of Carpenters; (3) the Cement Masons' Local Union No. 780; (4) the Cement and Concrete Workers District Council; (5) the

---

reported in the Remittance Reports, and from the Consulting Firm, for additional (overtime) hours that were not reported. (Dkt. 211, at 7–8.)

[14] For example, another one of the Government's intended witnesses, V.L., was expected to testify, among other things, that he asked an unindicted co-conspirator for a raise after learning that he was paid less than a co-worker, which was granted. Helen O'Sullivan subsequently relayed to the Consulting Firm that V.L.'s hourly rate was raised to $30, but the Remittance Reports purportedly did not disclose the hours worked by employees such as V.L. (Dkt. 211, at 9–10.)

Mason Tenders District Council; (6) the Pointers, Cleaners and Caulkers; and (7) the International Brotherhood of Teamsters Local Union No. 282.  (Indictment, Dkt. 1, ¶ 2.)  As noted by Defendant Naughton in his motion *in limine*, the Government represented that these seven unions are "the relevant unions and union benefits funds" (Dkt. 192-1, at 5 (quoting Dkt. 152)),[15] and the Government produced discovery regarding alleged damages only for these seven unions (*id.* at 3).  Included on the Government's witness list, however, were two witnesses, H.T. and J.B.,[16] who were employees paid by the Consulting Firm but were members of the Glazier's Union and Ironworkers Union, respectively, unions not specifically mentioned in the Indictment.  (Dkt. 192-1, at 5–6; *see also* Dkt. 220, at 6–7.)  Naughton contended that any evidence and testimony related to unions not named in the Indictment should be precluded as irrelevant, confusing and misleading to the jury, and untimely Rule 404(b) evidence.  The Court denied that motion at the FPTC.

As an initial matter, the Indictment does not say that the named seven unions are the *only* unions with benefits funds to which Navillus allegedly owed benefits contributions.  Rather, the Indictment states: "The defendant DONAL O'SULLIVAN authorized the [Building Contractors Association, Inc.] to represent Navillus for the purpose of entering Navillus into collective bargaining agreements ('CBAs') with labor union organizations *including*: [the seven named unions]." (Indictment, Dkt. 1, ¶ 2 (emphasis added).)  Moreover, in describing the alleged scheme, the Indictment alleges that "[i]n furtherance of the Payroll Scheme, the defendants paid and caused to be paid certain Navillus employees (the 'Designated Employees') with checks issued by the

---

[15]  Defendant Naughton's brief purports to quote Dkt. 153, but it is in fact quoting Dkt. 152.  This document is a May 3, 2021 filing by the Government attaching "a list of witnesses [it] may call at trial from the relevant unions and union benefits funds." (Dkt. 152, at 2.)  This witness list contains names from only the seven unions named in the Indictment.  (*See* Dkt. 192-3.)

[16]  Although J.B. ended up testifying at trial, H.T. ultimately did not.

Consulting Firm." (*Id.* ¶ 12.)   Notably, in September 2020, the Government produced to Defendants "a spreadsheet containing the names of all those who received paychecks from the Consulting Firm in furtherance of the Payroll Scheme," including H.T. and J.B.  (*See* Dkt. 211, at 30; *see also* Dkt. 220, at 6 n.4.)

The relevance of H.T.'s and J.B.'s testimonies, as anticipated pre-trial, that they were paid with checks from the Consulting Firm accordingly is plain.  Such evidence goes to the very mechanism by which the alleged scheme operated.  Naughton's argument that this evidence is irrelevant confuses the victims of the alleged scheme (the unions' benefits funds) with the mechanism by which the alleged scheme operated (funneling payroll through the Consulting Firm).  The Government was not required to prove who all of the victims of the scheme were; rather, it was required to prove how the scheme worked, *i.e.*, that Navillus employees working on covered jobs were being paid through the Consulting Firm.

Additionally, Naughton's argument regarding constructive amendment of the Indictment is misplaced.  Constructive amendment occurs when "the prosecution's proof or theory constitute a modification at trial of an *essential element* of the offense charged." *United States v. Weiss*, 752 F.2d 777, 787 (2d Cir. 1985); *see also United States v. Delano*, 55 F.3d 720, 729 (2d Cir. 1995) ("A constructive amendment occurs when the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." (internal quotation marks and citation omitted)). Allowing H.T. and J.B. to testify would not be modifying an essential element of the charges. Indeed, the Indictment plainly alleges that in furtherance of the alleged scheme, Defendants "paid and caused to be paid certain Navillus employees (the 'Designated Employees') with checks issued

19

by the Consulting Firm." (Indictment, Dkt. 1, ¶ 12) There is no dispute that H.T. and J.B. are Designated Employees who were paid with checks from the Consulting Firm, as disclosed to Defendants in September 2020. (*See* Dkt. 211, at 30; Dkt. 220, at 6 n.4.) Moreover, to the extent that the Indictment did not provide a comprehensive list of the alleged victim unions, this was permissible. *See United States v. Orena*, 32 F.3d 704, 714–15 (2d Cir. 1994) (in a case involving an alleged conspiracy to murder, finding no deficiency in the government's identification of twelve intended victims, with the phrase "and others" at the end of the list, "to indicate that there might be others not then known to the government").

