UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
UNITED STATES OF AMERICA,

    - against -

DONAL O'SULLIVAN, HELEN
O'SULLIVAN, and PADRAIG NAUGHTON,

                 Defendants.
--------------------------------------------------------x

**MEMORANDUM & ORDER**
20-CR-272 (PKC)

PAMELA K. CHEN, United States District Judge:

       Defendants Donal O'Sullivan, Helen O'Sullivan, and Padraig Naughton (collectively, "Defendants"), officers or high-ranking employees at Navillus Tile, Inc. d/b/a Navillus Contracting ("Navillus")—one of the largest construction companies in New York City—are charged in this case with crimes relating to their participation in a multi-year fraud scheme to evade making required payroll contributions to certain benefits funds for Navillus employees who performed work covered by collective bargaining agreements ("CBAs"). (Indictment, Dkt. 1, ¶¶ 1, 6–7.) The Indictment, unsealed on July 30, 2020, alleges that between 2011 and 2017, Defendants "conspired to execute, and executed, a scheme to evade making" contributions to the benefits funds. (*Id.* ¶ 11.) The Indictment also alleges that Defendants carried out this scheme by fraudulently funneling payroll funds for its employees through a consulting firm, D.E.M. Consulting LLC d/b/a/ as Allied ("D.E.M. Consulting" or "Allied"), that was not a party to the CBAs, so that it appeared that Navillus did not have to make benefits contributions or submit remittance reports to the benefits funds with respect to those employees' "covered work," *i.e.*, work for which benefits were owed under the CBAs. (*See id.* ¶¶ 4, 12–13.) The Indictment charges Defendants with conspiracy to commit mail and wire fraud, several counts of wire fraud and mail fraud, conspiracy to embezzle from employee benefits funds, embezzlement from employee

benefits funds, conspiracy to file false remittance reports, and the submission of false remittance reports.  (*Id.* ¶¶ 17–34.)  On October 22, 2021, at the conclusion of a 17-day trial in this matter, the jury returned guilty verdicts against all Defendants as to all counts of the Indictment.

Before the Court are Defendants' motions for acquittal under Federal Rule of Criminal Procedure 29, or, alternatively, for a new trial pursuant to Federal Rule of Criminal Procedure 33. For the reasons stated herein, Defendants' motions are denied in their entirety.

## BACKGROUND

### I.     The Indictment

The Indictment alleges that Navillus was a signatory to CBAs under which it was required to hire union workers for construction projects and make contributions to union benefits funds (the "Benefits Funds") for these workers based on the number of hours of covered work these workers performed.[1]  (*Id.* ¶¶ 2–5.)  According to the Indictment, although the CBAs required Navillus to employ union workers for covered work, if Navillus employed non-union workers for such work, it was still required to make contributions to the Benefits Funds with respect to that work.  (*Id.* ¶ 4.)  Navillus was also required to submit periodic reports to the Benefits Funds ("Remittance Reports") detailing the number of hours worked by each union and non-union worker.  (*Id.* ¶ 5.)

The Indictment charges Defendants Donal O'Sullivan, Helen O'Sullivan, and Padraig Naughton with eleven violations of federal law.  Count One of the Indictment charges conspiracy under 18 U.S.C. § 1349 to commit mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. (*Id.* ¶¶ 17–18.)  Counts Two through Seven charge several substantive acts of mail fraud and wire

---

[1] The Benefits Funds include, but are not limited to, funds associated with seven unions: (1) the Bricklayers and Allied Craftworkers Local Union No. 1; (2) the New York City District Council of Carpenters; (3) the Cement Masons Union; (4) the Cement and Concrete Workers District Council; (5) the Mason Tenders District Council; (6) the Pointers, Cleaners and Caulkers; and (7) the International Brotherhood of Teamsters Local 282.  (Indictment, Dkt. 1, ¶ 2.)

fraud under 18 U.S.C. §§ 1341 and 1343. (*Id.* ¶¶ 19–24.) Count Eight charges conspiracy under 18 U.S.C. § 371 to embezzle or steal from employee benefits funds in violation of 18 U.S.C. § 664. (*Id.* ¶¶ 25–27.) Count Nine charges a substantive violation of 18 U.S.C. § 664. (*Id.* ¶¶ 28–29.) Count Ten charges conspiracy under 18 U.S.C. § 371 to submit false remittance reports in violation of 18 U.S.C. § 1027. (*Id.* ¶¶ 30–32.) Finally, Count Eleven charges a substantive violation of 18 U.S.C. § 1027.[2] (*Id.* ¶¶ 33–34.)

## II.   The Trial

At the trial, the Government called the following 24 witnesses:

- Government's cooperating witnesses: Kieran Lambe, owner of Allied (Trial Transcript ("Tr.") 1321:1–1541:1), and Georgeanne Kelly, former Accounts Manager at Allied (Tr. 2007:22–2245:17);

- Former Navillus employees: Vincent LaPenta (Tr. 906:25–979:21), Gerard Tully (Tr. 1245:19–1269:10), Michael Hope (Tr. 1865:1–1905:25), Giulio Pomponio (Tr. 1906:12–1946:19), Joel Borris (1969:1–2006:11), Luis Gonzalez (Tr. 2287:23–2369:20), Alfred Santana (Tr. 2371:4–2420:17), and Gregory Daniel Kelly (Tr. 2442:10–2517:1);

- Union and union benefits fund employees: David Bolger, Field Representative for the Masons Tenders District Council (Tr. 979:23–1042:22), Paul Capurso, President of the New York City District Council of Carpenters (Tr. 1189:14–1245:1), William Davidian, Employer Services Director of the New York District Council of Carpenters Benefits Fund (Tr. 1269:22–1292:8), Jack Argila, President of the Bricklayers Union (Tr. 1557:6–1608:25), Carole Perisi, Comptroller and Office Manager for the Pointers, Cleaners and Caulkers Fringe Benefits Fund (Tr. 1609:18–1643:24), Jorge Cano, Comptroller for the Bricklayers Fund (Tr. 1645:1–1664:16), Lisa Parisi, Fund Administrator at the Northeast District Council of the OPCMI Fringe Benefit Fund, which includes the Cement Masons Union (Tr. 1705:10–1756:18), Mario Bulding, Fund Administrator at the Teamsters Local 282 Trust Funds (Tr. 2246:6–2278:16), and Tony Ho, Payroll Auditor at the Teamsters Local 282 Trust Funds (Tr. 2420:24–2441:22);

- Auditors and compliance firms: William Austin, an employee of Schultheis & Panettieri, an accounting firm that managed payroll audit for the Mason Tenders District Council Trust Funds (Tr. 1091:10–1189:5), Viorel Kuzma, Director in the Payroll Audit

---

[2] Before trial, the Court "dismisse[d] as time-barred the portions of Counts Nine and Eleven that charge[d] conduct prior to July 29, 2015." *See United States v. O'Sullivan*, 20-CR-272 (PKC), 2021 WL 1979074, at *9 (E.D.N.Y. May 18, 2021).

Department at Schultheis & Panettieri (Tr. 1666:1–1704:12), Ankur Patel, Payroll Compliance Review Manager at Novak Francella, a firm that conducts compliance review of union benefits funds (Tr. 1293:9–1308:24.), and Hany Kilada, President of Audit Associates, a compliance accounting firm (Tr. 1759:1–1863:12); and

- Special Agent Maureen Buoneto, U.S. Department of Labor Office of Inspector General (Tr. 2525:18–2989:21).

Additionally, the Government introduced various documentary and audio evidence, including weekly payroll sheets and new employee documents for Navillus employees paid through Allied; employee paychecks issued by Allied; invoices issued to Navillus by Allied; checks issued to Allied by Navillus to cover the costs of the alleged scheme; email correspondence; recordings of calls between Navillus and Allied employees regarding the alleged scheme; Remittance Reports; audit reports; and CBAs.

Defendants called one witness, David Hegarty, a Navillus yard Supervisor. (Tr. 3012:1–3080:15.)[3]

The following facts were established at trial.

### A.    Defendants' Relationship With Kieran Lambe

Kieran Lambe is the owner of D.E.M. Consulting a/k/a Allied. (Tr. 1322:3–6; 1323:21–22.) D.E.M. Consulting/Allied is not a signatory to any CBAs, and thus does not owe benefits payments for its workers. Lambe is originally from Ireland and came to the United States in 2003 on a visitor travel visa. (Tr. 1321:6–21; 1328:7–1329:4.) Lambe then worked for a construction

---

[3] Because Defendants moved for acquittal at the close of the Government's case, and the Court reserved ruling, the Court considers only the evidence presented by the Government in deciding Defendants' arguments under Federal Rule of Criminal Procedure 29. *See United States v. Velazquez*, 271 F.3d 364, 371 (2d Cir. 2001). However, the Court can consider Hegarty's testimony with respect to Defendants' request for a new trial under Federal Rule of Criminal Procedure 33.

company that sponsored his J-1[4] visa until approximately 2006, when the company shut down. (Tr. 1329:14–1330:15.)  Approximately two months after losing his job, Lambe started D.E.M. Consulting and obtained a E-2[5] investor visa. (Tr. 1331:2–1332:23.)  Renewal of an E-2 investor visa is contingent upon the applicant's business's financial growth. (Tr. 1341:8–19.)  In other words, to receive E-2 visa renewals, Lambe had to show that D.E.M. Consulting's business grew from the time of his last application. (Tr. 1428:25–1429:3.)

In early 2008, Navillus hired Lambe as a project manager for a construction job in Harlem, New York. (Tr. 1332:24–1333:22.)  As Lambe worked on various projects for Navillus, he interacted with Donal O'Sullivan, Navillus's founder and president, who was "hands-on," and Padraig Naughton, Navillus's controller or head accountant, among others. (Tr. 1335:4–12; 2518:15–16; 2520:19–2521:1.)  The group had monthly meetings to discuss scheduling and financial reviews.  Lambe worked out of Navillus's office every day, first in Long Island City and later in Manhattan. (Tr. 1336:1–21.)  At the Navillus office, Lambe interacted with Helen O'Sullivan, Donal O'Sullivan's sister who worked in Navillus's payroll department, approximately once a week in connection with "[m]aterial delivery docket[s]." (Tr. 1337:6–20; 2518:24–2519:4.)

---

[4] "The J-1 classification (exchange visitors) is authorized for those who intend to participate in an approved program for the purpose of . . . consulting, demonstrating special skills, [and] receiving training[.]"  Exchange Visitors, United States Citizenship and Immigration Services ("USCIS"), https://www.uscis.gov/working-in-the-united-states/students-and-exchange-visitors/exchange-visitors (last visited Apr. 1, 2022).

[5] "The E-2 nonimmigrant classification allows a national of a treaty country . . . to be admitted to the United States when investing a substantial amount of capital in a U.S. business. Certain employees of such a person or of a qualifying organization may also be eligible for this classification."  E-2 Treaty Investors, USCIS, https://www.uscis.gov/working-in-the-united-states/temporary-workers/e-2-treaty-investors (last visited Apr. 1, 2022).

**B.    The Arrangement to Funnel Navillus Employee Payroll Funds Through Allied**

In February 2011, Navillus began funneling payroll for some of its employees through Allied.  The evidence introduced at trial regarding the details of this arrangement and how it developed is discussed below.

1.    Allied Gets Set Up to Provide Services to Navillus

In 2009–2010, Lambe submitted an application to renew his E-2 visa, expecting to receive a five-year renewal; however, the renewal was approved only through 2011.  At that time, Lambe's primary source of income was from construction consulting work he was doing directly for Navillus, which kept him very busy.  (Tr. 1337:25–1339:4.)  Sometime in 2010, Lambe spoke with Donal O'Sullivan about his work at[6] Navillus, and based on that conversation, believed that he would continue to have full-time work at Navillus in 2011, when his E-2 visa would be up for renewal again.  As a result, Lambe turned down an offer for a project at another company.  (Tr. 1339:3–1340:2.)  However, sometime in late 2010/early 2011, Donal O'Sullivan told Lambe that his work for Navillus would be reduced to one day a week, and that Lambe had to "finish up" the Navillus projects he was working on at the time.  (Tr. 1340:3–15.)

Donal O'Sullivan and Lambe had a subsequent conversation, where Lambe told Donal O'Sullivan that he needed full-time work because he had a "mortgage and family to feed" and that

---

[6] Lambe's testimony about his exact work arrangement with Navillus at this time is somewhat conflicting.  Lambe testified both that he did construction consulting "directly for Navillus" (Tr. 1338:13–19) and that he was a consultant through D.E.M. Consulting (Tr. 1501:5–15).  It is clear, however, that Lambe was working out of the Navillus office, that all of his work at this time was for Navillus, *i.e.*, he did not do consulting work for other clients, and that he had a "navillusinc.com" email address.  (Tr. 1338:16–19 ("Q At that time what was the primary source of your income? A From consulting. Q How many clients did you have? A I worked directly for Navillus at the time."); 1380:24–1381:2 ("Q Did you have an email address at navillusinc.com? A Yes. Q Was that part of your work for Navillus? A Yes.").)

working part-time would put Lambe "further into marginality on visa renewal." (Tr. 1340:20–
1341:19.) In response, Donal O'Sullivan said that there might be something he and Lambe could
"work out" and mentioned subcontracting. (Tr. 1341:20–1342:2.) Donal O'Sullivan then referred
Lambe to Padraig Naughton to discuss insurance. (Tr. 1346:22–25.)