Further, Naughton's Rule 404(b) argument is unavailing. The evidence at issue here is testimony from Navillus employees who were paid with checks from the Consulting Firm. This is not other-acts evidence, but rather direct evidence of the charged offenses. At the least, this evidence concerns activity arising out of the same series of transactions as the charged offenses, which does not fall under Rule 404(b). *See Carboni*, 204 F.3d at 44 ("[E]vidence of uncharged criminal activity is not considered other crimes evidence under Fed. R. Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." (quoting *Gonzalez*, 110 F.3d at 942.)); *see also United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994) ("When the indictment contains a conspiracy charge, uncharged acts may be admissible as direct evidence of the conspiracy itself. . . . 'An act that is alleged to have been done in furtherance of the alleged conspiracy is not an "other" act within the meaning of Rule 404(b); rather, it is part of the very act charged.'" (alteration and citation omitted)). Indeed, though Naughton argues that "where it is not *manifestly clear* that the evidence in question is intrinsic proof of the charged crime, the proper course is to proceed under Rule 404(b)," it is

20

"manifestly clear" here that the evidence in question is intrinsic proof of the alleged scheme.  (*See* Dkt. 220, at 4 (emphasis in original) (quoting *United States v. Nektalov*, 325 F. Supp. 3d 367, 372 (S.D.N.Y. 2004)).)

Finally, the probative value of H.T.'s and J.B.'s testimonies, given that they go to the heart of how the alleged scheme operated, is not substantially outweighed by the potential for jury confusion or unfair prejudice.  *See* Fed. R. Evid. 403.  That H.T. and J.B. were not members of a union named in the Indictment does not make their testimonies as to how the alleged scheme operated more confusing.  Nor can Naughton claim any prejudice, as the list of employees who were paid by the Consulting Firm was disclosed over a year ago.  Thus, it was proper to deny Naughton's motion to preclude testimony of Designated Employees who were not members of one of the seven unions named in the Indictment.

### B.    Preclude Evidence Regarding Grassi & Co., CPAs P.C.

Grassi & Co., CPAs P.C. ("Grassi") is an accounting firm that provided accounting services to Navillus, although never in connection with any audits by the union benefits funds named in the Indictment.  (Dkt. 194-1, at 1–2.)  The Government initially marked 31 documents it received from Grassi as trial exhibits, which Naughton argued should be precluded as irrelevant and unduly prejudicial.  (Dkt. 194-1, at 3; *see also* Dkt. 211, at 31.)  At the FPTC, however, the Government represented that it had winnowed down the Grassi documents it intended to introduce to those "sufficient to show that the jobsite numbers identified in the weekly payroll sheets are, in fact, Navillus jobsites and which ones."  (Transcript of FPTC ("FPTC Tr."), at 83:12–14.)  The parties agreed to confer regarding these Grassi documents.  (*See id.* at 83:17–84:9.)  Accordingly, the Court did not need to resolve, and does not now discuss, this issue.[17]

---

[17]  No issues regarding the Grassi documents were raised at trial.

## C.     Preclude Evidence of Audio Recordings Made by Jane Doe in 2016

Between May 16 and June 30, 2016, after John Doe and Jane Doe began cooperating with the Government, Jane Doe made seven recordings of telephone conversations with Navillus employees.  (*See* Dkt. 195-1, at 2–3.)  Four of the recordings are telephone conversations between Jane Doe and Mark Naughton ("M.N."), an unindicted co-conspirator.  (*See id.*; Dkt. 211, at 20.)

- May 16, 2016 Call (GX6002):  Jane Doe informed M.N. that she was working on sending M.N. certain payroll records for 2012 and 2013.  M.N. told Jane Doe, "Yeah, we're looking for tomorrow as soon as possible," in terms of receiving the records.  (*See* Dkt. 195-1, at 4; Dkt. 211, at 22; *see also* Dkt. 195-6 (transcript of call).)

- May 20, 2016 10:53 a.m. Call (GX6003):  Jane Doe advised M.N. that she was having difficulty emailing him certain large data files, which kept "bouncing back."  M.N. confirmed that the correct email to which to send the files was a Gmail account.  M.N. told Jane Doe that he would set up a Google drive.  (*See* Dkt. 195-1, at 5; Dkt. 211, at 22; *see also* Dkt. 195-5, at ECF 9–10[18] (transcript of call).)

- May 20, 2016 11:29 a.m. Call (GX6004):  Jane Doe confirmed with M.N. that she had just sent over the records for 2013, and stated that she was working on gathering other requested payroll records.  (*See* Dkt. 195-1, at 5; Dkt. 211, at 23; *see also* Dkt. 195-5, at ECF 10–12 (transcript of call).)

- May 25, 2016 Call (GX6005):  Jane Doe asked M.N. to check the Google Drive to make sure all of the requested records had been received.  M.N. confirmed that he had received everything he needed.  Jane Doe also asked M.N. to send her certain payroll hours.  (*See* Dkt. 195-1, at 5–6; Dkt. 211, at 23; *see also* Dkt. 195-5, at ECF 12–13 (transcript of call).)