On the heels of his conversation with Donal O'Sullivan, Lambe connected with Naughton,
who "set [D.E.M. Consulting] up with Island Risk to get an insurance quote." (Tr. 1347:1–6.)
Lambe then opened bank accounts, obtained a line of credit, and rented an office space. (Tr.
1347:7–17.) At this early stage, Naughton exerted control over D.E.M. in various ways: he
requested that Lambe change the name from D.E.M. Consulting to "D.E.M. Consulting, LLC
d/b/a/ Allied," (Tr. 1347:21–1349:2), he contacted ADP to set up payroll for D.E.M., and started
providing information to Lambe regarding how D.E.M., now Allied, would operate.

For example, on January 25, 2011, Naughton sent an email to Peter Billera at ADP asking
for a quote for Allied "on 20 employees weekly payroll year-end W2" and stating that ADP's
services would need to be in place within a week. (Tr. 1348:12–1349:24.) Lambe did not know
why Naughton requested the quote for 20 people or why payroll needed to be set up quickly. (Tr.
1349:6–20.) On the same day, Naughton also emailed Jeff Walsh, an insurance broker, to set up
insurance for Allied, telling Walsh that he could call Naughton to discuss. (Tr. 1358:6–1359:2.)
Lambe did not know Walsh and was not included on the email that Naughton had sent to Walsh.
(Tr. 1359:3–6.) In a subsequent email to Walsh, Naughton included Lambe and urged Walsh to
"fast track" the process of getting general liability insurance for Allied. (Tr. 1360:2–15.) Walsh
did, in fact, obtain insurance quotes for Allied, based on information and completed forms
provided to him by Naughton and someone other than Lambe. This information included things
that Lambe knew nothing about—such as the fact that Allied would be providing tile

subcontracting work to Navillus, and trade classifications supplied by Naughton, *e.g.*, "[m]ason work," "[t]ile work," and "debris removal." (Tr. 1362:10–1366:20.)

Naughton also exerted control over the invoices Allied provided to Navillus. (Tr. 1369:4–1371:10.) For example, when on February 9, 2011, Lambe sent an invoice to Naughton for the insurance coverage Naughton set up for Allied, the header of the invoice stated that it was issued by "D.E.M. Consulting, LLC d/b/a Allied," and listed Lambe's apartment address. (GX 284; *see also* Tr. 1400:10–11.) Naughton responded by requesting that Lambe send the invoice "without Allied" and said "[w]e will alternate the names." Naughton did not explain to Lambe what he meant by "alternate the names" and Lambe did not have an understanding as to why alternating names would matter. (Tr. 1369:4–1371:13.)

2.    Lambe Learns From Naughton That Allied Will Process Navillus's Payroll

On February 9, 2011, while Lambe was still working out of Navillus's office and preparing to apply for his E-2 visa renewal, Naughton sent an email to Lambe, which said: "Kieran, see attached payroll for processing. Call me to discuss. Thanks." (Tr. 1372:23–1373:5, 1376:14–18, 1428:15–24.) The email had an attachment, which was a weekly Navillus payroll summary sheet dated February 8, 2011. The payroll sheet included a list of Navillus employees, the hours they had worked, and their pay rate, among other things. Lambe neither knew the employees listed in the payroll sheet, nor their hours or pay rates. (Tr. 1373:9–1374:6.) In fact, prior to receiving the email, Lambe did not have any explicit discussions with anyone at Navillus about processing payroll and believed that he would be doing subcontracting construction work for Navillus. (Tr. 1536:14–22.) Instead, Naughton asked Lambe to process payroll for a certain number of Navillus's employees, but not all of them, since Navillus has an internal payroll department that

8

includes Helen O'Sullivan and three other employees. (Tr. 2519:17–21.) Naughton is not part of Navillus's payroll department; he is the "controller[] or head accountant." (Tr. 2520:19–2521:1.)

The following events occurred immediately or shortly after Lambe received Naughton's email:

- Lambe called Naughton to discuss the email but could not reach him. He realized that he was now being asked to do "payroll processing," not subcontracting as he expected, but he never ended up having a discussion with Naughton about the change in services that Allied was to provide to Navillus. (Tr. 1374:7–1375:3.)

- Lambe had never processed employee payroll before, so he did not know how to "actually submit it on ADP." (Tr. 1375:6–9.) Lambe and Naughton exchanged emails about the logistics because Lambe was not familiar with the process and Lambe was missing necessary information. For example, because these employees were not, in fact, Allied employees, Lambe was missing their W-4[7] tax forms and was not able to enter these Navillus employees into the Allied ADP system. (Tr. 1375:13–1377:10, 1378:16–1379:2.)

- Lambe sent the payroll sheet to Peter Billera at ADP, requesting help with processing and asking that checks be issued under Allied's name and with Lambe's apartment address, but delivered to Navillus's office. (Tr. 1377:13–1379:2.)

- Because Lambe was having difficulty with processing the payroll for Navillus, Lambe advised Naughton that the first payroll that Lambe had received from Naughton, on Wednesday, February 9, 2011, would not be completed until the following Monday or Tuesday. This was significant because checks had to be issued that Friday, February 11, 2011. (Tr. 1378:23–1379:8.)

- On Monday, February 14, 2011, Naughton emailed Lambe, copying Helen O'Sullivan, and asked if Navillus could "expect the checks" that day. (Tr. 1380:18–1381:11.) Lambe responded that checks would be delivered the following day, and said: "As soon as Helen has the [payroll] list for me, send it over so I can input [it] into ADP and expedite checks for the next run for 2/17." (Tr. 1381:13–21.)

- Helen O'Sullivan and Lambe then exchanged emails, wherein Helen O'Sullivan promised to send the Navillus payroll sheet to Lambe as soon as Navillus confirmed its employees' hours. (Tr. 1382:5–16.) Helen O'Sullivan also confirmed receipt of the checks from ADP

---

[7] Employees complete W-4 tax forms "so that [their] employer[s] can withhold the correct federal income tax from [their] pay." About Form W-4, Employee's Withholding Certificate, Internal Revenue Service ("IRS"), https://www.irs.gov/forms-pubs/about-form-w-4 (last visited Apr. 2, 2022).

for the Navillus payroll sheet dated February 8, 2011, which were being delivered directly to Navillus's office at that time. (Tr. 1382:23–1383:3.)

Following Naughton's first email on February 9, 2011, to Lambe requesting him to process a payroll sheet for Navillus, Naughton and Helen O'Sullivan continued to email Allied regarding payroll sheets and Navillus employee checks over the next six years. (*See generally*, Tr. 1321:1–1498:17 (Lambe direct testimony); Tr. 2007:22–2197:5 (Kelly direct testimony).)

Allied got paid well for processing the select Navillus employees through its own payroll. Allied invoiced Navillus for the paystubs it issued, with a 5% markup. (Tr. 1387:16–1388:3; 2091:17–19.) For example, between February and December 2011, Navillus paid approximately $1.4 million to Allied. (Tr. 1423:1–1425:6.) Allied got paid by 348 checks, signed by Donal O'Sullivan and Helen O'Sullivan, which were at first hand delivered to Lambe[8] and later directly deposited into Allied's bank account. (Tr. 2095:3–2096:10; 2555:2–4.) In total, Navillus paid approximately $9 million to Allied between February 2011 and December 2016. (Tr. 2554:19–2555:1.)

Once the process was set up, Lambe hired two Allied employees—Georgeanne Kelly and David Lyons. In January 2012, Kelly took over the management of the Navillus employee payroll for Allied. (Tr. 1444:13–1447:16, 1452:5–13, 2010:20–25.) Naughton or Helen O'Sullivan (and later other Navillus employees) emailed Lambe or Kelly with a Navillus payroll sheet, which included a list of Navillus employees indicating their hours, rates, and trades, *e.g.*, laborer, carpenter, bricklayer, teamsters, plasterer, etc. The submissions also sometimes included handwritten notes and new employee forms. Helen O'Sullivan also frequently emailed Kelly regarding issues related to specific Navillus employees' payroll. (*See e.g.*, Tr. 2053:9–2054:14

---

[8] Initially, Lambe often received these checks at the same time Navillus employees' checks were delivered or picked up. (Tr. 1419:15–1420:4.)

(Vincent LaPenta), 2055:11–2057:8 (Aidan Lundy), 2057:11–25 (Manuel Muzha), 2058:1–2059:14 (Michael McGivney), 2060:21–2061:16 (Alfred Santana).)  In addition to using to her official Navillus email, Helen O'Sullivan also used alliedpayroll9@gmail.com, an anonymous Gmail account, to email Kelly about Navillus employee payroll issues.  (Tr. 2081:4–2086:13.)[9]

No one at Allied recognized the Navillus employees because they did not in fact work for Allied; yet, Lambe and Kelly continued to manually enter those employees into Allied's ADP system to process the Navillus payroll sheets.[10]  (Tr. 1384:3–1400:20.)  The same was true for Navillus employees themselves—they did not understand that they were not, in fact, being paid by Navillus.  (*See e.g.*, Tr. 931:4–934:19 (Vincent LaPenta's testifying he was not familiar with Allied and did not understand that he was not getting paid by Navillus directly).)  At Navillus's request, Allied sometimes issued multiple checks for the same employee within the same pay period.  (Tr. 2030:11–2033:9.)

ADP initially delivered the Navillus employees' checks to Navillus's office (Tr. 1377:13–1378:15), but that quickly changed.   In February 2011, Allied set up a new office in Woodside, Queens, and in early March 2011, Lambe told Naughton that he was "working on changing the address" with ADP to "reconfigure the check[s]."  Around the same time, Naughton told Lambe

---

[9] Georgeanne Kelly also received a Navillus payroll processing email from an anonymous Gmail account hoursdec2015@gmail.com, which Kelly processed because it contained the payroll sheet, although she did not know who sent it.  (Tr. 2086:14–2087:21.)  Additionally, Mark Naughton, a Navillus payroll employee not related to Padraig Naughton, used a Gmail email account, marknaughton@gmail.com, text messages, and phone calls to communicate with Kelly in connection with the alleged payroll scheme.  (Tr. 2169:1–2178:19, 2184:16–2192:16.)

[10] Although Lambe was not personally familiar with the Navillus employees for which Allied was "processing payroll," Lambe knew that the rates on the payroll sheets were lower than union pay rates and thus were non-union pay rates.  (Tr. 1490:24–1491:10.)  Lambe therefore came to understand that the Navillus employees he was running payroll for were not getting union wages.  (Tr. 1536:23–1537:7.)  As much was indicated on the later payroll sheets.  (Tr. 1517:22–1518:21.)

that checks that week had to be delivered to the house of Dymphna Coleman, a Navillus payroll department employee who lived near Lambe. (Tr. 1398:11–1399:7; 1400:6–20; 1401:7–1404:22.) Similarly, in early April 2011, Coleman told Naughton in an email that checks could not be delivered to Navillus's office. Lambe responded to Coleman, copying Naughton and Helen O'Sullivan: "Dymphna, okay. So I will drop over to you after work or Ricky [a Navillus driver] can stop by my office tomorrow and pick up." (Tr. 1406:1–1407:18.) Thus, under this new system, ADP delivered the checks to Allied's new office in Woodside, Queens, and then either Lambe or a Navillus driver, sometimes at Helen O'Sullivan's direction, delivered them to Navillus's yard or Coleman's house. (*See e.g.*, Tr. 1403:4–1410:4; 2049:12–2052:4 ("Q So, Ms. O'Sullivan notified you that Victor [a Navillus driver] would be coming to the office [to pick up the checks]? A Correct.").)

### 3. Navillus Uses the Allied Payroll to Violate Its Obligations to Pay Benefits for Covered Work

The weekly payroll sheets and new employee forms that Navillus sent to Allied often identified the trade to which the listed employee belonged. (*See e.g.*, Tr. 1390:3–1391:5 (Lambe describing a payroll sheet that included trades such as bricklayer, teamster, plasterer, etc.); 1394:7– (Lambe describing new employee information for Stephen Magee, which includes a "carpenter" trade classification); 1538:9–17 (Lambe describing new employee information for Gerard Tully, which includes a "tiler" trade classification).) These trade classifications were internal to Navillus, meaning that they were assigned by Navillus—not a third party—to its employees during the onboarding process. Some of the trades were covered by CBAs pursuant to which Navillus owed benefits contributions to the union benefits funds. Multiple former Navillus employees testified to performing work that the Government argued to the jury was covered work. (Tr. 912:3–9, 916:15–20 (Vincent LaPenta); Tr. 1252:7–8, 1257:2–4 (Gerard Tully); Tr. 1870:15–19, 1872:19–

20 (Michael Hope); Tr. 1918:19–1919:8 (Guilio Pomponio); Tr. 1971:8–12 (Joel Borris); Tr. 2296:20–2297:25, 2299:16–21 (Luis Gonzalez); Tr. 2380:2–2381:25 (Alfred Santana); Tr. 2449:19–24, 2459:9–2460:25 (Gregory Daniel Kelly).)