Two of the recordings are conversations between Jane Doe and Defendant Naughton.  (Dkt. 195-1, at 2–3; Dkt. 211, at 20.)

- June 3, 2016 Call (GX6006):  Defendant Naughton advised Jane Doe that he would have funds deposited into the Consulting Firm's account to cover a workers' compensation policy and "the payroll."  (*See* Dkt. 195-1, at 6; Dkt. 211, at 23–24; *see also* Dkt. 195-5, at ECF 15–16 (transcript of call).)

- June 30, 2016 Call (GX6008):  Jane Doe informed Defendant Naughton that she had not yet received the payroll sheet for that week.  Naughton said that he would

---

[18]  Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

ask "the girls," and after doing so, he reported that "they are going to send it over right now." Jane Doe then advised Naughton that someone could come pick up "the checks" at the Consulting Firm the next day. Additionally, Naughton confirmed that he was aware that Jane Doe was sending M.N. historical payroll records. Naughton indicated that the records were related to an issue with audits and "whether these people were union or not union." (*See* Dkt. 195-1, at 6–7; Dkt. 211, at 24; *see also* Dkt. 195-5, at ECF 5–7 (transcript of call).)

The last recording (GX6007) is a brief conversation between Jane Doe and a receptionist at Navillus on June 30, 2016. (*See* Dkt. 195-1, at 6; *see also* Dkt. 195-5, at ECF 4 (transcript of call).)

In his motions in *limine*, Naughton sought to exclude all seven recordings, as well as transcripts of the recordings, on the grounds that they lack probative value and are unfairly prejudicial, confusing, and needlessly cumulative. (*See* Dkt. 195-1, at 7–15.) The Government opposed with respect to six of the seven calls—all but the non-substantive call with the Navillus receptionist, GX6007. (*See* Dkt. 211, at 19–26.)

As a preliminary matter, Defendant Naughton posited that the recordings have "serious" authentication problems. (Dkt. 195-1, at 8.) But as the Government pointed out, Jane Doe would be able to authenticate the recordings at trial. (*See* Dkt. 211, at 20.) Moreover, the Government need not establish an unbroken chain of custody, as "gaps in the chain [of custody] normally go to the weight of the evidence rather than its admissibility," and it is up to the prosecution "to decide what steps in the chain of custody are so crucial as to require evidence." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 n.1 (2009) (citation omitted). Further, with proper instruction, transcripts are permitted "to serve as a jury aid with respect to [a] properly-admitted recording." *United States v. Zemlyansky*, 908 F.3d 1, 18 (2d Cir. 2018); *see also United States v. Rosa*, 17 F.3d 1531, 1548 (2d Cir. 1994) ("The court, in its discretion, may allow the use of [] transcripts if it instructs the jury clearly that the transcripts themselves are not evidence and may be used only as

aids in listening to the audio tapes and as nonbinding guides that are subject to the jurors' own assessment of the transcripts' accuracy." (citations omitted)).

The six recordings are plainly relevant. The two recordings of calls between Jane Doe and Defendant Naughton concern the transmission of payroll information and payments from Navillus to the Consulting Firm to cover the costs of operating the alleged scheme. These recordings are strongly probative of Defendant Naughton's knowledge of and participation in the alleged scheme. The four recordings of Jane Doe's calls with M.N., which concern payroll records maintained by the Consulting Firm on behalf of Navillus, are also relevant and probative of the existence of the alleged scheme. Additionally, given that the recordings are directly pertinent to the alleged charges, the probative value of the recordings is not substantially outweighed by any prejudice or possible jury confusion.

Finally, in his reply brief, Defendant Naughton argued that the Government had not made a showing that the statements of M.N. are admissible as co-conspirator admissions under Rule 801(d)(2)(E). (*See* Dkt. 220, at 12–13.) This rule of evidence allows admission of an out-of-court statement if the district court finds "by a preponderance of the evidence (a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy." *United States v. Coppola*, 671 F.3d 220, 246 (2d Cir. 2012) (quoting *United States v. Farhane*, 634 F.3d 127, 161 (2d Cir. 2011)). "In determining the existence and membership of the alleged conspiracy, the court must consider the circumstances surrounding the statement, as well as the contents of the alleged coconspirator's statement itself." *United States v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014) (citations omitted). Such a determination need not be made prior to trial. *See United States v. Mohamed*, No. 18-CR-603 (ARR), 2020 WL 1686259, at *1 (E.D.N.Y.

Apr. 7, 2020) ("I cannot make a blanket acceptance or rejection of co-conspirator statements at this time.  Those rulings will be made on a case-by-case basis. . . . [B]efore any statement is admitted, I will want to know what the statement is and what the foundation is.").

Accordingly, it was proper to deny Defendant Naughton's motion to exclude Jane Doe's 2016 telephone recordings with respect to the six recordings the Government sought to introduce, and to permit their introduction at trial, subject to authentication and a preponderance showing that the statements by M.N. were non-hearsay statements of a co-conspirator made during and in furtherance of the alleged conspiracy.