Additionally, Luis Gonzalez, a former Navillus employee paid through Allied, did various jobs such as demolition, caulking, cleaning, painting, bricklaying, carpentry, and other trades. (Tr. 2296:17–2300:21.) Gonzalez, an undocumented worker, was paid by Navillus under the name of Donal O'Sullivan's brother-in-law, John Michael Sugrue, despite Gonzalez asking to be paid in his own name. (Tr. 2288:13–19; 2293:10–2295:21; 2316:7–2318:24.) Construction sites Gonzalez worked at were union job sites, and because Gonzalez was not a union member, but was likely doing covered work, union shop stewards[11] would often ask him for his union book. Gonzalez tried to avoid the shop stewards and sometimes got help from the Navillus forepersons on site. At times, when union inspectors arrived at a job site, Gonzalez hid and/or left the site, sometimes along with a few other people, and did not return until the inspector left. (Tr. 2304:1–11.) Gonzalez wanted to join a union, which would have given him higher wages and benefits. But when he asked Donal O'Sullivan about joining a union, Donal O'Sullivan asked for Gonzalez's permanent resident green card, which Gonzalez did not have. (Tr. 2304:12–2305:11.)

Thus, while some of the Navillus employees paid through Allied were doing covered work for which Navillus owed contributions to the Benefits Funds, the payroll sheets processed by Allied for Navillus did not include deductions for any types of benefits. (Tr. 2048:10–2049:11.) Despite Navillus funneling payroll for some of its employees through Allied, Naughton did not

---

[11] Shop stewards are union representatives who visit construction job sites to record covered work being performed at those job sites. (Tr. 1022:20–25; 1193:8–12.) The shop stewards submit reports to the unions based on information they gather at the job sites, which can then be compared by union auditors against the remittance reports submitted by companies. (Tr. 1030:6–22.)

disclose Navillus's relationship with Allied to union auditors who were tasked with investigating and determining whether Navillus was meeting its obligations under the CBAs. The union auditors were required to review Navillus's payroll, general ledger, and cash disbursements, and Navillus was required to provide all payroll records, regardless of whether Navillus deemed the employees paid through Allied to be non-union or performing non-covered work. (Tr. 1095:7–1097:6; 1303:9–17; 1669:11–1672:15; 1765:22–1766:15; 2426:16–25; 2267:20–2268:3.) In addition, Helen O'Sullivan consistently submitted Remittance Reports to unions that did not disclose the employees being paid through Allied, and each time signed the Remittance Reports with the full awareness of Navillus's obligations under the CBAs. (*See* GX4152 (Bricklayers); GX4326 (Cement & Concrete Workers); GX4400 (Cement Masons); GX4623 (Mason Tenders); GX4717 (Pointers, Cleaners & Caulkers); GX4811 (Teamsters).)

      4.    Lambe Receives E-2 Visa Renewal Based on the Navillus-Allied Arrangement

Lambe's E-2 visa was set to expire in September 2011. (Tr. 1428:22–24.) At the beginning of 2011, before Lambe started claiming Navillus employees as his own through the Allied payroll, processing their paychecks under the Allied name and getting paid by Navillus for these services, Lambe did not think that his E-2 renewal application would be able to show business growth. But the payroll arrangement helped Lambe show, on paper, that Allied had grown substantially. (Tr. 1429:4–14.) Specifically, the arrangement allowed Lambe to fraudulently show that his business had increased its subcontracting masonry work. (Tr. 1488:21–1489:20.)

While the total fee to run payroll through ADP on any given week cost Allied only approximately $100–$200 per week (Tr. 1356:6–8), Navillus paid Allied a 5% fee for each Navillus payroll Allied processed. For example, if the payroll amount was approximately for

14

$24,000 in a given week, Navillus paid Allied $1,200 for processing that payroll as its own.  (Tr. 1387:16–1388:3.)

Although Lambe knew that he was not actually doing any subcontracting work for Navillus, he represented otherwise to his immigration attorney and his accountant, and used the ADP payroll and Allied invoices to Navillus to obtain a renewed E-2 visa for a 5-year term in 2011.[12]  (Tr. 1429:15–1431:14.)

On September 20, 2011, seven months after Navillus started funneling some of its payroll through Allied, and after Lambe received his renewed E-2 visa, Lambe emailed Donal O'Sullivan stating: "Donal, can you give me a call this evening regards my position at Navillus Contracting. I tried to meet up with you in August before you left for vacation, but you were too busy."  (Tr. 1435:7–22.)  Donal O'Sullivan responded with the following: "As far as your position with Navillus, I think all the work you were involved with is finished and, therefore, we should only need to ask you some questions in the future. We will continue with the weekly arrangement we have with your company.  In the future, if work comes our way and I can sub it to you, I will keep you in mind for this."  (Tr. 1437:10–21.)  Lambe understood "the weekly arrangement" to mean the payroll funneling arrangement and "sub it to you" to mean subcontracting masonry work.  (Tr. 1436:16–1437:3.)  After this communication with Donal O'Sullivan, Lambe continued to process Navillus employees on the Allied payroll for the next six years.  (Tr. 1438:13–16; 1515:7–11.)

### C.     The Allied Payroll Arrangement Created Myriad Costs, Issues, and Delays for Navillus

Allied's payroll services for Navillus required a convoluted process and stood in stark contrast to how Allied processed payroll for two other customers.  Unlike with Navillus, the checks

---

[12] Lambe later pleaded guilty to visa fraud and entered into a cooperation agreement with the Government in connection with the instant case.  (Tr. 1431:15–1435:1.)

for Allied's other customers' employees bore the addresses of the customers, not Allied, and the payments came out from the customers' bank accounts, not Allied's.   The paychecks similarly were directly mailed to the customers, not to Allied's office.  (Tr. 2164:4–2166:4 (Georgeanne Kelly testifying about the payroll process for other customers: "I set up their payroll and used their address and their bank account. . . . [Employee checks] were sent to their addresses.").)  Navillus's use of Allied for payroll services was a costly and cumbersome process that caused many challenges and issues for Navillus.

### 1.    Timely Payment Issues

There were issues with Allied checks not being delivered to Navillus employees on time. (Tr. 1406:8–19.)  This was, in part, caused by Allied receiving the payroll sheets and deposits to cover the paystubs from Navillus late, which meant that checks to Navillus employees were delayed and Allied did not always have funds on hand to endorse the checks.  (Tr. 2035:5–2038:1.) On multiple occasions, Kelly had to request that Helen O'Sullivan send the weekly payroll sheets so that they could be processed on time.  (*See e.g.*, Tr. 2040:7–25 (Helen O'Sullivan stating in an email: "Oh, my God, sorry, will send now."); 2041:1–2042:3 (Helen O'Sullivan stating in an email: "O M G, I thought you had it.  Will try to get to you ASAP.  Helen."); 2043:3–19 (Helen O'Sullivan stating in an email: "I will [do] my best" to send the payroll sheets before 5:00 p.m. that day).)  Kelly also emailed and had two calls with Naughton about deposits and payroll sheets. During one of the calls, Naughton promised to "get a check" to Kelly by that Monday and during another, he promised to check on the payroll sheets to be submitted to Allied.  (Tr. 2193:1–2195:6.)

### 2.    Insurance Issues

The description of services in Allied's initial invoices to Navillus gave the impression that Allied was performing subcontracting construction work for Navillus, not "payroll processing." (Tr. 1396:4–1398:12 (describing services in an invoice as "[l]abor cost to complete masonry

16

repairs on a labor only cost basis."); 1415:7–1416:17 (describing services as "masonry").)  In July 2011, however, Naughton, without explaining why, asked Lambe to send invoices "with no description." (Tr. 1420:2–11.)  Although Lambe immediately complied with that request, he later reverted to describing the services as "masonry" in future invoices, prompting Naughton to again ask that Lambe not include "any description on the invoices." (Tr. 1420:12–1422:21.)  Lambe again complied, but for a period of time again reverted to describing the services as masonry.[13]  Eventually, in about November 2018, at Naughton's request, Allied's invoicing descriptions changed to "consulting." (Tr. 2096:12–2099:7.)

The classification of services being provided by Allied affected the insurance rates Navillus had to pay for Allied's coverage.  In December 2011, Naughton was in close contact with Lambe over Allied's insurance coverage renewals for 2012. (Tr. 1454:11–1455:22.)  In connection with the renewals, insurance companies were conducting audits of Allied. (1461:22–1462:3.)  Based on the payroll, the insurance companies were led to believe that Allied was doing tile and masonry construction work and had hired its own employees to perform the work. (Tr. 1471:24–1472:13.)  As a result of the audits, and because the Navillus payroll was classified as "masonry" in Allied's system, the insurance companies sent large audit bills to Allied, which it immediately passed on to Navillus through Naughton. (Tr. 1461:22–1467:24.)  In total, the workers' compensation and general liability audit bills for Allied in 2011 amounted to approximately $383,000 and significantly affected Allied's 2012 insurance rate quotes. (Tr. 1462:4–1469:14.)

Some of the Allied employees identified as part of the audit process, such as Georgeanne Kelly and David Lyons, were not Navillus employees and thus were Allied's responsibility. (Tr.

---

[13] As discussed below, the classification of the services as "masonry" was beneficial to Lambe because it allowed him to show the U.S. government, on paper, that his subcontracting business was growing as required for the renewal of his E-2 visa.

1467:25–1468:24.)  Otherwise, Navillus was responsible for paying Allied's insurance, and Allied invoiced Navillus for those payments.  (Tr. 1476:5–1478:9.)  As was the case with the payroll invoices, the insurance invoices did not describe the actual reason for which the amount was requested and instead generally described Allied's services as "consulting."  In response to invoice after invoice, Naughton directed payment of Allied's insurance costs, incurred on Navillus's behalf, and Donal signed the checks for payment of these insurance costs.  (Tr. 2150:14–2158:22.)

To curb these additional costs, Naughton worked with Allied's insurance broker to adjust Navillus employees' classifications on Allied's payroll and to bring down the rates.  (Tr. 1473:23–1475:14, 1479:11–1480:21.)  On May 1, 2012, Naughton met with Lambe and Kelly to discuss insurance policy renewals and the associated costs.  (Tr. 1475:24–1476:10.)  The meeting resulted in Naughton and Lambe agreeing that Navillus would reimburse Allied for the insurance costs, which Navillus did.  (Tr. 1477:8–1479:8.)  In July 2012, Lambe signed off on letters that contained blank trade classifications, and Naughton filled in the "percentages for each [trade] class code" for the Navillus employees being paid through Allied.  These trades included, among others, masonry, tile work, and driving.  (Tr. 1480:2–1485:4; 2143:19–2150:13.)  Allied continued to renew its insurance policies at Naughton's direction and with his involvement in the following years.  (Tr. 1485:20–1488:20.)

3.    Employee Tax Form Issues

Because the Navillus-Allied arrangement involved Navillus employees being paid as if they were Allied employees, Navillus needed to provide Allied with W-4 tax forms for new employees and Allied had to issue W-2[14] tax forms to Navillus employees.  Thus, in the course of

---

[14] "Every employer engaged in a trade or business who pays remuneration, including noncash payments of $600 or more for the year (all amounts if any income, social security, or Medicare tax was withheld) for services performed by an employee must file a Form W-2 for each employee (even if the employee is related to the employer) from whom:" (1) "Income, Social

their payroll dealings, Allied received various tax-related paperwork requests from Navillus.  On February 1, 2012, Helen O'Sullivan asked Lambe for 2011 W-2 tax forms for certain Navillus employees being paid as Allied employees because the employees "ke[pt] calling" her.  (Tr. 1447:17–1449:6.)  On March 12, 2012, Helen O'Sullivan asked Allied to change Angel Ordonez, a Navillus employee, to "single" in the payroll system.  (Tr. 1449:22–1450:15.)  Helen O'Sullivan also was directly responsible for providing Allied with new employee W-4 forms, which required her to email back and forth with Allied, sometimes as late as about 11:00 p.m., to ensure that new employees would be processed in time.  (Tr.  1520:14–1525:17.)

On April 16, 2012, Naughton asked Lambe to send him the 2011 W-2 for John Michael Sugrue, Donal O'Sullivan's brother-in-law, "as Donal [O'Sullivan] [wa]s looking for it to do his taxes."  (Tr. 1450:21–1451:4.)  Sugrue's name appeared in Allied's records as one of the Navillus employees who was paid as an Allied employee.  Even though the work performed in Sugrue's name was actually done by Gonzalez (Tr. 2288:13–19; 2293:10–2295:21), Allied issued a W-2 in Sugrue's name as requested by Naughton (Tr. 1451:7–16).  Similarly, in subsequent years and at Naughton's request, Kelly emailed Sugrue's W-2 forms, frequently to Naughton and/or Helen O'Sullivan.  (Tr. 2069:24–2072:10.)