### D.    Preclude the Government (But Not Defendants) from Introducing into Evidence Any Rule 16 Material Not Produced by January 27, 2021

The Court decided at the Discovery Conference that in general the Government would not be categorically precluded from introducing materials it produced after the Court-imposed deadline of January 27, 2021, because Defendants had not demonstrated sufficient prejudice from the late disclosure.  The Court, however, exercised its discretion to preclude the Government from introducing voluminous audit reports that were untimely produced without explanation. (9/22/2021 Docket Order.)

### E.    Order the Government to Bates-Stamp All Documents on Its Trial Exhibit List

As discussed at the Discovery Conference, Defendant Naughton has failed to demonstrate sufficient prejudice with respect to the lack of Bates stamping on the Government's trial exhibits. Accordingly, this request was properly denied.

### F.    Order the Government to Provide a Revised Exhibit List Identifying When the Exhibits in the List Were Produced for the First Time

At the Discovery Conference, the Court directed the Government to provide a final trial exhibit list by September 22, 2021.  The Court otherwise did not require the Government to identify when each exhibit on the list was produced for the first time.  Because there is no good reason to

require the Government to identify when exhibits were produced for the first time, and Defendant Naughton failed to show any prejudice from not knowing exactly when a certain exhibit was produced, it was appropriate to deny this request.

### G. Preclude the Government (But Not Defendants) from Introducing All Rule 16 Material that the Government Cannot Demonstrate Was Produced with Bates-Stamps by January 27, 2021

As discussed, the Court found that the categorical exclusion of materials produced after the Court-imposed deadline of January 27, 2021 is inappropriate and unwarranted, and Defendant Naughton has not sufficiently demonstrated prejudice from the lack of Bates-stamping.  Thus, it was proper to deny Naughton's request for preclusion of all Rule 16 material that the Government could not demonstrate was produced with Bates-stamps by January 27, 2021.

### H. Preclude the 2014 Audio Recording Produced to Defendants on May 27, 2021

The 2014 audio recording—which the Government produced on May 27, 2021—was created by an employee at Audit Associates, the auditor for some of the unions, in 2014.  (*See* Dkt. 196-1, at 8–9; *see also* Dkt. 211, at 26.)  In the five-minute-long recording, the Audit Associates employee asks Defendant Naughton whether Navillus has any "affiliates," to which Naughton answers in the negative.  Naughton also agrees to provide employer tax forms to the auditors, identifies jobs on which Navillus was then engaged, and declines to sign an audit report.  (*See* Dkt. 196-1, at 9; Dkt. 211, at 26.)  In his motions *in limine*, Naughton argued that the 2014 audio recording should be excluded because it was untimely produced and is irrelevant and unduly prejudicial.  (*See* Dkt. 196-1, at 13–20.)

As noted, the Court has generally rejected the argument that the Government should be precluded from introducing materials produced after January 27, 2021, including materials produced on May 27, 2021.  Naughton received these materials over four months before trial and

plainly was not prejudiced by its production after the Court-imposed deadline of January 27, 2021 (which was more than eight months before trial).

Naughton's argument as to relevance, however, has more merit.  As Naughton argues, the 2014 recording, particularly the question on "affiliates," was created by the auditors with the intent of uncovering evidence of Navillus's purported use of alter-ego companies (*see* Dkt. 196-1, at 17), and the Court already precluded the Government generally from introducing evidence pertaining to the SDNY civil litigation to show that Navillus used alter-ego companies.  *See O'Sullivan I,* 2021 WL 1979074, at *11–12.  The Government does not respond specifically to this argument; it simply contends that the audio recording "shows Naughton's active involvement in the audit process," and corroborates the auditors' anticipated testimony that "Naughton was their point of contact at Navillus when audits were conducted, that he was involved in making available the requested payroll, tax, and other financial records during the audit process, and that he well understood the auditors' requests and the information those requests were designed to elicit." (Dkt. 211, at 26–27.)  This explanation simply shows that the audio recording is, at best, minimally probative, while likely being cumulative and confusing, particularly given its context and the purported intent with which it was made.  Moreover, even assuming Naughton's active involvement in the audit process is relevant, there is nothing from the description of the audio recording that indicates that it is particularly probative as to that fact.  The Government had many more direct ways of showing Naughton's involvement in the audit process.  Therefore, it was appropriate to grant Naughton's motion to exclude the 2014 audio recording.

## I.    Severance of Defendant Naughton

Defendant Naughton argued as part of his motions *in limine* that his trial should be severed from that of his co-Defendants if the Court denied Donal O'Sullivan's motions to exclude evidence regarding aiding and abetting John Doe's visa fraud and evidence that L.G. was paid under the

name of Donal O'Sullivan's relative J.S.  (Dkt. 193-1, at 1.)  As discussed, the Court did both. Despite these rulings, however, severance of Naughton's trial was unwarranted.