### D.    The End of Lambe's Involvement in the Navillus-Allied Payroll Arrangement

The Navillus-Allied payroll arrangement ran from 2011 to 2016.  (Tr. 1511:14–19.)  Beginning in 2015, the arrangement unraveled because Lambe was being investigated by the

---

Security, or Medicare tax was withheld" or (2) "Income tax would have been withheld if the employee had claimed no more than one withholding allowance or had not claimed exemption from withholding on Form W-4, Employee's Withholding Allowance Certificate."  About Form W-2, Wage and Tax Statement, IRS, https://www.irs.gov/forms-pubs/about-form-w-2 (last visited Apr. 3, 2022).

Government.    (Tr. 1513:7–1515:25.)  Lambe's false inflation of his business's growth came to

light and the Government asked Lambe to stop running "payroll" for Navillus.  (Tr. 1491:17–

1496:21.)  On December 15, 2016, Lambe emailed Naughton advising him that Allied would "no

longer provide services to" Navillus.  (Tr. 1496:22–1498:8.)  Naughton responded by asking

Lambe to call him.  (Tr. 1498:9–12.)  Lambe did not call Naughton.  (Tr. 1533:18–1534:23.)

After Lambe withdrew from the scheme, Helen O'Sullivan, who worked in Navillus's

internal payroll department and had full access to it, wrote dozens of personal checks to Navillus

employees previously processed through Allied.    (Tr. 2649:9–16; 2820:11–2821:2.)    Helen

O'Sullivan did so on a weekly basis for approximately five months, and the checks she wrote

totaled over $50,000.  (GX7125.) The employees Helen O'Sullivan paid personally included

Gonzalez, who spoke with Helen O'Sullivan about being paid in Sugrue's name and joining a

union.  (Tr. 2316:7–2327:25.)

## III.    The Verdict

The jury returned a guilty verdict against each Defendant on all Counts.  (Tr. 3409:17

3413:2.)  With respect to Counts 8 and 10, the jury found that there was a single conspiracy to

commit two offenses: embezzlement and submission of false remittance reports.  (Tr. 3411:21–

25.)

## STANDARD OF REVIEW

## I.    Federal Rule of Criminal Procedure 29

Under Federal Rule of Criminal Procedure Rule ("Rule") 29, "the court[,] on the

defendant's motion[,] must enter a judgment of acquittal of any offense for which the evidence is

insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  "The test for sufficiency . . . is

whether a rational jury could conclude beyond a reasonable doubt that a defendant is guilty of the

crime charged."  *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (quotation marks

omitted).    The Court must make this determination with "the evidence against a particular defendant . . . viewed in a light that is most favorable to the government . . . and with all reasonable inferences . . . resolved in favor of the government."  *Id.* (quotation marks and brackets omitted). In other words, a court should deny a defendant's motion for acquittal if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in *Jackson*).  That is, "[a] judgment of acquittal is warranted only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017).

To view the evidence in "the light most favorable to the government," the court must "credit[ ] every inference that the jury might have drawn in favor of the government," *United States v. Temple*, 447 F.3d 130, 136–37 (2d Cir. 2006), and "resolve all issues of credibility in the government's favor," *United States v. Canady*, 126 F.3d 352, 356 (2d Cir. 1997).  To be sure, the court "must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that [each] element . . . is established beyond a reasonable doubt." *United States v. Triumph Capital Grp., Inc.*, 544 F.3d 149, 159 (2d Cir. 2008).  However, "it is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003).  Furthermore, "[t]his 'traditional deference to a jury's verdict is especially important when reviewing a conviction for conspiracy . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'" *Eppolito*, 543 F.3d

at 46 (quoting *Jackson*, 335 F.3d at 180).  "[A] defendant challenging the sufficiency of the evidence bears a heavy burden . . . ."  *Martoma*, 894 F.3d at 72 (quotation marks omitted).

## II.    Federal Rule of Criminal Procedure 33

Under Rule 33, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  In general, "a motion for a new trial 'should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'"  *Smith v. Carpenter*, 316 F.3d 178, 183 (2d Cir. 2003) (quoting *Atkins v. New York City*, 143 F.3d 100, 102 (2d Cir. 1998)).  In making this determination, the court "is not required to view the evidence in the light most favorable to the government," *United States v. Lopac*, 411 F. Supp. 2d 350, 359 (S.D.N.Y. 2006), but instead must "examine the entire case, take into account all facts and circumstances, and make an objective evaluation," *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001).  The court may "weigh the evidence" for itself, "and in so doing evaluate for itself the credibility of the witnesses," *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992), but the court "must strike a balance between weighing the evidence and credibility of witnesses and not 'wholly usurping' the role of the jury," *Ferguson*, 246 F.3d at 133 (brackets omitted) (quoting *United States v. Autuori*, 212 F.3d 105, 120 (2d Cir. 2000)).

"[A] district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be manifest injustice to let the verdict stand."  *United States v. Archer*, 977 F.3d 181, 190 (2d Cir. 2020) (quotation marks omitted).  Under the "preponderates heavily" standard, "a district court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable."  *Id.* at 188 (quotation marks omitted).  Clear examples of when this standard is met include situations where: (1) "the evidence was 'patently incredible or defied

22

physical realities,'" (2) "an evidentiary or instructional error compromised the reliability of the verdict," and (3) "the government's case depend[ed] upon strained inferences drawn from uncorroborated testimony." *United States v. Landesman*, 17 F.4th 298, 331 (2d Cir. 2021) (citations and brackets omitted). In the absence of such examples, which are not exhaustive, "a district court must defer to the jury's resolution of conflicting evidence." *Id.* (quotation marks omitted). Ultimately, the court should only order a new trial under Rule 33 if "it would be a manifest injustice to let the guilty verdict stand." *Sanchez*, 969 F.2d at 1414.

## DISCUSSION

## I.    Elements of the Charged Offenses

### A.    Mail and Wire Fraud

"The essential elements of [mail and wire fraud] are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015) (quotation marks omitted). "Because the mail fraud and the wire fraud statutes use the same relevant language, [courts] analyze them the same way." *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016). "[T]he gravamen of the offense is the scheme to defraud," *id.*, which requires the government to prove "that the misrepresentations were material," *U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 657 (2d Cir. 2016), and that the defendant acted with fraudulent intent, *Greenberg*, 835 F.3d at 305–06.

"[T]he mail or wire communications themselves need not contain a false statement." *Williams v. Affinion Grp LLC*, 889 F.3d 116, 125 (2d Cir. 2018) (citing *Schmuck v. United States*, 489 U.S. 705, 715 (1989)). Instead, the government must prove that "the mail and wire fraud were in furtherance of a larger scheme to defraud." *SKS Constructors, Inc. v. Drinkwine*, 458 F. Supp. 2d 68, 78 (E.D.N.Y. 2006) (quotations marks omitted). The government "need not prove that the

victims of the fraud were *actually* injured, but only that defendants *contemplated* some actual harm or injury to their victims." *Greenberg*, 835 F.3d at 306 (quotation marks omitted, emphasis in original). "[T]he government may meet its burden on [scheme to defraud] through circumstantial evidence." *United States v. Autori*, 212 F.3d 105, 115 (2d Cir. 2000); *see United States v. Couto*, 383 F. App'x 30, 33 (2d Cir. 2010) (summary order) ("We have repeatedly emphasized . . . that 'intent to defraud' can be established by circumstantial evidence." (*citing United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999); *United States v. Goldstein*, 442 F.3d 777, 783–84 (2d Cir. 2006)).

### B.    Embezzlement

Section 664 of Title 18 of the United States Code makes it a crime to "embezzle[], steal[], or unlawfully and willfully abstract[] or convert[] . . . any of the moneys, . . . of any employee welfare benefit plan or employee pension benefit plan." 18 U.S.C. § 664; *United States v. O'Sullivan*, 20-CR-272 (PKC), 2021 WL 1979074, at *3 (E.D.N.Y. May 18, 2021) ("In other words, an employer's intentional and fraudulent use of another company to avoid its obligation to make contributions to an ERISA benefits fund can constitute a conversion of the fund's contractual rights that violates 18 U.S.C. § 664."). In enacting Section 664, Congress sought to prevent diversion of welfare and pension funds and to preserve such funds for the protection of those entitled to their benefits. *See United States v. Santiago*, 528 F.2d 1130, 1133 (2d Cir. 1976) ("The legislative history of § 664 clearly indicates that its intended purpose was to preserve welfare funds for the protection of those entitled to their benefits."). The government must prove that the defendant acted with the fraudulent intent "to deprive the union of its money." *See United States v. Nolan*, 136 F.3d 265, 270 (2d Cir. 1998).

24

### C.    Submission of False Remittance Reports

Section 1027 of Title 18 of the United States Code, which applies to remittance reports, states:

> Whoever, in any document required by [ERISA] to be published, or kept as part of the records of any employee welfare benefit plan or employee pension benefit plan, or certified to the administrator of any such plan, makes any false statement or representation of fact, knowing it to be false, or knowingly conceals, covers up, or fails to disclose any fact the disclosure of which is required by such title or is necessary to verify, explain, clarify or check for accuracy and completeness any report required by such title to be published or any information required by such title to be certified, shall be fined under this title, or imprisoned not more than five years, or both.

18 U.S.C. § 1027.  "In short, the statute punishes anyone who knowingly makes a false statement, or knowingly fails to disclose material facts, 'in any document' required by ERISA." *O'Sullivan*, 2021 WL 1979074, at *8 (quoting 18 U.S.C. § 1027); *see also United States v. Somerstein*, 971 F. Supp. 736, 743 (E.D.N.Y. 1997) (Section 1027 "requires the Government to demonstrate that: (1) the defendant made a false statement or representation of fact, or concealed, covered up, or failed to disclose a fact; (2) that the defendant did so knowingly; (3) that the false statement or representation of fact was made in a document required by ERISA to be kept as part of the records of an employee benefit plan; and (4) that the plan in question was an employee benefit plan under ERISA.").  "[T]he term 'knowingly' requires proof of a voluntary, conscious failure to disclose without ground for believing that such non-disclosure is lawful or with reckless disregard for whether or not it is lawful." *Id.* at 745 (quoting *United States v. Tolkow*, 532 F.2d 853, 858 (2d Cir. 1976)); *see also United States v. Martorano*, 767 F.2d 63, 66 (3d Cir. 1985) ("[A] general intent (a failure to disclose) rather than a specific intent (a failure to disclose knowing that such failure violates a statutory disclosure requirement) is all that is required to prove a violation of § 1027.").

25

### D.      Conspiracy

Section 1349 of Title 18 of the United States Code provides, in relevant part, that "[a]ny person who attempts or conspires to commit [mail fraud and wire fraud offenses] shall be [guilty of a crime]."  18 U.S.C. § 1349.  Section 371 of Title 18 of the United States Code provides that "[i]f two or more persons conspire . . . to commit any offense against the United States . . . and one or more of such persons do any act to effect the object of the conspiracy, each shall be [guilty of a crime]."  18 U.S.C. § 371.

"'To prove conspiracy, the government must show that the defendant agreed with another to commit the offense' and 'that he knowingly engaged in the conspiracy with the specific intent to commit the offenses that were the objects of the conspiracy.'"  *United States v. Carpenter*, 190 F. Supp. 3d 260, 266 (D. Conn. 2016) (quoting *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008)), *aff'd sub nom.*, *United States v. Bursey*, 801 F. App'x 1 (2d Cir. 2020). "[B]oth the existence of a conspiracy and a given defendant's participation in it with the requisite knowledge and criminal intent may be established through circumstantial evidence."  *United States v. Torres*, 604 F.3d 58, 66 (2d Cir. 2010) (alternation in original).

## II.      Under Rule 29 Acquittal Is Not Warranted

Defendants argue that the Government did not introduce sufficient evidence for the jury to infer that they intended to deprive the unions from receiving the benefits that Navillus owed to them.[15]  Specifically, Defendants assert that the evidence at trial did not show that employees paid through Allied were doing covered work, that Defendants knew that Allied employees were doing covered work for which Navillus owed union benefits but did not pay them, and that Defendants intended for Navillus not to pay these benefits.  (Donal O'Sullivan's Memorandum in Support of

---

[15] Defendants join in each other's arguments, to the extent relevant.

Motion for a Judgment of Acquittal or, in the Alternative, a New Trial ("D. O'Sullivan Mem."), Dkt. 270-1); Helen O'Sullivan Memorandum of Law in Support of Motion for a Judgment of Acquittal or, in the Alternative, a New Trial ("H. O'Sullivan Mem."), Dkt. 271-1; (Padraig Naughton's Memorandum in Support of Motion for a Judgment of Acquittal or a New Trial ("Naughton Mem."), Dkt. 272-1.) To support their arguments, Defendants treat the evidence introduced at trial piecemeal, attacking separate pieces of the evidence to challenge the jury's decision as unreasonable, and argue that the evidence equally supports a theory of Defendants' innocence. The Court disagrees with both the approach and substance of Defendants' arguments.