"There is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993).  Thus, a severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539; *see also United States v. Page*, 657 F.3d 126, 129 (2d Cir. 2011) ("[T]he defendant [must] demonstrate[] that the failure to sever [would] cause[] him substantial prejudice in the form of a miscarriage of justice." (quoting *United States v. Blakney*, 941 F.2d 114, 116 (2d Cir. 1991))); *United States v. Ventura*, 724 F.2d 305, 312 (2d Cir. 1983) ("We have held repeatedly that, absent a showing of substantial prejudice, defendants who are jointly indicted should be jointly tried." (citations omitted)).  Even where a defendant shows a risk of prejudice, "less drastic measures" than severance, "such as limiting instructions, often will suffice to cure any risk of prejudice." *Zafiro*, 506 U.S. at 539 (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)).

Naughton failed to demonstrate sufficient prejudice.  To start, as discussed, neither the evidence regarding aiding and abetting of visa fraud nor the evidence of L.G. being paid under the name J.S. is really "other acts" evidence.  Instead, they are direct evidence of the alleged scheme, in which both Naughton and Donal O'Sullivan are charged.  Therefore, Naughton's argument that such evidence is entirely unrelated to whether he engaged in the scheme is misplaced; it is part of the evidence of the alleged scheme itself.  In any event, there is no indication that any of this evidence is such that it would "prevent the jury from making a reliable judgment about guilt or innocence." *See Zafiro*, 506 U.S. at 539.  Accordingly, Defendant Naughton's motion for severance was properly denied.

## V.    Government's Motions

### A.    Preclude Defendants from Introducing Evidence of Navillus's Contributions to Union Benefits Funds

In its motions *in limine*, the Government sought to preclude Defendants from introducing evidence of union benefits contributions that Navillus made during the period charged in the Indictment, arguing that such evidence is irrelevant and violates the longstanding principle that "prior good acts" cannot negate criminal intent.  (*See* Dkt. 186, at 4–7; Dkt. 224, at 2–5.)  The Government also contended that Defendants' introduction of evidence that Navillus paid benefits contributions to show lack of intent would open the door to the SDNY civil litigation evidence of alleged alter-ego companies that the Court had excluded.  (*See* Dkt. 186, at 7–8; Dkt. 224, at 6.) Defendants argued that the Government misconstrued the intended purpose of the contributions evidence.  (*See* Dkt. 213, at 1–9.)  In Defendants' view, such evidence "is plainly relevant—and of immense probative value—as to [their] lack of motive."  (*Id.* at 1.)  Defendants also argued that such evidence does not open the door to the civil litigation evidence of alter-ego companies because that evidence lacks the requisite "similarity" to the charged conduct here, does not rebut an inference of lack of motive, and, as the Court previously found, is unduly prejudicial.  (*See id.* at 9–12.)

Though a close call, the Court agrees with Defendants that a jury could properly infer from evidence of Navillus's contributions to union benefits funds during the relevant period that Defendants lacked the requisite fraudulent intent or that Navillus's failure to pay benefits contributions for its employes paid through the Consulting Firm was inadvertent.  Fraudulent intent requires a showing "that some actual harm or injury was *contemplated* by the schemer"—*i.e.*, "the defendant must intend to harm the fraud's victims."  *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994) (citations omitted).  Given that the "harm" in this case is the loss of contributions,

the magnitude of such lost contributions compared to the magnitude of contributions not lost over the relevant period could be directly probative of a lack of fraudulent intent.  In other words, a jury could infer a lack of fraudulent intent from evidence of Navillus's benefits contributions over the relevant period, independent of improper inferences based on character or propensity.  *See United States v. Sternstein*, 596 F.2d 528, 530–31 (2d Cir. 1979).

The cases on which the Government relies are distinguishable.  In *United States v. Walker*, 191 F.3d 326 (2d Cir. 1999), a case in which the defendant was charged with preparing fraudulent asylum applications, the defendant sought to introduce applications that he had prepared that contained honest accounts of persecution, to disprove fraudulent intent.  The Second Circuit affirmed the district court's exclusion of this evidence because "[w]hether [the defendant] had prepared other, non-fraudulent applications was simply irrelevant to whether the applications charged as false statements were fraudulent."  191 F.3d 326, 336 (2d Cir. 1999).  Here, the evidence of contributions made by Navillus is not akin to the extrinsic, non-fraudulent applications because the purpose of such contributions evidence is not to show lack of intent simply by way of showing that Navillus did not commit fraud in all instances.  Rather, the contributions evidence "goes directly to [their] absence of motive—which in turn bears on whether [they] possessed the requisite guilty knowledge and intent."  (Dkt. 213, at 3.)  The Government's other cases are similarly distinguishable.  *See United States v. Dawkins*, 999 F.3d 767, 792 (2d Cir. 2021) (affirming the district court's exclusion of evidence that the defendant did not bribe certain coaches in a case involving a scheme to bribe basketball coaches); *United States v. Damti*, 109 F. App'x 454, 455–56 (2d Cir. 2004) (summary order) (in a case involving charges of fraud in a moving business, affirming the district court's exclusion of evidence of "good moves," because "[e]ven if many or most of [the] moves were fraudulent, it follows that a substantial portion also presumably