### A.    Evidence Presented at Trial Was Sufficient to Prove Defendants' Guilt as Charged

#### 1.    Findings Applicable to All Defendants

As an initial matter, the Court rejects Defendants' attempt to separate and isolate each piece of evidence, and then claim that each of these pieces of evidence are insufficient to prove Defendants' guilt beyond a reasonable doubt. As the Second Circuit has repeatedly held, "the evidence must be viewed in its totality, 'as each fact may gain color from others.'" *United States v. Cassese*, 428 F.3d 92, 98–99 (2d Cir. 2005) (citation omitted). That some individual pieces of evidence, standing alone, may be insufficient and yield equally plausible competing inferences of innocence is beside the point. Accordingly, the Court's discussion of the evidence, and its finding that the evidence was sufficient, places each fact into the interconnected chain of events and actions that establish the totality of the evidence presented at trial.

The Court also finds that Defendants' focus on covered work is largely a red herring. The Government was not required to prove that all work performed by Navillus employees paid through Allied was covered work. Such a standard would be contrary to what the Government actually had to demonstrate at trial, *i.e.*, how Defendants' fraudulent scheme worked and each

27

Defendant's intent in agreeing to participate in, and participating in, this scheme. (*See* Memorandum and Opinion on Parties' Motions *in Limine*, Dkt. 265, at 19.) In any event, the Government presented sufficient evidence from which the jury could reasonably infer that some Navillus employees were doing covered work, and that they were being paid through Allied without contributions being made to the appropriate Benefits Funds.[16] (Tr. 912:3–9, 916:15–20 (Vincent LaPenta); Tr. 1252:7–8, 1257:2–4 (Gerard Tully); Tr. 1870:15–19, 1872:19–20 (Michael Hope); Tr. 1918:19–1919:8 (Guilio Pomponio); Tr. 1971:8–12 (Joel Borris); Tr. 2296:20–2297:25, 2299:16–21 (Luis Gonzalez); Tr. 2380:2–2381:25 (Alfred Santana); Tr. 2449:19–24, 2459:9–2460:25 (Gregory Daniel Kelly).) Defendants' unsupported argument, made most forcefully in Naughton's papers, that the evidence presented at trial was not sufficient for the jury to reasonably infer that covered work was being performed by Navillus employees paid through Allied, is therefore entirely unconvincing.[17]

---

[16] Defendants' argument regarding yard work is similarly unpersuasive. There was sufficient evidence in the record for the jury to infer that certain kinds of yard work was covered work. (*See e.g.*, Tr. 2254:18–20 ("The employer recognizes the union as the sole and exclusive bargaining agent for all chauffeurs, drivers, and full-time warehousemen."); Tr. 2459:18–21, 2465:17–2466:2 (Gregory Kelly testifying that work at the Navillus yard included gathering warehouse supplies and loading the truck); Tr. 2378:25–2379:7, 2379:15–2381:10 (Santana testifying about driving to and from job sites when working in the yard); Tr. 2460:17–25, 2462:11–2464:12 (Kelly testifying to same).)

[17] Similarly, the defense's argument that the Government was required to introduce the CBA for each union referenced in the Indictment is another red herring. The Government was not required to prove that Defendants deprived specifically or only the benefit funds named in the Indictment. The Court previously ruled on this issue in the context of Defendants' motions *in limine* and held that evidence of other trades was admissible to show how the scheme operated. (Memorandum and Opinion on Parties' Motions *in Limine*, Dkt. 265, at 17–21.) At trial, the Government was entitled to rely on whatever evidence it believed sufficient to prove Defendants' guilt beyond a reasonable doubt, and the jury was asked and allowed to consider only the evidence before it. The question post-verdict is not whether a CBA for a specific trade was introduced or not, but whether the evidence the Government presented regarding Defendants' involvement in a scheme to deprive one or more union benefits funds was sufficient for the verdict. The only relevance of the CBAs that were introduced is whether they showed that at least some of the Navillus workers paid through Allied worked in trades covered by a CBA that required

28

Relatedly, the Court rejects Naughton's reliance on *Mason Tenders District Council Welfare Fund v. M.A. Angeliades, Inc.*,[18] to argue that it is "patently unreasonable" to rely on trade classifications that appeared on payroll sheets and new hire information in determining whether an employee was performing covered work. 2007 WL 4208587, at *5–6 (S.D.N.Y. Nov. 20, 2007). *Angeliades* is not applicable here. In *Angeliades*, the trade of each employee was inferred by the auditor, who had no relevant personal knowledge, based solely on certain information in the records,[19] as opposed to here, where the inference of covered work is being drawn from the trade classifications assigned by Navillus *itself*, as well as from the direct testimony of some of the workers as to their individual trades. In fact, in this case, the unions could not have examined the trade classifications of the Navillus employees paid by Allied because Naughton intentionally concealed from union auditors the Navillus payroll that was processed through Allied.[20]

---

contributions to a benefits fund—regardless of whether those funds were specifically named in the Indictment.

[18] In *Angeliades*, the various Mason Tenders benefits funds and their director sued M.A. Angeliades, Inc. and its principals for failing to make all required contributions to the fund on behalf of the company's employees. The matter was resolved by bench trial before the Honorable Leonard B. Sand, who memorialized his Findings of Fact and Conclusions of Law in the Memorandum & Order reported at 2007 WL 4208587.

[19] That information included the "wage rate; . . . if they appeared on shop steward reports; if they're a member in the union; if they reported to another jurisdiction where the work was actually done; based on some member complaints; if they were on the company's health plan or on the company's retirement plan; if they were on their auto insurance plan." 2007 WL 4208587, at *5.

[20] The Court further disagrees that Defendants were unfairly prejudiced by its decision to preclude cross-examination of William Austin, one of the Mason Tenders' outside auditors (Tr. 1092:1–1189:4), regarding *Angeliades*. As the Court explained at trial, the purpose of Austin's testimony in *Angeliades* was to calculate the amount that was owed by the defendant to the Mason Tenders benefit funds. Here, Austin was not asked to calculate anything, or extrapolate anything based on calculations, and therefore it would have been confusing and misleading to the jury to allow this irrelevant line of cross-examination. (Tr. 1171:4–14 ("I'm not letting you cross on this because it seems to me Judge Sand was addressing a very markedly different situation, assumptions that were made in determining, I guess, a total amount of hours that are deficiencies;

29

Finally, as a general matter, the Court finds that the evidence presented at trial about the gross inefficiency and costliness of the Allied payroll arrangement (*see supra* Section II.C.)—especially given the absence of a coherent explanation for why Navillus chose to run some of its payroll through Allied when it has its own payroll department and automated payroll system—supported the jury's finding of fraudulent intent as to all three Defendants.

The Court now discusses the sufficiency of the evidence as to each Defendant separately.

### 2.    Donal O'Sullivan

Donal O'Sullivan argues that the Government had to introduce evidence independent of Navillus's payroll scheme because the scheme was not in itself criminal and did not necessarily cause any harm.  Donal O'Sullivan relies on Lambe's testimony that a paymaster relationship between two companies, where one company pays the employees of another under its own name, is legal and exists in the construction industry.  But Lambe also testified, among other things, that (1) he provided payroll services to other companies through Allied that stood in stark contrast to Allied's services to Navillus, (2) the way the Navillus/Allied payroll relationship was operated was inefficient and caused many issues, delays, and high costs, (3) the payroll processing system set up for Navillus's employees made it appear that they were working for Allied, when, in fact, they were working for Navillus; and (4) he was fully aware that Allied's business growth as a result of its payroll services to Navillus was only on paper, and fraudulent, because Navillus employees were not employed by Allied, but were being represented as such (without the employees' awareness).  Lambe's testimony was accompanied and supplemented by the fact that

---

and that's not what this witness did.  Quite frankly, [Austin's testimony in this case] was very matter of fact. . . . He's not making any assumptions at all. It's only the assumptions that Judge Sand found improper.").)  Nor was Austin asked to deduce the trade of any Allied-paid employee in this case, which is what Judge Sand found improper in *Angeliades*.

Navillus had an internal payroll system that it could have easily used to pay these employees.   In this context, the jury could properly draw an inference that, even if paymaster relationships in the construction industry are generally legal, the *specific manner* in which the Navillus-Allied relationship was established and operated shows that it was established "to further a scheme to injure" the Benefits Funds rather than because "it was a reasonable" arrangement. *See United States v. D'Amato*, 39 F.3d 1249, 1259 (2d Cir. 1994). *Cf. States v. Starr*, 816 F.2d 94, 101 (2d Cir. 1987) ("While a finding that defendants garnered some benefit from their scheme may be helpful to the jury to establish motive, it cannot be probative of fraudulent intent unless it results, or is *contemplated to result*, from a corresponding loss or injury to the victim of the fraud." (emphasis added)).

Moreover, there was sufficient evidence from which the jury could infer that Donal O'Sullivan not only knew about Allied, but also directed Naughton to set up the fraudulent payroll scheme and knew that Navillus was using Allied to deceive and harm the Benefits Funds.  Contrary to what Donal O'Sullivan argues, his knowledge of the work performed by Navillus employees paid through Allied does not rest on "rank speculation."  (D. O'Sullivan Mem., Dkt. 270-1, at 5.)

First, while one would not expect the president of one of the largest construction companies in New York City to personally handle payroll, assign work to individual employees, or supervise the employees' work, Lambe testified that Donal O'Sullivan was "hands-on" (Tr. 1335:4–12) and the evidence established that Donal O'Sullivan spoke directly to at least one Navillus employee about getting paid through Allied—Luis Gonzalez (Tr. 2304:12–2305:11)—and, as discussed below, that the jury could reasonably infer that Donal O'Sullivan knew that the work Gonzalez performed for Navillus included covered work.

Second, there was evidence supporting the conclusion that Donal O'Sullivan directed and was involved in setting up Navillus's relationship with Allied, for the specific purpose of carrying out the fraudulent scheme. In late 2010 or early 2011, Donal O'Sullivan met with Lambe to discuss a significant reduction in Lambe's hours for his work at Navillus, which Lambe did not anticipate. Despite initially telling Lambe that he had to "finish up" his Navillus projects, Donal O'Sullivan soon thereafter told Lambe that "[t]here might be something [they] can work out," and referred Lambe to Naughton to talk about insurance. (Tr. 1341:3–1341:22; 1346:22–1347:25.) Soon after this discussion with Donal O'Sullivan, Lambe began working under Naughton's direction to prepare Allied to process the Navillus payroll. (*See e.g.*, 1347:1–1348:9.) In September 2011, seven months after Navillus had begun funneling some of its payroll through Allied, in response to an inquiry by Lambe about his "position at Navillus," Donal O'Sullivan emailed Lambe: "As far as your position with Navillus, I think all the work you were involved with is finished and, therefore, we should only need to ask you some questions in the future. *We will continue with the weekly arrangement we have with your company.* . . . In the future, if work comes our way and I can sub it to you, I will keep you in mind for this." (Tr. 1437:10–21 (emphasis added).) Lambe understood "the weekly arrangement" to mean the Navillus payroll processing, and "sub it to you" to mean subcontracting masonry work (Tr. 1436:16–1437:1). In this communication, Donal O'Sullivan made plain his knowledge about the payroll processing scheme and distinguished it from the subcontracting masonry work Lambe had done in the past for Navillus.[21] After this email from Donal O'Sullivan, Lambe continued to process Navillus employees on the Allied payroll for the next five years, until December 2016. (Tr. 1438:13–16; 1515:7–11.) Throughout this time,

---

[21] While Donal O'Sullivan also described prior unrelated work as an "arrangement" in the same email, the jury was free to draw an inference from Donal O'Sullivan's reference to "weekly arrangement" as a reference to the payroll processing scheme.

Navillus issued 115 checks signed by Donal O'Sullivan to Allied, totaling approximately $2.9 million, to cover the costs of the payroll scheme. (Tr. 2555:2–14.) Donal O'Sullivan's signature also appeared on two large bonus checks issued to Helen O'Sullivan, both in March 2017, totaling approximately $95,600. (Tr. 2683:9–2684:13.)

The jury heard other evidence, relating to a Navillus employee Luis Gonzalez, that supported the conclusion that Donal O'Sullivan knew that Navillus workers being paid by Allied were doing covered work. In April 2012, Allied issued a W-2 tax form to Donal O'Sullivan's brother-in-law, John Michael Sugrue, upon receiving an email from Naughton that "Donal [wa]s looking for it to do his taxes." (Tr. 1450:21–1451:4.) Although Allied was issuing checks to Sugrue, the evidence showed that, in fact, Luis Gonzalez, an undocumented worker, was the employee performing the work for which Sugrue was receiving credit, and that Gonzalez was the one receiving and cashing the checks. (Tr. 1451:7–16; 2292:2–2294:3.) Gonzalez also testified that he did construction at Donal O'Sullivan's house for 11 months before being hired by Navillus. (Tr. 2289:23–2291:7.) While working directly for Donal O'Sullivan, Gonzalez worked on the house's foundation and the stairs, and cleaned the construction site—work that the jury could reasonably infer came within the trades of Mason Tenders and Pointers, Cleaners, and Caulkers. (Tr. 2290:1–24.) Gonzalez did various jobs for Navillus such as demolition, caulking, cleaning, painting, bricklaying, carpentry, and work related to other trades. (Tr. 2296:17–2300:21.) And he did so at union job sites. (Tr. 2302:3–5.) Gonzalez asked Donal O'Sullivan directly about joining a union, but Donal O'Sullivan told Gonzalez that he (O'Sullivan) needed to see Gonzalez's permanent resident green card, which Gonzalez did not have. (Tr. 2304:12–2305:11.) When Gonzalez received his first check for Navillus, issued by Allied, he saw that he was getting paid under Sugrue's name. Gonzalez showed the check to Donal O'Sullivan and a Navillus foreperson,

33

Jimmy Dwyer, and told them both that the check was not issued in his own name. Donal O'Sullivan did not respond, but the foreperson told Gonzalez to "work with that." (Tr. 2294:4–2295:6.) Between February 2011 and December 2016, Gonzalez received 283 checks in Sugrue's name, issued by Allied. (Tr. 2295:7–21.) And Allied continued to issue W-2 tax forms to Sugrue over the years, bearing Donal O'Sullivan's personal home address. (Tr. 2069:24–2072:10; 2648:1–16.) Based on this evidence—showing that Donal O'Sullivan *knew* that Gonzalez was paid by Allied for work he performed for Navillus (including the volume of that work, based on the "Sugrue" W-2s that Donal O'Sullivan received to "do his taxes") and that Gonzalez performed the type of work covered by CBAs that Navillus had with various unions—the jury reasonably could have concluded that Donal O'Sullivan intended that Allied be used to fraudulently conceal the work performed by Navillus for which union benefits were owed but never paid.