30

were legitimate" and this evidence of legitimate moves "would not have been probative of the key issue during trial"); *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990) (affirming the district court's exclusion of tapes that merely did not include incriminating statements, because "[a] defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on specific occasions"). Thus, it was appropriate to permit Defendants to introduce summary evidence of the amount of Navillus's union benefits contributions over the relevant period.[19]

However, Defendants introduction of this evidence opens the door to at least some of the SDNY civil litigation evidence regarding alter-ego companies that the Court had excluded because its probative value was substantially outweighed by unfair prejudice and the potential for undue delay and confusion of the issues. *See O'Sullivan I*, 2021 WL 1979074, at *11–12; *O'Sullivan II*, 2021 WL 3080330, at *2–3. At the time the Court made that decision, it was unaware Defendants planned to introduce evidence regarding Navillus's contributions to union benefits funds over the relevant period. By seeking to argue a lack of criminal intent based on the magnitude of the contributions Navillus made compared to the magnitude of the contributions it avoided through the alleged payroll scheme, Defendants made the evidence tending to show that Navillus avoided making benefits contributions through other schemes or means plainly relevant and, per Defendants' theory, probative of knowledge and fraudulent intent as to the alleged scheme. *See O'Sullivan I*, 2021 WL 1979074, at *11 ("Here, the connection that the Government proffers is simply that both the scheme alleged in this case and the use of purported alter-ego companies alleged as part of the double-breasting scheme in the civil case had the same goal of avoiding

---

[19] As the Court noted during the FPTC, even if this ruling was in error, it was better to err in Defendants' favor, especially when the Government could readily and effectively counter this evidence by arguing to the jury that the evidence was largely irrelevant and a distraction from the actual evidence of Defendants' alleged fraudulent intent with respect to the charged scheme.

31

contributions to union benefits funds." (internal quotation marks and record citations omitted)). At the same time, this alter-ego evidence still carries the risk of prejudice, confusion, and undue delay.  To avoid the trial from devolving into a retrial of the civil litigation or a sideshow about issues from that case, the Government's presentation of alter-ego evidence would also have to be in summary form and limited to the Navillus employees who were paid through the scheme alleged in this case.  Accordingly, it was proper both to permit Defendants to introduce summary evidence of Navillus's benefits contributions over the relevant period to show lack of motive and fraudulent intent, and to permit the Government to counter that evidence with a limited presentation of evidence of Navillus using other entities besides the Consulting Firm to pay the Designated Employees in this case.[20]

### B.    Preclude Defendants from Offering a "Blame the Victim" Defense

The Government sought *in limine* to preclude Defendants from arguing that the failure of the unions to detect the alleged scheme, or their enabling or condoning of it, absolves Defendants of fraud.  (*See* Dkt. 186, at 8–9.)  Defendants represented that that they had "no intention" of advancing a so-called "blame the victim" defense—and indeed, they did not contest the established rule that negligence or lack of diligence on the part of the victim is no defense to mail and wire

---

[20]    Defendants' opening statements at trial prominently featured argument regarding Navillus's contributions to the union benefits funds named in the Indictment during the relevant period.  Donal O'Sullivan's opening statement even included demonstratives depicting the amount of contributions paid, which were included without objection from the Government.  In light of the opening statements, the Court considered whether to allow the Government to introduce evidence of alter-ego payments for more than just the Designated Employees in this case.  *See Luce*, 469 U.S. at 41–42 ("[E]ven if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling."); *Downing*, 297 F.3d at 59 ("[T]he district court retains broad discretion to balance the evidence's potential prejudice to the defendant against its probative value.").  The Court ultimately did not allow the Government to do so, given its *in limine* ruling described above and the potential prejudice to Defendants, especially given the timing, *i.e.*, after all parties had opened.

fraud.  (*See* Dkt. 206, at 1.); *see also United States v. Thomas*, 377 F.3d 232, 242–43 (2d Cir. 2004).   Indeed, in a wire or mail fraud case, the Government "is not required to prove that an intended victim was actually defrauded to establish a violation by the defendants."  *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) (citations omitted); *see also D'Amato*, 39 F.3d at 1257 ("The scheme to defraud need not have been successful or complete.  Therefore, the victims of the scheme need not have been injured." (citations omitted)).  Defendants nevertheless contended that evidence of the union's actual knowledge and acceptance of Navillus's payroll methods was "relevant to whether Defendants engaged in a fraudulent scheme in the first place."  (Dkt. 206, at 2 (emphasis removed).)  Defendants posited that, at a minimum, the Government's motion was premature and that the Court could not decide to exclude an entire line of evidence and argument without having seen the Government's case.  (*See id.* at 6–7.)  The Government did not object to the Court deferring on its motion.  (Dkt. 224, at 7.)  Accordingly, the Court did not need to, and does not now, decide this issue.[21]

### C.   Preclude Defendants from Cross-Examining John Doe About Inflammatory Emails

The Government also moved *in limine* to preclude Defendants from cross-examining John Doe about inflammatory emails[22] he frequently received, on the basis that they have no probative value and would be unduly prejudicial.  (*Id.* at 13–15.)  Defendants responded that they "do not intend, at this time, to rely on these emails to cross-examine John Doe," but "reserve the right to use this evidence in cross-examination of John Doe, if subsequent events reveal that the emails are

---

[21]  At trial, Defendants did not attempt to advance a "blame the victim" defense.