Third, the jury had an ample basis to infer that, as the founder, owner, and President of Navillus, Donal O'Sullivan had a powerful financial incentive to implement this fraudulent scheme. Donal O'Sullivan's reliance on *IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 193 (2d Cir. 2009) is inapposite. There, the court considered JP Morgan Chase Co.'s ("JPMC") financial motive to secure above-market interest rates and fees from Enron Corporation. *Id.* at 200. *IBEW* was a shareholder action, and thus the Second Circuit's analysis of the issues in that case is not directly applicable here. Even assuming the analysis applies, the Second Circuit found that JPMC's "desire to maximize the corporation's profits" did "not strengthen the inference of an intent to defraud because earning 'excessive' fees" by charging above-market interest rates and fees "actually benefit[ed] the shareholders." *Id.* The panel in *IBEW* specifically differentiated the facts before it from *Livent, Inc. Noteholders Securities Litigation*, 174 F. Supp. 2d 144 (S.D.N.Y. 2001), where the district court found "that the excessive

34

fees the investment bank received provided a strong inference of intent to defraud." *IBEW*, 553 F.3d at 200. Contrasting *Livent* from the case before it, the panel in *IBEW* observed that it was "the shareholders of the company being charged [the] excessive fees" that had brought the lawsuit in *Livent*. *Id.* Here, similar to *Livent* and different from *IBEW*, the jury reasonably could have concluded that the alleged perpetrator of the fraudulent scheme, Donal O'Sullivan, benefitted personally and substantially from the scheme and thus had the requisite intent to defraud the Benefits Funds.[22]

Fourth, the jury's finding that Donal O'Sullivan had the requisite intent was bolstered by another piece of evidence—that in January 2015, Donal O'Sullivan made sworn statements that he did not believe he had "ever used an outside payroll company to process [Navillus] payroll," and that, while he had "heard of a company called Allied," he did "not recall using them to process payroll to pay employees." (Government's Response, Dkt. 277, at 26 (quoting GX8010 at 4, 6).) At the time Donal O'Sullivan made those statements: (1) he had helped set up the Navillus-Allied payroll scheme and had told Lambe that Navillus would continue with the "weekly arrangement"; (2) Allied had issued at least three W-2 tax forms in Sugrue's name for the work done by Luis Gonzalez, bearing Donal O'Sullivan's home address; and (3) Navillus had issued over 200 checks to Allied/D.E.M. Consulting totaling over $7 million, approximately 78 of which bore the signature of Donal O'Sullivan. (*Id.* (citing GX7135); Tr. 1340:20–1347:25; 1435:15–18.) Based on these facts, the jury reasonably could have inferred both that Donal O'Sullivan knowingly made

---

[22] While the defense was permitted to present evidence showing the large amount of union benefits Navillus did pay during the relevant period in support of its argument that Defendants had no motive to withhold the far smaller amount of benefit contributions at issue in this case, the jury was free to assign whatever weight it saw fit to this evidence, and to find, as urged by the Government, that "[t]hose contributions don't mean the defendants are entitled to break the law." (Tr. 3311:9–10.)

false statements under oath about his knowledge of Allied being used to process part of Navillus's payroll and that these false statements demonstrated his consciousness of guilt with respect to Navillus's use of Allied to carry out the fraudulent scheme, and also constituted an attempt by Donal O'Sullivan to thwart investigation into that scheme. (*See* Tr. 3304:13–3305:11 (Government arguing consciousness of guilt in summation).)

Donal O'Sullivan's reliance on *United States v. Samaria*, 239 F.3d 228 (2d Cir. 2001), and *United States v. Nusraty*, 867 F.2d 759 (2d Cir. 1989), to argue that his false statements are insufficient to support the guilty verdict is misplaced. The factual circumstances of *Samaria* and *Nusraty* are similar to each other, and fundamentally dissimilar from the present case, in one significant respect: the government's case turned entirely on the defendants' mere presence at the scene of a crime and their association with the perpetrators. In *Samaria*, the court found the defendant's false exculpatory statement insufficient to support his conviction because "the government [had] presented no evidence of any . . . contact or connection between" defendant and the co-conspirators outside of defendant's "presence at the two pickups, and [presented] no evidence that [defendant] was in any way involved in the theft of credit card numbers, ordering of goods, or any other aspect of the fraud scheme." 239 F.3d at 233. Similarly, in *Nusraty*, the court found the defendant's false exculpatory statement insufficient, "when considered in conjunction with the totality of the evidence." 867 F.2d at 765. There, the court explained that the defendant's "mere presence at the airport, and even his association with [one of the perpetrators], are of only limited probative value; and his false exculpatory statement simply offers evidence from which it could be inferred that the [defendant], under the circumstances of his arrest, surmised he was implicated in some sort of criminal activity." *Id*. Thus, the Second Circuit emphasized in both cases "that a defendant's mere presence at the scene of a criminal act or association with

conspirators does not constitute intentional participation in the conspiracy, even if the defendant has knowledge of the conspiracy." *Samaria*, 239 F.3d at 235; *accord Nusraty*, 867 F.2d at 764.

Here, by contrast, the jury had ample evidence of Donal O'Sullivan's involvement in the fraudulent scheme to provide an inculpatory context for Donal O'Sullivan's false statements about Allied. *See Samaria*, 239 F.3d at 236 (explaining that false statements "may strengthen an inference already supplied by specific indicia of knowledge and intent"). As discussed above, based on the totality of evidence introduced at trial, the jury reasonably could have inferred that Donal O'Sullivan initiated the scheme, directed and funded its operation, and derived financial benefit from it. Unlike the defendants in *Samaria* and *Nusraty*, Donal O'Sullivan certainly cannot argue that his involvement in the conspiracy to defraud the Benefits Funds was simply the result of being in the wrong place at the wrong time on a single occasion.

\*    \*    \*

In sum, based on all of the evidence presented at trial specifically relating to Donal O'Sullivan, as well as the other evidence relating to all three Defendants (*e.g.*, the inexplicability of Navillus using the costly and cumbersome Allied payroll arrangement for some employees when it has a payroll department and automated payroll system), viewed in light most favorable to the prosecution, the jury reasonably could have found beyond a reasonable doubt not only that Donal O'Sullivan was responsible for and directed the establishment and maintenance of the Navillus-Allied payroll scheme, but did so with the specific intent to use the scheme to fraudulently avoid making contributions to the Benefits Funds. The evidence was therefore sufficient to support the jury's guilty verdict as to Donal O'Sullivan on all counts of the Indictment.

3.    Padraig Naughton

Naughton contends that the evidence was insufficient to establish his intent to deceive the Benefits Funds and to deprive them of contributions owed by Navillus. For many of the same reasons discussed above, this is incorrect.

As discussed, the jury learned that, although Navillus had an internal payroll department consisting of four employees, including Helen O'Sullivan, and although Naughton was not part of the payroll department—he was the controller or head accountant at Navillus—it was Naughton who supervised and helped Lambe in setting up Allied to provide payroll services to Navillus. This happened on the heels of Donal O'Sullivan's conversation with Lambe about Lambe getting more work from Navillus so that he could remain in the country. Naughton sent the first weekly payroll sheet to Lambe advising him to call Naughton to discuss it; directed the renaming of D.E.M. Consulting to Allied; contacted ADP on behalf of Allied; personally worked with insurance brokers, Lambe, and Kelly to get and maintain insurance for Allied; provided employee trade classification information to the insurance brokers; and arranged for Navillus to reimburse Allied for all insurance expenses. In connection with the insurance, Naughton knowingly allowed the insurance brokers to believe that the employees they were providing insurance for were Allied's employees, not Navillus's. (Tr. 2520:19–2521:1; s*ee generally*, Tr. 1321:1–1498:17 (Lambe direct testimony); Tr. 2007:22–2197:5 (Kelly direct testimony).)

The jury also learned that Naughton sometimes requested Lambe to leave blank the description of services that Allied was purportedly providing to Navillus in the invoices, or to describe them as "consulting," even though Naughton knew that "consulting" was not an accurate description. (*See e.g.*, Tr. 1414:4–16; 2096:12–2099:7.) Moreover, even though Navillus was required, under the CBAs, to disclose its payroll records for all of its employees, regardless of its understanding whether they were performing covered work or not (Tr. 1095:7–1097:6; 1303:9–

38

17; 1669:11–1672:15; 1765:22–1766:15; 2426:16–25; 2267:20–2268:3), Naughton, who was the contact person for the union's audits, failed to disclose that Navillus was using Allied to process some of its employees' payroll, throughout the entire six-year scheme (*see* Tr. 1108:15–1109:22; 1110:22–1111:23; 1302:2–1303:17; 1304:3–25; 1684:18–1685:9; 1688:1–1689:11, 1791:16–24, 1793:14–1794:18, 1796:14–20, 1798:18–1799:1, 1799:11–22).  And Naughton remained closely involved in Navillus's payroll relationship with Allied the whole time the scheme operated, either by sending the weekly payroll sheets, which contained trade classifications assigned by Navillus itself, or being copied on payroll related emails to Allied.

Based on all of this evidence, the jury could reasonably infer that Naughton knew that the employees being paid through Allied were doing covered work and that Naughton sought to conceal this fact by intentionally providing false information to the insurance brokers about the nature of the Allied payroll, directing Allied not to describe the true nature of the services it provided to Navillus in the invoices, and not disclosing the payroll arrangement between Navillus and Allied to union auditors.  This evidence also supported the reasonable inference that Naughton knowingly and intentionally misled the union auditors for years by concealing the fact that Navillus was running part of its payroll through Allied and not paying union contributions for these employees.  Furthermore, as previously discussed, many of the Navillus payroll records transmitted by Naughton to Allied identified the workers' trades, which the jury reasonably could infer to be covered by CBAs.  While the jury was free to consider the fact that Naughton did not personally oversee any covered work, this does not render unreasonable the jury's conclusion that Naughton knew that the Allied-paid workers were doing covered work and that Naughton intentionally and fraudulently concealed this information, along with the entire Navillus-Allied

paymaster relationship, from union auditors in order to avoid Navillus having to pay union benefits.

Naughton's argument that the evidence at most establishes a breach of contract is unavailing. Naughton argues that "a breach of contract, even coupled with an intent to deceive, does not absolve the Government of its requirement to prove an intent to harm." (Naughton Mem., Dkt. 272-1, at 19 (emphasis removed).) The intent to deceive the Benefits Funds in this case necessarily results in intent to harm them because Defendants were knowingly depriving the Benefits Funds of owed monetary contributions. (Oral Argument Transcript, 31:8–33:9.) Naughton's reliance on *O'Donnell* is inapposite here, especially given that the Government's theory in this case does not rest solely on representations made to the unions at the time the CBAs were signed. *See O'Donnell*, 822 F.3d at 663 ("Both to the jury and to this Court, the Government identified provisions in the contracts . . . —and only those provisions—as the representations underlying its fraud claim[.]"); *id.* at 661 n.12 (finding that "[t]he law of the[] cases" where "the purported fraudulent statements or conduct were made outside the four corners of the contract, albeit related to performance thereunder" "is perfectly consistent with [the holding] that fraudulent intent must be found at the time of the allegedly fraudulent conduct, and the results are consistent because . . . the Government only proved representations wholly within the contract").