[22]  The Government described the emails "as off-color jokes . . . , including ones with racist, sexist, religiously prejudiced, homophobic, and sexually explicit contents."  (Dkt. 186, at 13.)

relevant to John Doe's testimony." (Dkt. 213, at 20.) Therefore, the Court did not need to, and does not now, decide this issue.[23]

### D. Permit the Government to Cross-Examine Donal O'Sullivan—if He Testifies—About Findings that He Committed Perjury, As Well As Other Adverse Credibility Findings Against Him

In the SDNY civil litigation regarding Navillus's alleged use of alter-ego companies, Judge McMahon found, among other adverse credibility findings, that Donal O'Sullivan twice perjured himself during the case. *See Moore*, 276 F. Supp. 3d at 138 ("I do not credit Donal O'Sullivan's testimony that he forgot about holding an option to purchase the interests of Corcoran and O'Donnell in ACS. That is an obvious falsehood; as I remarked during the trial, Donal O'Sullivan is not a man who forgets a business deal. I conclude that Donal O'Sullivan perjured himself in giving both his deposition testimony (in which he disclaimed the existence of any options) and his trial testimony (in which he claimed to have forgotten about the options until he discovered copies in his office in July of 2017—conveniently three months after the options expired)." (internal record citations omitted)). In its motions *in limine*, the Government argued that it should be permitted to cross-examine Defendant Donal O'Sullivan regarding Judge McMahon's finding of perjury and other adverse credibility findings if he chose to testify.[24] (Dkt. 186, at 16–22.)

Donal O'Sullivan advanced four separate grounds for rejecting the Government's argument: (1) Judge McMahon's decision has been vacated, and her findings therefore are a nullity and should be treated as if they "never existed"; (2) Judge McMahon's findings are inadmissible hearsay; (3) an analysis of the factors set forth in *United States v. Cedeño*, 644 F.3d 79, 83 (2d Cir.

---

[23] At trial, Defendants did not seek to cross-examine John Doe about his inflammatory emails.

[24] Donal O'Sullivan did not testify at trial.

2011),[25] favor preclusion; and (4) the findings should be excluded under Rule 403.  (Dkt. 213, at 12–20.)

Rule 608(b) allows cross-examination regarding "specific instances of a witness's conduct . . . if they are probative of the character for truthfulness or untruthfulness." Fed. R. Evid. 608(b).  "Even if the specific instance is probative of the witness's veracity, the court still must balance that probative value against the risk of unfair prejudice to the defendant, pursuant to Rule 403." *United States v. Desposito*, 704 F.3d 221, 233–34 (2d Cir. 2013) (citations omitted).  Such decisions are within the sound discretion of the court.  *See id.* at 233.

Despite the potentially high probative value of Judge McMahon's findings, it is substantially outweighed by the unfair prejudice.  First, "judicial findings of fact present a rare case where, by virtue of their having been made by a judge, they would likely be given undue weight by the jury, thus creating a serious danger of unfair prejudice." *Nipper v. Snipes*, 7 F.3d 415, 418 (4th Cir. 1993) (internal quotation marks and citations omitted); *see also United States v. Benjamin Brandon Gray*, 891 F.3d 1054, 1058–59 (D.C. Cir. 2018) ("A practical reason for denying judgments evidentiary effect . . . is the difficulty of weighing a judgment, considered as evidence, against whatever contrary evidence a party might want to present, especially for a jury, which is apt to give exaggerated weight to a judgment." (internal quotation marks, alterations, and

---

[25] In *Cedeño*, the Second Circuit set forth a list of non-exhaustive factors to consider in deciding whether prior judicial credibility findings are admissible: (1) "whether the prior judicial finding addressed the witness's veracity in that specific case or generally"; (2) "whether the two sets of testimony involved similar subject matter"; (3) "whether the lie was under oath in a judicial proceeding or was made in a less formal context"; (4) "whether the lie was about a matter that was significant"; (5) "how much time had elapsed since the lie was told and whether there had been any intervening credibility determination regarding the witness"; (6) "the apparent motive for the lie and whether a similar motive existed in the current proceeding"; and (7) "whether the witness offered an explanation for the lie and, if so, whether the explanation was plausible."  644 F.3d at 82–83 (citations omitted).  The parties in *Cedeño* had waived the issue of whether past judicial credibility determinations are inadmissible hearsay.  *Id.* at 83 n.3.

citations omitted)); *United States v. Sine*, 493 F.3d 1021, 1033–34 (9th Cir. 2007) ("[J]urors are likely to defer to findings and determinations relevant to credibility made by an authoritative, professional factfinder rather than determine those issues for themselves."). Second, cross-examination regarding Judge McMahon's findings, even if limited to the fact that they occurred, may create a mini-trial on the circumstances in which they occurred. Third, considering that Donal O'Sullivan is a criminal defendant rather than just another witness, there is the risk that the jury may improperly convict him because another judge made adverse findings against him.