Naughton also asserts that the Government failed to prove Counts Two through Seven, which charge substantive counts of wire and mail fraud, because the Government did not prove that the wire transfers and mailings identified in those counts related to covered work. (Naughton Mem., Dkt. 272-1, at 19–22.) Naughton, however, misapprehends the law; the Government was not required to show that any of the wire transfers or mailings identified in the Indictment was itself fraudulent; rather, they needed only be necessary to the charged wire or mail fraud scheme

overall. *See United States v. Tocco*, 135 F.3d 116, 124 (2d Cir. 1998) ("Underlying the discussion of these mail fraud convictions is the rule that a person who launches a fraudulent scheme through the use of the mails is criminally liable for all consequent mailings that occur."); *see also Schmuck*, 489 U.S. at 712 ("Thus, although the registration-form mailings may not have contributed directly to the duping of either the retail dealers or the customers, they were necessary to the passage of title, which in turn was essential to the perpetuation of Schmuck's scheme.").  The Navillus employee payroll information transmissions from Allied to ADP and the mailings of Navillus employee checks from ADP to Allied, dated August 7, 2015, August 14, 2015, and October 16, 2015, were all made in furtherance of the fraudulent scheme because they facilitated the essential part of the scheme, *i.e.*, the concealed payment of Navillus employees through Allied.  *See Pereira v. United States*, 347 U.S. 1, 8–9 (1954) (A mailing is in furtherance of a fraudulent scheme where it is "incident to an essential part of the scheme.").

Naughton's reliance on an unpublished out-of-circuit decision, *United States v. Ogbazion*, 2021 WL 3847829, at *10 (S.D. Ohio Aug. 27, 2021), in support of his argument is unavailing. First, *Ogbazion* is not controlling here.  Second, even under *Ogbazion*, the Government can satisfy its burden as to Counts Two through Seven by showing that the transfers and mailings were closely related to the overall completion of the scheme or to prevent its detection, even if each transfer and mailing was not individually for covered work.  *Id.* at *12–13.  Here, the evidence was sufficient to prove that each of the charged wire transfers and mailings was integral to the scheme's completion and to prevent its detection.  First, the charged wire transfers related to three transmissions of Navillus's payroll details from Allied to ADP via ADP's online portal.  Second, the charged mail fraud counts related to three mailings from ADP to Allied containing checks issued to Navillus employees that were being processed on the Allied payroll.  Furthermore, as

discussed above, the evidence was more than sufficient to prove Naughton's involvement in setting

up the Navillus-Allied payroll relationship, including Allied's use of ADP to process the payroll,

in furtherance of the wire and mail fraud schemes alleged in Counts Two through Seven.[23] *Id.* at

*13 ("The relevant question at all times is whether the wire transmission is part of the execution

of the scheme as conceived by the perpetrator at the time . . . ." (alterations and brackets omitted)).

*    *    *

In sum, the evidence presented at trial specifically relating to Naughton, as well as the other

evidence relating to all three Defendants, viewed in light most favorable to the prosecution, was

sufficient for the jury to find beyond a reasonable doubt that Naughton knowingly and intentionally

agreed to participate, and participated, in a fraudulent scheme to deprive one or more of the

Benefits Funds of contributions owed under the CBAs, and that the evidence was therefore

sufficient to support the guilty verdict as to Naughton on all counts of the Indictment.

4.    Helen O'Sullivan

Helen O'Sullivan asserts that the evidence was insufficient to show her criminal intent.

However, at trial, the evidence established Helen O'Sullivan's direct involvement in the daily

management of the Allied payroll arrangement and her direct knowledge of the inefficiency,

burden, delay, and expense that resulted from this arrangement.  The jury learned, among other

things, that Helen O'Sullivan worked in Navillus's internal payroll department; she continuously

communicated with Lambe and Kelly about the Navillus employees being paid through Allied;

she sent weekly payroll sheets and new employee information to Allied; these records reflected

trade classifications assigned to the employees by Navillus; she had to direct Navillus drivers to

---

[23] To the extent Donal and Helen O'Sullivan adopt Naughton's *Ogbazion* argument, the
evidence established, as already discussed, that they were similarly involved in and aware of
Navillus's use of Allied to fraudulently funnel part of its payroll.

pick up the Navillus employee paychecks from Allied and deliver them to the job sites or the Navillus yard for distribution to the employees; and using Allied to process Navillus payroll was a tedious process that sometimes required her to work late nights. (*See* Tr. 1382:5–16; 1403:4–1410:4; 1447:17–1449:6; 1449:22–1450:15; 1520:14–1525:17; 2040:7–25; 2041:1–2042:3; 2043:3–19; 2049:12–2052:4; 2053:9–2054:14, 2055:11–2057:8, 2057:11–25, 2058:1–2059:14, 2060:21–2061:16; 2519:17–21.)[24]

The evidence also established that, despite certifying that she was aware of Navillus's obligations under the CBAs, Helen O'Sullivan submitted monthly Remittance Reports to the unions that failed to disclose the fact that Navillus employees were being paid through Allied. (*See* GX4152 (Bricklayers); GX4326 (Cement & Concrete Workers); GX4400 (Cement Masons); GX4623 (Mason Tenders); GX4717 (Pointers, Cleaners & Caulkers); GX4811 (Teamsters).) And like Donal O'Sullivan, Helen O'Sullivan signed hundreds of checks to Allied—233 checks totaling over $6 million between 2011 and 2016—as part of the payroll scheme. (Tr. 2554:19–2555:11.) In addition, Helen O'Sullivan knew some of the Navillus employees paid through Allied; for example, Vincent LaPenta was hired because Helen O'Sullivan knew his grandparents, and Luis Gonzalez spoke with Helen O'Sullivan about being paid in Sugrue's name and joining a union. (Tr. 909:14–911:13; 2316:7–2327:25.)

Significantly, the evidence also showed that when Lambe informed Naughton in December 2016 that Allied would no longer process payroll for Navillus, Helen O'Sullivan, who had full access to Navillus's internal payroll department and its ADP payroll processing system, wrote

---

[24] The evidence also established that Helen O'Sullivan sometimes used an anonymous Gmail account, alliedpayroll9@gmail.com, instead of her official Navillus email account, to communicate with Allied. (Tr. 2081:4–2086:13.)

dozens of *personal* checks to Navillus employees, including Gonzalez, who were previously paid through Allied.  Helen O'Sullivan did so on a weekly basis for approximately five months, and the checks she wrote totaled over $50,000.  (GX7125.)

This evidence demonstrated that, of all people, Helen O'Sullivan knew that the Allied payroll arrangement made no sense, yet she painstakingly executed it every week for six years, even using her own checks and money to perpetuate it for five months.  The evidence also demonstrated that Helen O'Sullivan knew or had reason to know that many of the employees paid through Allied were in trades covered by CBAs, yet she never disclosed the Allied payroll arrangement in the monthly remittance reports to the unions.  From this evidence, the jury reasonably could have found that Helen O'Sullivan did these things to conceal from the unions covered work performed by some Navillus employees and facilitate the fraudulent scheme to deprive the Benefits Funds of contributions owed under the CBAs.

Helen O'Sullivan argues that because union auditors found no discrepancies between the shop steward reports and the Remittance Reports, there is no reason to conclude that she knew that Allied workers were performing covered work.  (H. O'Sullivan Mem., Dkt. 271-1, at 5–7.) However, this argument fails for two reasons: (1) it presumes that the shop steward reports reliably identified all of the Navillus employees doing covered work; and (2) it overstates the significance and weight of this non-discrepancy when considered against the evidence demonstrating Helen O'Sullivan's intent.

The jury reasonably could have found that shop steward reports were unreliable and thus deserved little weight because they were circumvented by Navillus, or because shop stewards were not always present at job sites to record discrepancies.  Gregory Kelly, who was not a union member at the time, testified that shop stewards came to job sites "less than a majority of the time"

and that he continued to perform his work in their presence.   (Tr. 2509:3–24.)  LaPenta testified that a shop steward asked to see LaPenta's union book at a job site, and when LaPenta said that he did not have it, the shop steward "stormed off."  A day or two later, Navillus sent LaPenta to another job site.  (Tr. 946:10–947:3.)  Gonzalez testified that shop stewards would often ask him for his union book; that he tried to avoid the shop stewards and sometimes got help from the Navillus forepersons on site to do so; and that when union inspectors arrived at a job site, Gonzalez hid from them and/or left the job site, sometimes together with a few other workers, and did not return until the shop steward left.  (*See* Tr. 2303:6–2304:11.)

Furthermore, Helen O'Sullivan asking for and receiving a copy of an audit report does not offset the evidence that she knew that Allied employees were performing covered work, since she knew that the auditors' reports were based in part on the incomplete Remittance Reports she submitted.  Thus, the jury could have reasonably inferred that Helen O'Sullivan requested the audit report to ensure that the auditors had not discovered that Navillus was using Allied to funnel payroll for covered work—in other words, to confirm that the scheme was working exactly as intended.

Lastly, even assuming that the jury considered the auditors' reports as evidence of Helen O'Sullivan's lack of knowledge regarding covered work being performed by Allied-paid Navillus workers, there was ample other evidence from which the jury could infer Helen O'Sullivan's knowledge and intent, such as Helen O'Sullivan's transmittal of weekly payroll sheets and new hire forms, that contained trade classifications, to Allied.  Thus, the auditors' reports did not render the evidence of guilt as to Helen O'Sullivan insufficient.

*       *       *

In sum, the evidence at trial was sufficient for a jury to find Helen O'Sullivan guilty of all counts in the Indictment.

## B.    The Evidence Did Not Equally Support an Inference of Innocence or Mistake

Defendants argue that the evidence at trial equally supported an inference of innocent mistake or lack of criminal intent.  This is the "equipoise" rule applied by the Second Circuit in *United States v. Coplan*, 703 F.3d 46, 69 (2d Cir. 2012) and *United States v. Valle*, 807 F.3d 508, 522 (2d Cir. 2015).  In *Coplan*, the Second Circuit explained that "if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." 703 F.3d at 69 (alterations omitted).  But the Second Circuit has since cautioned that the equipoise rule is of "no matter to [a] sufficiency analysis because it is the task of the jury, not the court, to choose among competing inferences."  *United States v. Aquart*, 912 F.3d 1, 44 (2d Cir. 2018) (quoting *United States v. MacPherson*, 424 F.3d 183, 190 (2d Cir. 2005)).  "Thus, [the Second Circuit has] held the equipoise rule to apply only where evidence is nonexistent or so meager as to preclude the inferences necessary to a finding favorable to the government."  *Id.* at 44–45 (quotation marks omitted).  In *Valle*, for example, the Second Circuit affirmed that the evidence of the defendant's intent to carry out the crime in question was insufficient only because it was "indistinguishable" from evidence that the defendant merely fantasized about committing the crime.  807 F.3d at 516; *see also United States v. Lorenzo*, 534 F.3d 153, 160 (2d Cir. 2008) (noting "the absence of any evidence" supporting the inference that the defendant intended to further a cocaine-smuggling conspiracy).

As much as Defendants complain that direct evidence against them was meager or entirely nonexistent, it is well established that the Government can prove its case through indirect evidence. *See, e.g.*, *United States v. Murtha*, 803 F. App'x. 425, 427 (2d Cir. 2020) (summary order) ("As

46

fraudulent intent 'is rarely susceptible of direct proof, and must be established by legitimate inferences from circumstantial evidence,' the course of the parties' dealings is often a crucial source of evidence of fraudulent intent." (brackets omitted) (quoting *O'Donnell*, 822 F.3d at 659)). Defendants' argument that the jury could have drawn each inference advocated by the defense just as easily as (or more easily than) it could have drawn the Government's requested inferences is not persuasive. It is not for the Court to decide which of the parties' competing inferences is more likely correct; rather, the Court must "credit[] *every inference* that could have been drawn in the government's favor," *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019) (emphasis added) (quotations omitted), and only then determine whether the evidence was sufficient for the jury to find guilt beyond a reasonable doubt. Here, as discussed, the evidence supported the inference that each Defendant had the necessary criminal intent to be convicted of each of the 11 counts charged. That the jury could have drawn the opposite conclusion does not matter where, as here, the evidence establishing guilt is far from meager or non-existent. *See, e.g.*, *MacPherson*, 424 F.3d at 190 ("[W]here either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." (quotation marks omitted)). Further, Defendants make little effort to argue that the evidence as a whole was insufficient; rather, Defendants challenge each piece of evidence individually. As discussed above, the Court rejects this approach. *See, e.g.*, *United States v. Hunt*, No. 21-CR-86 (PKC), 2021 WL 5399986, at *27 (E.D.N.Y. Nov. 18, 2021) ("That some individual pieces of evidence, standing alone, arguably yield equally plausible competing inferences is beside the point.").

## III.    A New Trial Under Rule 33 Is Not Warranted

Naughton argues that, "[i]f the Court declines to enter an acquittal, the interests of justice warrant a new trial."[25]  (Naughton Mem., Dkt. 272-1, at 22.)  Naughton's assertion that Defendants were unfairly prejudiced at trial primarily relies on the Government's evidence and arguments regarding affiliates, yard work, and unions/trades for which no CBA was introduced, as well as the Court's decision to admit audit reports and evidence regarding Navillus's related companies. (*Id.* at 22–32.)  As an initial matter, the Court finds that, an objective evaluation of the evidence presented at trial, and an assessment of whether the evidence here "preponderates heavily" against the jury's verdict, does not warrant a new trial in light of the wealth of evidence detailed above. *Landesman*, 17 F.4th at 331.  The evidence, viewed as a whole, supports the conclusion that Defendants' actions were not mere innocent mistakes, and the jury had ample evidence to conclude that each Defendant acted with the requisite criminal intent to defraud the Benefits Funds. Accordingly, the Court is not convinced that the jury reached a "seriously erroneous result" or "that the verdict is a miscarriage of justice."  *Smith*, 316 F.3d at 183 (quoting *Atkins*, 143 F.3d at 102).  The Court addresses Naughton's specific challenges to the evidence and the Government's arguments below.