Thus, it was appropriate to preclude the Government from cross-examining Donal O'Sullivan about Judge McMahon's finding of perjury and other adverse credibility findings against him, if he testified at trial.[26]

---

[26] The Court does not find Donal O'Sullivan's other arguments compelling. First, even though vacatur may render a judgment and underlying findings a nullity, that simply means that they have no preclusive effect, not that they never happened. *See Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 970 F.2d 1138, 1146 (2d Cir. 1992) (explaining that "a vacated order has no collateral estoppel effect"); *Dodrill v. Ludt*, 764 F.2d 442, 444 (6th Cir. 1985) (per curiam) ("[T]he general rule is that a judgment which is vacated, for whatever reason, is deprived of its conclusive effect as collateral estoppel." (citations omitted)). Second, despite Donal O'Sullivan's conclusory statement that the Government was seeking to introduce Judge McMahon's findings for their truth (Dkt. 213, at 15), there is no indication that the Government actually sought to establish that Donal O'Sullivan committed perjury, as opposed to establishing that a federal judge found that he had committed perjury. Therefore, the findings are not inadmissible hearsay in this case. *See United States v. Gonzalez*, 905 F.3d 165, 198–99 (3d Cir. 2018) (distinguishing a Ninth Circuit decision and affirming the district court's admission of a Family Court order on the basis that the Government did not attempt to present the order for the truth of the factual findings, and because the district court gave a limiting instruction). Third, the *Cedeño* factors on balance favor admissibility. The credibility findings were specific, and the lies were made while under oath in relatively recent litigation. These false statements also were significant in that they bore directly on the issue of liability in a case with tens of millions of dollars at stake. Additionally, there would be a similar motive to lie here as there was in the civil case; in fact, there might be a stronger motive, given that this is a criminal case. Further, there was no explanation for the prior false statements. Finally, even if the subject matter of the civil case and that of this case differ, they both share a nexus of union benefits contributions, and any differences are strongly outweighed by the other factors.

### E.    Set a Schedule for Production of Reciprocal Discovery from Defendants

In light of the early deadlines that the Court set for the Government to produce exhibit and witness lists as well as *Giglio* and 3500 materials, the Government asked the Court to "also set deadlines in advance of trial for the disclosure by the defense of any Rule 16 material, including notice of any expert witnesses." (Dkt. 186, at 22.) That request was granted in part at the FPTC.

Where, as here, a criminal defendant requests discovery from the Government under Rule 16(a)(1)(E), the defendant must also permit the Government to inspect any document or record that the defendant "intends to use . . . in the defendant's case-in-chief at trial." Fed. R. Crim. P. 16(b)(1)(A). This Court has interpreted a defendant's "case-in-chief" to include any affirmative, *i.e.*, non-impeachment, evidence that the defendant seeks to introduce through a government witness during the government's case-in-chief. *United States v. Napout*, 15-CR-252 (PKC), 2017 WL 6375729, at *7 (E.D.N.Y. Dec. 12, 2017). Accordingly, "Rule 16 requires Defendants to identify all non-impeachment exhibits they intend to use in their defense at trial, whether the exhibits will be introduced through a government witness or a witness called by a Defendant." *Id.* Yet, as a practical matter, rather than set firm deadlines, the Court in *Napout* "adopted the approach used by many courts, and advised [the defendants] that if they sought to introduce an exhibit as affirmative evidence at trial—*i.e.*, for a purpose other than impeachment—the Court, on the government's motion, would consider whether the defense had failed to timely disclose that exhibit under Rule 16." *Id.* at *8.

Because the Court finds no reason to depart from this approach, it was appropriate for the Court to direct Defendants to: (1) disclose to the Government and summarize any expert testimony that they intended to introduce at trial within three days of the FPTC (*see* 9/28/2021 Minute Entry; *see also* FPTC Tr., at 90:15–91:10); and (2) disclose their exhibits and witnesses, including 3500 material, as soon as they knew such exhibit or witness would be introduced. (*See* 9/28/2021

Minute Entry; *see also* FPTC Tr., at 92:6–18 (reminding defense counsel that the Court had required the Government to disclose its preliminary exhibit and witness lists 60 days prior to trial and that unnecessary delays during trial would not be countenanced.)  Indeed, the Court warned Defendants, in general, to "proceed cautiously," because the Court would not "keep the jury waiting on something that [could be] resolved earlier and that the government has a right to review."  (FPTC Tr., at 91:18–23.)

## CONCLUSION

For the reasons discussed herein and at the final pretrial conference on September 28, 2021, the parties' motions *in limine* (Dkts. 181, 185, 186, 191, 192, 193, 194, 195, 196, 198) are granted in part and denied in part.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: November 5, 2021
　　　　Brooklyn, New York