### 1.    Affiliates and Alter-Egos

Naughton asserts that the Government improperly suggested, for the first time on rebuttal, that Allied is an "affiliate" of Navillus and that the jury should find that Naughton lied to the union auditors about Navillus not having any affiliates.  "As a general matter, a defendant asserting that a prosecutor's remarks warrant a new trial 'faces a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of his right to a fair trial.'"  *Coplan*, 703

---

[25] Donal and Helen O'Sullivan join in Naughton's arguments, to the extent relevant.

F.3d at 86 (quoting *United States v. Banki*, 685 F.3d 99, 120 (2d Cir. 2012)); *see also United States v. Whitten*, 610 F.3d 168, 202 (2d Cir.2010) ("We will reverse on the ground of prosecutorial misconduct only if that misconduct caused substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." (quotation marks omitted)). To determine whether the remarks caused a prejudicial error, the Court "examine[s] 'the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct.'" *United States v. Gansman*, 657 F.3d 85, 96 (2d Cir. 2011) (quoting *United States v. Caracappa*, 614 F.3d 30, 41 (2d Cir. 2010)).  While rebuttal "does not allow the government to bring in new matters," *United States v. Giovanelli*, 945 F.2d 479, 495 (2d Cir. 1991) (Newman, J., concurring), the Court must consider the remarks in the context of the entire trial, *see Coplan*, 703 F.3d at 86 ("In context, however, it appears that the 'surprise' . . . argument was briefly discussed in the Government's opening summation . . . . In the context of a rebuttal summation that spanned some 120 pages of trial transcript, any misconduct here cannot be deemed severe." (citing *United States v. Newton*, 369 F.3d 659, 681 (2d Cir. 2004)).

The Court rejects Naughton's assertion that the Government's argument was improper because it "ambushed the defense with the new, unsupported argument that Allied was an alter ego of Navillus." (Naughton Mem., Dkt. 272-1, at 24 (emphasis removed).)  As Naughton himself admits, "the Government visited the theme" of affiliates "throughout the trial[] by having Bolger read into the record multiple provisions of the Mason Tenders CBA regarding alter egos; by revisiting the theme of 'affiliates' at least a dozen times during the testimony of Kilada"; "by revisiting the issue with Teamsters accountant Ho"; by eliciting "from Buoneto that ACS is an "affiliate" of Navillus"; by walking "the jury through nine audit reports for the Cement Masons and CCW during summation" to highlight Naughton's "statements that Navillus has no

49

'affiliates'"; and by arguing the same in its summation.  (*Id.* at 23–24 (emphasis removed).)  Based on the trial record, it is clear that the defense was fully aware of the Government's arguments that Allied was controlled by Navillus and had an opportunity to elicit evidence and advance arguments to challenge that theory.  Any contention to the contrary is disingenuous.[26]  Moreover, the argument about alter-egos/affiliates was not irrelevant, misleading, or prejudicial.  Indeed, the jury reasonably could have concluded, based on the evidence adduced at trial, that Allied operated akin to an affiliate of Navillus or its alter-ego would not be seriously erroneous.  (*See e.g.*, Tr. 1018:4–9 (discussing audit report requirement that specified "books and records of any affiliate, subsidiary, alter ego, joint venture, successor or related company of the employer shall also be made available at all reasonable times for inspection and audit by the accountants of the trust funds . . . .").

The Court also rejects Naughton's argument that by referencing affiliates during its summation, the Government "lied in wait"[27] to introduce evidence that had been precluded by the Court in its rulings in motions *in limine*.  (Naughton Mem., Dkt. 272-1, at 23.)  While the Court excluded the 2014 audio recording where Naughton claimed that Navillus had no affiliates, the Court also held that Defendants' introduction of evidence of union benefits contributions that Navillus did make during the period charged in the Indictment "open[ed] the door to at least some of the SDNY civil litigation evidence regarding alter-ego companies that the Court had excluded." (Memorandum and Opinion on Parties' Motions *in Limine*, Dkt. 265, at 26–27, 29–32.)  Thus, the Court allowed the Government to present alter-ego evidence at trial "in summary form and limited

---

[26] For the same reasons, the Court rejects Naughton's argument that "emphasis on 'affiliates' was highly misleading and confusing and unfairly prejudicial."  (Naughton Mem., Dkt. 272-1, at 24.)

[27] The Court notes that this should be "lay in wait."  *See* How to Use "Lay" and "Lie," Meriam-Webster Dictionary, https://www.merriam-webster.com/words-at-play/how-to-use-lay-and-lie (last visited Apr. 3, 2022) (past tense of "lie" is "lay").

to the Navillus employees who were paid through the scheme alleged in this case." (*Id.* at 32.) That is exactly what the Government did—after Defendants' "opening statements at trial prominently featured argument regarding Navillus's contributions to the union benefits funds named in the Indictment during the relevant period," the Government countered that evidence with a presentation of evidence, and argument, about Navillus using Allied to pay certain Navillus employees. (*Id.* at 32 n.20.) Naughton's overblown complaints to the contrary are not persuasive.

### 2.    Yard Work

Naughton next complains that the Government improperly argued for the first time in rebuttal that yard work is covered work. Naughton makes use of the (grammatically incorrect) "lied in wait" metaphor once again, despite the fact that, considered in the context of the entire trial, the Government's argument was by no means a surprise. The Court therefore rejects any suggestion that the Government's argument was improper. Nor did the argument cause prejudice to Naughton—as already discussed, there was sufficient evidence on the record for the jury to infer that certain kinds of yard work was, in fact, covered wok. (*See e.g.*, Tr. 2254:18–20 ("The employer recognizes the union as the sole and exclusive bargaining agent for all chauffeurs, drivers, and full-time warehousemen."); Tr. 2459:18–21, 2465:17–2466:2 (Gregory Kelly testifying that work at the Navillus yard included gathering warehouse supplies and loading the truck); 3023:11–3027:25 (Hegarty testifying to same); 2378:25–2379:7, 2379:15–2381:10 (Santana testifying about driving to and from job sites when working in the yard); 2460:17–25, 2462:11–2464:12 (Kelly testifying to same).) That there was a competing inference does not make the Government's argument unfairly prejudicial so as to warrant a finding that the jury's verdict was seriously erroneous.

Naughton briefly challenges the credibility of Gregory Kelly and Luis Gonzalez. As to Kelly, Naughton argues that Kelly "had an obvious reason for bias against Defendants" because

he was twice fired by Navillus for cause, and that his testimony is "problematic" because he could not recall the exact year for certain work he performed.  As to Gonzalez, Naughton argues that "his testimony that he only spent four or five months (out of eleven years) working in Navillus's yard appears inconsistent with his incredible recall of various people working in the yard." (Naughton Mem., Dkt. 272-1, at 27 n.38.).  While under Rule 33 the Court may "weigh the evidence" for itself, "and in so doing evaluate for itself the credibility of the witnesses," *Sanchez*, 969 F.2d at 1413, it "must strike a balance between weighing the evidence and credibility of witnesses and not 'wholly usurping' the role of the jury," *Ferguson*, 246 F.3d at 133 (brackets omitted) (quoting *Autuori*, 212 F.3d at 120).  "[A]bsent a situation in which" there are examples of, for instance, "the evidence [being] patently incredible or def[ying] physical realities," and "the government's case depend[ing] upon strained inferences drawn from uncorroborated testimony, a district court must defer to the jury's resolution of conflicting evidence." *Landesman*, 17 F.4th at 331 (quotation marks omitted).  Here, the Court finds that Naughton's arguments regarding Kelly and Gonzalez's testimony, viewed in light of the entire evidence presented at trial, do not meet that standard, and that neither Kelly's nor Gonzalez's testimony was "patently incredible."

### 3.    Evidence of Trades for Which No CBA Was Introduced

Naughton argues that the Government's evidence about welding, painting, glazing, roofing, and electrical work confused and misled the jury because the Government did not introduce any evidence that Navillus was a party to CBAs covering those trades.  The Court previously ruled on this issue in the context of Defendants' motions *in limine* and held that evidence of other trades was admissible to show how the scheme operated.  (Memorandum and Opinion on Parties' Motions *in Limine*, Dkt. 265, at 17–21.)  Naughton argues that because evidence at trial demonstrated that welders' trade was not covered work, such evidence did not demonstrate the scheme, but was in fact exculpatory.  (Naughton's Reply Memorandum of Law,

Dkt. 288, 23–24.)   However, as the Court already discussed above, the Government was not required to prove that all work paid through Allied was covered work—it simply had to show that some of the work was covered, which it did.  Indeed, that this evidence was potentially exculpatory supports the conclusion that admission of it was not unfairly prejudicial to Defendants.  The parties were free to argue that some or all of the work paid for through Allied was not covered and that the Government therefore did or did not meet its burden of proving that the Allied payroll scheme was intended to fraudulently deprive the Benefits Funds of contributions.  There was nothing improper or prejudicial about such arguments, or the admission of this evidence.

4.     Audit Reports

Naughton argues that the Court improperly admitted the audit reports because the auditors who prepared those reports did not testify and there was no indication whether they asked Naughton about affiliated companies, and that the admission of this evidence unfairly and materially prejudiced Naughton.  As an initial matter, the audit reports are not hearsay and were properly admitted as business records under Federal Rule of Evidence 803(6) after a proper foundation was laid.  *See United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000) ("To lay a proper foundation for such a record, a 'custodian or other qualified witness' must testify that the document was 'kept in the course of a regularly conducted business activity and also that it was the regular practice of that business activity to make the [record].'" (quoting *United States v. Freidin*, 849 F.2d 716, 719–20 (2d Cir. 1988))).  Moreover, the statements in the audit report checklists were not admitted for the truth of matter asserted, *i.e.*, that a certain amount of covered work was performed by Navillus employees or that Navillus owed a certain amount of contributions to the benefits fund, but to show how the scheme operated, *i.e.*, that the Allied payroll was not disclosed to the union auditors and that audit reports did not reflect that information.  (*See* Fed. R. Evid. 801(c)(2); Tr. 1086:11–1087:1 (the Court ruling that Naughton's denials about

53

Navillus's paymaster relationship is not hearsay because "[t]he government isn't off[er]ing that for its truth, they're just saying this is how [Defendants] carried out the deception. It's not being offered for the truth, it's being offered to show how they lied to people.").) Thus, the audit reports were properly admitted.

        5.    <u>Naughton's Other Arguments</u>

Naughton also argues that the following statements and evidence were unfairly prejudicial to him: (1) that Naughton enriched himself as a result of the scheme, (2) Agent Buoneto's testimony that the Government was unable to present testimony from more Navillus employees paid through Allied because they were Irish nationals who returned to Ireland; (3) that Defendants together controlled Navillus; (4) that trade classifications in the weekly Allied hours reports correspond to unions with which Navillus has a CBA; and (5) that anyone working for Navillus who was involved in a certain construction job site identified as 150 Charles was doing covered work. Naughton also argues that the Court's COVID-19 related restrictions violated his constitutional rights. None of these arguments warrant a new trial. Naughton's argument that Buoneto's testimony was somehow prejudicial to him, as someone of Irish heritage, is frivolous. The Government did not elicit any prejudicial testimony about Irish nationality—Agent Buoneto was simply explaining to the jury why many of the 154 employees paid through Allied could not testify at trial. Naughton's argument about the COVID-19 precautions imposed by the Court during trial, to protect the health and safety of all of the trial participants, is unpersuasive. The Court alerted all the parties to the safety precautions—which had been adopted courthouse-wide based on guidance from the district's epidemiology and HVAC experts—before trial and fully considered Defendants' arguments regarding these precautions, which resulted in the Court allowing Defendants to wear clear face shields instead of masks (so that the jurors could see their faces) and allowing counsel to be fully unmasked when arguing or examining witnesses. That the

jury was masked does not violate Naughton's constitutional rights. *See United States v. Tagliaferro*, No. 19-CR-472 (PAC), 2021 WL 1225990, at *2–4 (S.D.N.Y. Mar. 31, 2021); *United States v. Trimarco*, No. 17-CR-583 (JMA), 2020 WL 5211051, at *5–6 (E.D.N.Y. Sept. 1, 2020). The remainder of Naughton's complaints—which challenge the Government's arguments that were neither improper nor substantially prejudicial, *see United States v. Banki*, 685 F.3d 99, 120 (2d Cir. 2011)—do not convince the Court that the jury reached a "seriously erroneous" result or that the verdict is a miscarriage of justice as a result of this evidence, *Carpenter*, 316 F.3d at 183 (2d Cir. 2003) (quoting *Atkins*, 143 F.3d at 102).

## CONCLUSION

Defendants' motions for acquittal or, in the alternative, for a new trial, are denied in their entirety.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: April 6, 2022
Brooklyn, New York