UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

UNITED STATES OF AMERICA,

         – against –

DONAL O'SULLIVAN,
HELEN O'SULLIVAN, and
PADRAIG NAUGHTON,

                      Defendants.

------------------------------------------------------------------ X

Cr. No. 20-272 (PKC)

 

## SENTENCING MEMORANDUM ON BEHALF OF DONAL O'SULLIVAN

 

ELLIOTT KWOK LEVINE & JAROSLAW LLP

ILENE JAROSLAW
ijaroslaw@ekljlaw.com

565 Fifth Avenue, 7th Fl.
New York, NY 10017
Telephone: (212) 321-0510

## TABLE OF CONTENTS

I.    INTRODUCTION ..............................................................................................1

II.   LEGAL AUTHORITY .....................................................................................2

III.  DONAL'S HISTORY AND CHARACTERISTICS JUSTIFY A SUBSTANTIAL
      DOWNWARD VARIANCE FROM THE GUIDELINES ..................................3

   A.  Donal's Upbringing, Family, and Education ...................................................3

   B.  Donal's Charitable Causes and Extensive Aid to Those in Need......................5

      1.  Donal has organized and funded numerous disaster relief efforts....................6

         a.  Southeast Queens After Hurricane Sandy ...........................................6

         b.  Haiti After the 2010 Earthquake ........................................................9

         c.  Hurricane Irma ...............................................................................11

         d.  Other Disaster-Affected Communities...............................................11

      2.  Donal lends charitable support for causes around the world..........................12

      3.  Donal's generosity and kindness towards his employees...............................16

      4.  Donal's generosity extends to business associates .......................................25

      5.  Donal's reputation in the business community.............................................26

      6.  Donal's acts of generosity towards friends and strangers alike.......................27

      7.  Donal's Commitment to Family ................................................................30

      8.  Donal's acts of charity are genuine and often performed anonymously ..........37

IV.   THE APPROPRIATE ADVISORY GUIDELINES CALCULATION.............38

V.    A SUBSTANTIALLY BELOW-GUIDELINES SENTENCE OF PROBATION WITH
      A CONDITION OF RIGOROUS COMMUNITY SERVICE IS APPROPRIATE. ..........40

   A.  Substantial Departures from the Guidelines Are Permitted, Appropriate, and
       Commonplace in Fraud Cases....................................................................41

   B.  This Prosecution is an Outlier ...................................................................43

   C.  Donal's History and Characteristics Militate Against Incarceration. ...............46

   D.  Incarceration Is Not Required to Reflect the Nature, Circumstances, and Seriousness of
       the Offense or to Provide Just Punishment for the Offense ..............................47

   E.  Neither Specific nor General Deterrence Is Best Served by a Sentence of Imprisonment
       Nor is it Needed to Protect the Public and to Promote Respect for the Law ....................49

   F.  A Sentence of Incarceration Is Likely to Result in Unwarranted Sentencing Disparities .50

   G.  The Court Should Consider Alternatives to Incarceration ................................51

VI.   NO FINANCIAL PENALTY IS WARRANTED..................................................53

VII.  CONCLUSION..................................................................................................53

i

# TABLE OF AUTHORITES

## Cases

*Gall v. United States*, 552 U.S. 38 (2007)........................................................................2

*Kimbrough v. United States*, 552 U.S. 85 (2007)............................................................41

*Nelson v. United States*, 555 U.S. 350 (2009)..................................................................2

*Pepper v. United States*, 562 U.S. 476 (2011) ...............................................................41

*Rita v. United States*, 551 U.S. 338 (2007) ......................................................................2

*Tishman*, No. 15-cr-617 (CBA) (E.D.N.Y. 2015)..........................................................45

*United States v. Adelson*, 441 F.Supp.2d 506 (S.D.N.Y. 2006)...............................42, 50

*United States v. Algahaim*, 842 F.3d 796 (2d Cir. 2016) ..............................................41

*United States v. AQB, Inc.*, No. 16-cr-14 (PBS) (D. Mass) ...........................................44

*United States v. Brennan*, 395 F.3d 59 (2d Cir. 2005)....................................................50

*United States v. Carmona-Rodriguez*, No. 04-cr-667 (RWS), 2005 WL 840464
    (S.D.N.Y. Apr. 11, 2005)............................................................................................49

*United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008)............................................41, 50

*United States v. Cervino*, 15-cr-171 (S.D.N.Y. 2016) ...................................................43

*United States v. Dokmeci*, No. 13-cr-455 (JG), 2016 WL 915185 (E.D.N.Y. Mar. 9, 2016)........52

*United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010)...................................................50

*United States v. Johnson*, No. 16-cr-457 (NGG), 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018) .41

*United States v. Kang,* No. 16-cr-837 (JPO) (S.D.N.Y. 2017) .......................................53

*United States v. Leitch*, No. 11-cr-609, 2013 WL 753445 (E.D.N.Y. Feb. 28, 2013)..................52

*United States v. Lend Lease (US) Construction Constr. LMB Inc. (f/k/a Bovis Lend Lease LMB Inc.)*, 12-cr-288 (ARR) (E.D.N.Y. 2012) ...................................................................44

*United States v. Murphy*, 108 F.R.D. 437 (E.D.N.Y. 1985) ..........................................52

*United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008) ....................................42

*United States v. Pippin*, 903 F.2d 1478 (11th Cir. 1990)...............................................................52

*United States v. Petit*, 19-cr-850 (JSR) (S.D.N.Y. 2020)...............................................................43

*United States v. Petrossi*, 16-cr-234 (BMC) (E.D.N.Y.) ...............................................................42

*United States v. Plaza Constr.*, No. 16-cr-532 (NGG) (E.D.N.Y. 2016).......................................46

*United States v. Preacely*, 628 F.3d 72 (2d Cir. 2010) ..................................................................41

*United States v. Pruitt*, 813 F.3d 90 (2d Cir. 2016) .........................................................................2

*United States v. Ruiz*, No. 04-cr-1146 (RWS), 2006 WL 1311982 (S.D.N.Y. May 10, 2006).......49

*United States v. Tomko*, 562 F.3d 558 (3d Cir. 2009) ...................................................................50

*United States v. Tuzman*, 15-cr-536 (PGG) (S.D.N.Y. 2021) .......................................................42

*Williams v. New York*, 337 U.S. 241 (1949) ..................................................................................41

**Statutes**

18 U.S.C. § 3553 ...........................................................................................................................40

18 U.S.C. § 3553(a)..................................................................................................................passim

18 U.S.C. § 3553(a)(1).............................................................................................................46, 47

18 U.S.C. § 3553(a)(2).............................................................................................................47, 49

18 U.S.C. § 3553(a)(3).....................................................................................................................51

18 U.S.C. § 3553(a)(6).............................................................................................................46, 50

**Other Authorities**

Am. Bar Ass'n Criminal Justice Section, *A Report on Behalf of the American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes* (Nov. 10, 2014)...............................................................................................................52

Richard S. Frase, *Punishment Purposes*, 58 Stan. L. Rev. 67, 80 (2005)....................................50

Interactive Data Analyzer of the United States Sentencing Commission......................................43

Elizabeth Szockyj, *Imprisoning White Collar Criminals?*, 23 S. Ill. U.L.J. 485, 492 (1999)......50

U.S. Sentencing Comm'n, *Alternative Sentencing in the Federal Criminal Justice System* 20 (2009)...........................................................................................................................................51

U.S. Sentencing Comm'n, *Fifteen Years of Guidelines Sentencing* 56 (2004) ...........................50

U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation Of The Federal Sentencing Guidelines* 28 (2004)................................................................................49

U.S. Sentencing Comm'n, *Recidivism Among Federal Offenders: A Comprehensive Overview* 23 (2016)................................................................................................................................49

U.S.S.G. § 2B1.1(a)(1) ................................................................................................................38

U.S.S.G. § 2B1.1(b)(1)(F) ..........................................................................................................38

U.S.S.G. § 2B1.1(b)(10) .............................................................................................................39

U.S.S.G. § 3B1.1(c) ....................................................................................................................38

U.S.S.G. § 3D1.2(d) ...................................................................................................................38

Defendant Donal O'Sullivan respectfully submits this memorandum of law in connection with his sentencing, scheduled for June 30, 2023. For the reasons stated herein, we respectfully submit that a sentence substantially below the advisory range under the U.S. Sentencing Guidelines is sufficient but not greater than necessary to satisfy the factors set forth in 18 U.S.C. § 3553(a) and the interests of justice.

## I.      INTRODUCTION

Donal O'Sullivan is a good man who, throughout his life, has been devoted to improving the lives of others and being present in their times of need.  Notwithstanding the offenses for which he was convicted, Donal has an unparalleled track record of hard work and honest success, as well as unflagging dedication to community. The continuous support Donal has received throughout this case from a vast network of family, colleagues, and friends is a testament to a lifetime lived with compassion, generosity, and kindness.

On April 18, 2023, Donal submitted over 300 letters of support from family, friends, employees and former employees, business associates, and others worldwide who vouch for Donal's kindness, generosity, and good moral character.[1]  These letters demonstrate Donal's lifelong commitment to service, and his genuine past efforts and future plans to do good.  Donal has been a devoted and loving father, son, brother, and uncle; a loyal friend to countless throughout the world; and a man of unusually prolific generosity to friend and stranger alike.  He is a devoted father to his six children, whom he loves deeply, and who have learned from their father a moral imperative to help others less fortunate.  He has been totally compliant with the Court throughout

---

[1]     For the reasons previously disclosed to the Court in our sealed submissions of April 18, 2023, and April 20, 2023 (*see* ECF Nos. 336, 342), and with the Court's permission on June 14, 2023, the three volumes of letters of support for Donal O'Sullivan were filed under seal. To the extent that those letters are quoted herein, the letter-writers have granted permission to make those excerpts public in this unredacted sentencing memorandum.

1

this case, with an impeccable Pre-Trial Services record.  In short, Donal's life history before this case has been spotless and the offenses of conviction are utterly inconsistent with his character and personality, as the letters submitted to the Court attest.

The Court must fashion a sentence for this extraordinary man in an equally extraordinary context. No individual has ever been sentenced for the failure to remit payments to union benefits funds, and so the Court is in uncharted territory. Moreover, in this District, more serious crimes involving construction companies—generally cases involving fraudulent billing practices or reporting—are routinely resolved through corporate deferred prosecution or non-prosecution agreements. We urge the Court to consider both the novel circumstances of this prosecution and the remarkable nature of the man in fashioning an appropriate sentence.

## II.       LEGAL AUTHORITY

While this Court must, of course, consider the sentencing guidelines, a "sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." *Rita v. United States*, 551 U.S. 338, 351 (2007).  Indeed, "sentencing judges are strictly *forbidden*" from assuming that a within-range sentence is reasonable. *United States v. Pruitt*, 813 F.3d 90, 93 (2d Cir. 2016) (emphasis in original) (citing *Rita*, 551 U.S. at 351); *see also Nelson v. United States*, 555 U.S. 350, 352 (2009); *Gall v. United States*, 552 U.S. 38, 39 (2007).

Rather, pursuant to 18 U.S.C. § 3553(a), this Court is required to "impose a sentence sufficient, but not greater than necessary" for the sentence imposed "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."    Further, "in

2

determining the particular sentence to be imposed, [this Court] shall consider" the so-called Section 3553(a) factors, which include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> …
> (3) the kinds of sentences available; [and]
> …
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct …

*See* 18 U.S.C. § 3553(a).

While our client entered a plea of not guilty and proceeded to trial, disputing criminal scienter, Donal acknowledges that he had failings as a chief executive and he accepts responsibility for his conduct. Because Donal plans to appeal his conviction, this submission will not address his conduct at Navillus as it relates to the offenses of conviction, other than as relevant to two disputed Guidelines enhancements.

This submission will instead focus on Donal's background and life history, topics which, though not subjects at trial, are now before the Court to consider pursuant to the sentencing factors enumerated in 18 U.S.C. § 3553(a).

## III.   DONAL'S HISTORY AND CHARACTERISTICS JUSTIFY A SUBSTANTIAL DOWNWARD VARIANCE FROM THE GUIDELINES

"[I]n determining the particular sentence to be imposed," the Court must view the offenses in the context of Donal's "history and characteristics." 18 U.S.C. § 3553(a). Throughout his life, as an overwhelming number of people attest, Donal has been a dedicated family man with a long history of commitment to his employees, his community, and others in need throughout the world.

### A.    Donal's Upbringing, Family, and Education

Donal O'Sullivan comes from humble beginnings. Born and raised in Ballinskelligs, County Kerry, in a remote tip of Ireland, life was a struggle. "Times were hard, money was scarce."

3

(Desmond Cronin, vol. II, tab 133).  Donal's parents, Jack and Theresa, had a small farm, with little machinery; work was done by hand. (Michael Sugrue, vol. I, tab 114).  As a result, "every penny was hard earned." (Brian McDonald, vol. I, tab 14).  The quality of housing and infrastructure left much to be desired. (Michael Healy Rae, vol. I, tab 66).  There was no electricity, no running water, and no bathrooms until Donal was an adolescent. (Marian O'Sullivan, vol. I, tab 35).

Donal and his family worked the farm constantly – he went to school during the day, and then worked hard doing chores on the family farm after school. (Eileen O'Sullivan, vol. I, tab 28).  He would help at the neighbors' farms as well. (Marian O'Sullivan (vol. I, tab 35), Edward Trindle (vol. I, tab 118)).

A "shy" child (Eileen Horgan, vol. I, tab 8), Donal made a great impression on his elders, even at an early age.  For example, his school guidance counselor and sports coach, who knew him for five years, stated "I found Donal to be a young man of great integrity, always cooperative, popular with both fellow students and teachers, possessing great empathy, always positive, great leadership skills, excellent sense of humor and a great work ethic." (Mickey O'Sullivan, vol. 1, tab 106).

Donal was a very hard worker – a quality that has stayed with him.  When he was 18, Donal got his first construction job in order to help support his family.  For two winters, he worked in construction in Dublin during the week. After a strenuous week of manual labor, he then traveled over five hours to return home so that he could help out on the family farm on Saturdays and half a day on Sunday.  Then Donal traveled over five hours back to Dublin for the next week's work.

In the early 1980s, recession hit Ireland hard. (Hanna O'Donoghue, vol. I, tab 96).  And so Donal did what many Irish youth did at that time – he emigrated to the United States, in search of a better life.  With just a few hundred dollars in his pocket, Donal, then just 23, and two of his

brothers, Leonard and Kevin, came to New York in 1985. (Michael Sugrue, vol. I, tab 114).  After searching many places for work, Donal managed to land a job with a local tiling company. (Leonard O'Sullivan, vol. I, tab 33).

After a few years, Donal and his brothers Leonard and Kevin decided to form their own tiling company – called Navillus (Sullivan backwards).  They were joined by their sister Helen a few years later.  Navillus grew tremendously, eventually becoming one of New York City's largest concrete and masonry subcontractors and then general contractors, on many major construction projects, with a workforce of over 1,000 at any given time.  Navillus primarily employed union labor on its projects, with agreements with over 25% of the major New York City-based construction unions.  Navillus maintained an exemplary record with the construction unions and was one of the largest contributors to union benefit funds between 2007 and 2017.

For many years, Donal and his siblings made sure to rotate their time in New York so that one of them was always around to help out on the family farm in Ireland.  Eventually, Leonard returned to Ireland and Kevin started his own company, leaving Donal as Navillus's sole owner.  Donal remained in charge of the company until shortly after the indictment in this case, when he stepped aside in order to preserve the company's existing and potential future business.  Donal has not run the company since that time.

### B.    Donal's Charitable Causes and Extensive Aid to Those in Need

If Donal is known for one thing more than anything else, it is his desire to help others in need—with both his time and money; in large ways and small; for the benefit of family, friends, neighbors, employees, business associates, strangers, charities, and entire communities—both here and elsewhere around the globe.  Moreover, he offers this help without fanfare or pursuit of recognition.

People who know him well, describe it well. Two long-time friends from his neighborhood write that Donal is "one of those rare breeds" who "goes out of his way to help other people, even strangers, even at his own personal expense. There are people put on this Earth to help make it a better place. Donal O'Sullivan is one of those people." (Christine and Michael Arnouse, vol. I, tab 42). His ex-wife's sister, whom Donal has known since childhood, states that Donal is "the most compassionate, hardworking and generous man I know." (Eileen Horgan, vol. I, tab 8). And his older sister Marian writes that she has the "greatest admiration" for Donal because of the "kind, thoughtful, generous and selfless human being that he is and always was." (Marian O'Sullivan, vol. I, tab 35). An acquaintance from Ireland captures the essence of Donal O'Sullivan: "To put it simply, there are not enough positive adjectives in the dictionary to describe the character of Donal O'Sullivan. Honourable, charitable, kind, selfless, considerate, sympathetic, and empathetic are the ones that come immediately to my mind." (Katie O'Carroll, vol. I, tab 92).

Specific examples of Donal's thoughtfulness and generosity abound. We highlight and summarize some of them here.

### 1. Donal has organized and funded numerous disaster relief efforts

Donal has an extraordinary track record of providing abundant and critical support to communities that have been ravaged by natural disasters, both in the United States and abroad, becoming a savior to these communities in the face of overwhelming devastation.

#### a. *Southeast Queens After Hurricane Sandy*

Perhaps the best-known and most extensive of Donal's herculean disaster relief efforts occurred in 2012 in several communities in southeast Queens in the wake of Superstorm Sandy. That storm wreaked havoc on hundreds of homes in the Rockaways and surrounding communities; it destroyed or seriously damaged countless houses and residential buildings, leaving residents without food, water, or electricity for days or even longer.

Just days after the storm, Donal organized a huge recovery operation – enlisting dozens of employees, friends, neighbors and members of his own family (including his own young children) to help Rockaway residents recover from the storm's devastation.  A former Navillus employee recalled that:

> I will always remember that the email said "It is time for us to give back . . . ." And give back he did, ten-fold, as Donal volunteered his enormous resources of trucks, manpower and equipment for several months to help relieve the dire consequences of the people of Rockaway.

(Fergal Conefrey, vol. III, tab 214).  This volunteer effort, which lasted for several months, included:

- Cleaning out hundreds of people's homes of water, sand, dirt, and debris, and salvaging their personal possessions (David Hegarty (vol. III, tab 245), Gilmer Pereira (vol. III, tab 320), Jane Saffran (vol. I, tab 111));

- Clearing local roads for official first responders to use (Eoin O'Mahony, vol. III, tab 305);

- Setting up a tent for residents to obtain food, supplies and other essentials (David Ashe (vol. I, tab 43), Peter Segal (vol. I, tab 112));

- Providing hundreds of generators to enable residents to get heat and electricity (Eoin O'Mahony, vol. III, tab 305);

- Providing tools, machinery, and other equipment to help in this effort. (Peter Segal, vol. I, tab 112).

Donal's executive assistant from 2006 to 2105 vividly recalls the mobilization effort:

> [I]n the days following Hurricane Sandy, Mr. O'Sullivan took a ride to see first-hand the devastation left by that natural disaster. Within a few hours, my phone rang, and we were planning what would be the preamble to the "Build It Back" program. The next morning, our entire company, from the office staff to the labor, was directed to report to a church parking lot in Belle-Harbor, Queens. With 2 small tents, a truck full of shovels and buckets, some water pumps, and a clip board, we began what would be a months-long endeavor of helping to salvage people's homes. All volunteer. **All without pay – well, without pay to Navillus, that is. Mr. O'Sullivan continued to pay his employees as if they were working on billable jobs.** I watched as people came into the tents crying and sobbing. They would give their address and tell him what they need. Mr. O'Sullivan would

7

dispatch the appropriate skilled labor and equipment to the home to mitigate whatever damage had been done.

(Krystal Mastoras, vol. III, tab 275).

The sheer enormity of this effort is hard to fully capture in words, but those writing on Donal's behalf have made admirable efforts to do so.  A longtime friend who participated in the effort describes how he went to the site, expecting to see "a few guys with wheelbarrows and shovels" but instead being "absolutely shocked at what I saw":

> There was a massive tent set up serving hot food and distributing essential items and food to the neighborhood.  Donal organized all of this to help the stranded residents.  Also staged at the tent area was the starting point for numerous different work crews equipped with Navillus shovels, brooms, pumps, dump trucks, and bobcats, among other things, to help the local citizens where they can.  That this type of operation could be set up by a private individual, no less a friend of mine at his own expense, was completely unbelievable.

(Peter Segal, vol. I, tab 112). That friend worked at the site every day for months, helping people salvage their homes.  He recalls how "many were brought to tears along with the work crews." Indeed, he was "so inspired by Donal's actions" that he enlisted his wife and children to volunteer their time to help with the recovery as well.

On November 7, 2012, one Rockaway resident sent an email to Donal in which he wrote:

> I just wanted to thank you from the bottom of my heart for sending your workers down to Rockaway on Sunday. . . They did not stop working on my parents [sic]basement till every thing was finished. . . . Only after everything was finished did they grab a quick bite to eat and then moved on to our neighbors [sic] house. I asked [the foreman] what I should give the workers for all their hard work and he told me money will just take away the good deed.  Donal[,] just wanted to let you know you should be very proud of the employees working for you.  It's a true testament to you as an owner to have such dedicated and thoughtful workers.  Your company and your name will always be spoken highly of by any Rockaway person. Thanks again.

(Tommy Ryan, Ex. 1).  Another Rockaway resident wrote an email to Donal on November 10, 2012: "Today your company assisted my family in [B]elle [H]arbor . . . I cannot thank you enough

for the work you are doing for these people who have been devastated by this storm.  You helped lighten their burden and we are so grateful."  (Erin Corcoran, Ex. 2).

Others who were there describe Donal's contributions in similar terms.  A former employee describes it as a "mind-blowing volunteer effort" and the "biggest act of kindness in humankind I have witnessed personally in my life." (David Ashe, vol. I, tab 43).  A friend and neighbor said that "I was overwhelmed" by Donal's commitment of people and equipment to the recovery effort. (Tom Carty, vol. I, tab 49).  And a Rockaway Park homeowner says that, without Donal's and his sister Helen's help, "a lot of us would not have survived." (Mary Bouderau, vol. II, tab 125).  That homeowner was "so impressed with them and their charity for others" that she applied for and got a job working for Navillus.

Donal not only provided the financial and organizational support for these efforts, but often led from the front, personally assisting in the relief efforts and performing manual labor himself, along with several of his children and others, including shoveling, pumping water, and removing sand and debris from people's homes. (David Hegarty (vol. III, tab 245), Gilmer Pereira (vol. III, tab 320), Jane Saffran (vol. I, tab 111)).  And why did he enlist his own children in this effort?  Because he wanted them to be aware of "the privilege they had in their lives, and to always be cognizant of, and try to help, those who were less fortunate." (Anne McVeigh, vol. II, tab 167).

Donal's help to the community did not end in 2012.  Years later, Donal donated laptop computers and other equipment and gifts to a local school where he had headquartered his relief efforts. (Paula Burke (vol. III, tab 203), Caroline O'Sullivan (vol. I, tab 27)).

### b.  *Haiti After the 2010 Earthquake*

The Superstorm Sandy recovery effort was not the first, nor the last, time that Donal spearheaded such an endeavor.  A 2010 earthquake in Haiti devastated that country, leading to over 250,000 deaths and billions of dollars of property damage.  Donal, along with nearly 100 employees

and family members from the United States and Ireland, traveled to Haiti to provide help to the victims of that disaster. (Patrick Boland (vol. II, tab 124), Michael Brewster (vol. II, tab 127), James Mulvey (vol. III, tab 293)).  Donal paid for people to fly there, and for their room and board, while they contributed their time and effort to set up and build housing for numerous residents. (Nitza Barreto-McGill, vol. III, tab 194).  As in the Rockaways, Donal himself personally helped in the effort, working side-by-side with laborers in the trenches. (Sarah Fitzpatrick, vol. I, tab 63).

Donal also was a key figure in the creation of Haven, a 501(c)(3) organization established in 2010, to provide financial and other support to Haiti in the wake of the earthquake, and which provided such support for the next decade.  Donal provided funding and joined the Board; he helped set up the New York office with space, equipment, and personnel. (Michael Brewster (vol. II, tab 127), Peter Segal (vol. I, tab 112)).  Equally important, Donal introduced Haven to his "vast network" of potential donors and supporters. (Leslie Buckley, vol. I, tab 46).  All these efforts were successful beyond imagination:  Haven eventually raised $29 million to help communities in Haiti rebuild. (*Id.*).

One of Donal's daughters describes the life-altering experience she had as a participant in this relief effort.  Inspired by her father, Katie O'Sullivan (who was 14 at the time) decided she wanted to go to Haiti as well.  Donal personally accompanied her there, despite the fact that he was still recovering from a serious skiing accident that left him with numerous broken ribs, a broken shoulder and collar bone, and a fractured spine – "all so [Katie] could see [her] dream through." (Katie O'Sullivan (vol. I, tab 31), Sarah Fitzpatrick (vol. I, tab 63)).  Katie describes it as a "turning point in my life" – leading her to study International Peace in college and ultimately volunteering with the Peace Corps in Cambodia, where she serves today.

Donal's support of Haven and the Haiti recovery is yet another example of what his friend and colleague (and long-time operations director of Haven), Sarah Fitzpatrick, describes about

10

Donal: "They say one of the greatest things in life that you can give somebody is your **time**.  Donal gives that in spades." (emphasis in original) (Sarah Fitzpatrick, vol. I, tab 63).

### c.  *Hurricane Irma*

Donal participated in another exceptional recovery effort that took place in locations off the coast of Florida that were decimated in 2017 by Hurricane Irma.  Donal was among the first to help, providing laborers (at his expense) and two camps (one with hot meals; the other with food, hygiene supplies, clothing, medicine, and more) for the residents there. (Patrick Boland (vol. II, tab 124), Sher Boota (vol. III, tab 199)).  Once again, Donal paid for people to fly there, rent cars, and live while they assisted in the recovery efforts. (Ian Galvin, vol. III, tab 237).  And once again, Donal personally participated – for several weeks – in the work. (Sher Boota (vol. III, tab 199), Mark Humbles (vol. I, tab 71)).

Donal's colleagues recognize the extraordinary nature of this relief effort.  A long-time employee observed how Donal had "no connection" to the area, and "yet he mobilized as if it was his family." (Ian Galvin, vol. III, tab 237).  A former employee then living in Miami says, "I was amazed how, even though he was stationed in New York, Donal was the first to react, deploying workers and trucks within days to the affected areas." (Mark Humbles, vol. I, tab 71).  Indeed, people there were "shocked" when they learned that Donal organized a team from New York City to help them.  (Gilmer Pereira (vol. III, tab 320), John Prettyman, vol. I, tab 109)).

### d.  *Other Disaster-Affected Communities*

And the list goes on.  A business colleague and a long-time Navillus employee both describe Donal's help with the recovery from Hurricane Maria in Puerto Rico in 2017. (Jack Dooley (vol. II, tab 139), James Smith (vol. III, tab 328)).  Another long-time employee describes Donal's donation of employees and supplies in the wake of Hurricane Florence in South Carolina in 2018. (Ian Rubinstein, vol. III, tab 324).  Yet another supporter describes Donal enlisting others to help

11

in the wake of Hurricane Katrina in New Orleans in 2005. (Jean van Sinderen-Law, vol. II, tab 187).

Long-time employee Ian Galvin sums it up well: "Donal's help in the aftermath of the hurricanes shows his true character. He truly cares for people whether he knows them or not." (Ian Galvin, vol. III, tab 237).

### 2. Donal lends charitable support for causes around the world

In addition to his substantial efforts in disaster relief, Donal has acted as a generous benefactor for charities and communities around the world.

Donal's long list of charitable endeavors here in the United States include serving on the Board of Trustees of and donating to his community's school (Christine and Michael Arnouse, vol. I, tab 42); providing food baskets for homeless shelters (Lorraine Callan, vol. I, tab 2); and making a sizeable donation to a food drive and organizing his employees to distribute food to people adversely affected by COVID. (Beata Kuzma (vol. I, tab 265), James Smith (vol. III, tab 328)). Donal has also personally supported the following charities and causes:

- The Adaptive Sports Foundation, a program for children with disabilities (Cynthia Francis, vol. I, tab 146);

- Charitable Secret Santa events (David Ashe, vol. I, tab 43);

- Toys for Tots events (David Ashe (vol. I, tab 43), Mark Kelly (vol. III, tab 259), Kevin O'Dwyer (vol. I, tab 98), Robert Sodano (vol. III, tab 330));

- Christmas food appeals (Linda Gisonda, vol. II, tab 149);

- Winter coat drives (Mark Kelly (vol. III, tab 259), Kevin O'Dwyer (vol. I, tab 98), Robert Sodano (vol. III, tab 330));

- Habitat for Humanity (*Id.*);

- The Special Olympics (*Id.*); and

- A school for children with special needs. (Frank Sciame; vol. II, tab 180).

Beneficiaries of Donal's generosity also include U.S.-based organizations of shared national heritage including the New York chapter of the Gaelic Athletic Association (GAA) and its youth organization, Shannon Gaels.  Donal donated $100,000 to these organizations so they could build a new soccer field in Queens, paid for 90 male and female players to travel to Ireland to attend the World Games, and lent a helping hand when the organization was on the "verge of extinction." (Eamon Devlin (vol. II, tab 138), Colin Mathers (vol. III, tab 278), Patrick O'Donoghue (vol. I, tab 97)).  Other such organizations that Donal has supported include the American Ireland Fund, the Irish Arts Center (Michael Brewster, vol. II, tab 127), and the Irish Educational Development Foundation. (Michael Higgins, vol. I, tab 69).

Donal also has a history of extensive charity work abroad, which has included:

- Organizing a golf charity to help build schools and water projects in Brazil and South Africa (Donnchadh Costello, vol. III, tab 217);

- Supporting American Friends of the Ludwig Foundation of Cuba, which assists artists and filmmakers (James Durkin, vol. II, tab 141);

- Making a significant donation for a 400-room, female student hostel for a university in Africa (William Fennell, vol. II, tab 144);

- Donating money for medical supplies and other basic needs for people in Uganda (James Girdusky, vol. III, tab 240);

- Donating clothes and other essentials to an orphanage in Jamaica (Jerry O'Halloran, vol. I, tab 99).

Donal has never forgotten his roots and has provided extensive support to his original homeland, especially to his home community of Ballinskellig.  This includes financially supporting:

- The local community center (Anne Coffey, vol. I, tab 3);

- Social services and events, and Meals-on-Wheels, for the elderly (John Barry, vol. I, tab 44);

13

- A special bus with wheelchair access for residents to travel to social events and medical appointments (Patrick Boland (vol. II, tab 124), Anne Coffey (vol. I, tab 3), Desmond Cronin (vol. II, tab 133), Valerie Moran (vol. I, tab 17);

- A children's playground (Patrick Boland (vol. II, tab 124), Desmond Cronin (vol. II, tab 133), Valerie Moran (vol. I, tab 17));

- The renovation of a local nursing home (Patrick Boland (vol. II, tab 124), Jack Fitzpatrick (vol. II, tab 145), Denise Nolan (vol. I, tab 88));

- Annual pilgrimages by severely handicapped residents to Lourdes (Aidan Browne, vol. I, tab 1);

- A local foundation for Flag Day and other activities (Michael Cavanagh, vol. II, tab 130);

- The local GAA (football) club, St. Michaels (Patrick Coffey (vol. I, tab 4), Pierce Kirby (vol. I, tab 11), Valerie Moran (vol. I, tab 17)) – thereby "help[ing] to keep rural Ireland alive" (Patrick O'Sullivan, vol. I, tab 107);

- A local heritage center (Desmond Cronin, vol. II, tab 133);

- Medical care for the ill (*Id*.);

- An in-shore rescue boat and equipment (Gerald and Patricia Fitzgerald, vol. I, tab 59);

- Medical and other equipment for the local hospital (Eileen Horgan (vol. I, tab 8), Valerie Moran (vol. I, tab 17), Patrick Sugrue (vol. I, tab 115));

- A sound system for hearing-impaired patrons of a local church (Patsy Lynch, vol. II, tab 162);

- Computers for a local school (Valerie Moran, vol. I, tab 17);

- The repair and expansion of the local rowing boathouse, used by over 400 children (Kieran Murphy, vol. I, tab 18);

- The local development committee's ability to receive government grants by matching funds (Michael O'Leidhin, vol. I, tab 100);

- University College, Galway (Michael Brewster, vol. II, tab 127);

- University College, Cork (Jean van Sinderen-Law, vol. II, tab 187); and

- Royal Irish Academy of Music (Michael Brewster, vol. II, tab 127).

As in the United States, Donal's beneficence in Ireland is not only fiscal – he returned there often and gave his time and attention to people there as well.  As one long-time family friend says, "Whilst Donal's many examples of monetary and financial contributions have been outstanding, his greatest gift of all has been his presence and quality of time supporting the people he cares for." (Maurice Fitzgerald, vol. I, tab 61).  Donal devotes himself in this way not just to family members (described below) – but also to friends, neighbors, and even complete strangers.  For example, Donal:

- Visited an employee's mother-in-law, who suffered from dementia (Mick Cunningham, vol. III, tab 220);

- Visited people in the local community center (Micheal Cronin, vol. III, tab 218);

- Visited his family's neighbors, including those struggling with personal challenges (John Barry (vol. I, tab 44), Anne Coffey (vol. I, tab 3), Sarah Forde (vol. I, tab 7));

- Trained youngsters on a local football team, helping lead them to their first championship (Kieran Murphy, vol. I, tab 18);

- Took a friend of a friend (the latter of whom was visiting Ireland from California), who was dying of pancreatic cancer, to visit a monastery on the coast of Ireland (William Murphy, vol. I, tab 86);

- Skipped Christmas dinner to help friends rescue their house from a flood (Mary and Kathleen O'Connor, vol. I, tab 94);

- Visited the homes of strangers who were alone at holiday time (Caroline O'Sullivan, vol. I, tab 27); and

- Flew to Ireland to be with a family friend, when each of his parents passed away (Maurice Fitzgerald, vol. I, tab 61).

Given all that, one long-time family friend's summary is unsurprising:  Donal "is a total Gent, always looking out for others.  Donal is one of life's true gentlemen and a national treasure in Ireland, he is so humble, caring and kind." (Aine Murphy, vol. I, tab 84).

### 3.  Donal's generosity and kindness towards his employees

Contrary to how he was portrayed at trial, Donal is a generous and conscientious employer who genuinely cares for and supports his employees not only financially, but in numerous other ways that go well beyond an employer's duty.

Donal compensates his employees well and often takes actions aimed at advancing their financial and working futures.  As a company executive with over 10 years in the industry puts it: "I have never seen a company paying so much in bonuses to employees, especially union employees." (Loukas Georgiou, vol. III, tab 239).  When the executive asked Donal why he did this, Donal told him, "they are the ones that make money for this company and they deserved every additional dollar of bonus." (*Id*.). Donal also created an employee incentive program, allowing employees to share in the profits from projects they worked on – something one project manager describes as "unparalleled" in the construction industry (Kate Clancy, vol. III, tab 210), but which Donal did because "he cares about his employees." (Kenny McBrien, vol. III, tab 280).  Donal also has a history of keeping employees in their jobs, even if there was no actual need for their services or when business was slow, so they could provide for their families.  He did so even when it negatively impacted the company's profitability. (Juan Carbajal (vol. III, tab 206), Paul Garvey (vol. III, tab 238), Apollo Jordan (vol. III, tab 254), Selina Maddock (vol. I, tab 78), Dale O'Connor, vol. III, tab 299).

Donal's care for his employees also extends to protecting their welfare.  Donal has demonstrated a particular concern for his employees' safety on the job – a refrain heard from many employees, and others. (James Durkin (vol. II, tab 141), Miguel Gutierrez (vol. III, tab 242), Michael Lagace (vol. II, 157), Patrick Mills (vol. III, tab 290), Milton Padilla (vol. III, tab 316), Dawa Phuntsok (vol. III, tab 322), Ian Rubinstein, vol. III tab 324)).  For example:

- As a 35-year veteran of another large New York construction company puts it, "it is very rare for someone in Donal's position to take such an active and personal involvement in ensuring the work place and actions of his work force are safe." (James Durkin, vol. II, tab 141).

- Donal prioritizes worker safety "[d]espite the added expense." (Michael Lagace, vol. II, 157).

- Donal also has a history of showing up at job sites and arranging for food for the workers. (Babar Boota (vol. III, tab 198), Michael and Bridget Brennan (vol. III, tab 202), Eoin O'Mahony, vol. III, tab 305)).

- One employee reported that it "shocked me" that a company owner would do that – in this instance, arranging for food to be brought to a job site performing emergency work in the middle of a cold night, and then staying with the workers for the rest of the night. (Babar Boota, vol. III, tab 198).

- Another employee wrote that going to a job site to praise the workers and provide meals is an "absolute rarity in the construction industry, but for Donal it was common practice." (Eoin O'Mahony, vol. III, tab 305).

Donal's care and concern for his employees takes other forms as well. He gave an employee battling addiction a second chance, allowing him to rise through the ranks of the company. (Duncan McCarthy, vol. III, tab 281). Donal's concern for his employees also includes discrete but thoughtful gestures like staying in the office on Christmas Eve, personally writing holiday cards to his employees (Sher Boota, vol. III, tab 199), reassigning an employee with a heart condition to a less onerous assignment (Edward Soler, vol. III, tab 331), or immediately getting a dry set of clothes for a snow-covered employee at a job site – something the employee later recalled as "never happen[ing] in my line of work and I've been doing it for 40 years." (Kevin Wilson, vol. III, tab 343).

Another common theme that emerges from the many letters of Navillus employees and business associates is that Donal gives people a chance – providing them opportunities (sometimes life-altering opportunities) to succeed, picking them up when they are down, and getting them to

exceed their own expectations.  Here's how a former employee – an Allied payroll employee, and the government's first witness at trial – describes the opportunity he received:

> Helen and Donal didn't hire me or people like me to take advantage of us and save some money.  Truth is, these jobs could have easily been completed without me and the others like me.  I firmly believed they hired us to help us.  Many of the people I worked side by side with were workers who otherwise wouldn't have had a job and if they didn't wouldn't have been paid as well or treated as well…. They hired me and people like me and gave us opportunities that we would never have gotten otherwise.

He concludes, "[i]t's thanks to the both of them I've learned the skills I not only use today in my personal life around my house, but also can take with me on the next path in my career.  If I could go back and do it all over again, I would without any hesitation." (Vincent LaPenta, vol. III, tab 268).

As a colleague puts it, Donal "puts people…in positions to succeed, even when most others would not do it." (Antonio Cartolano, vol. II, tab 128).  The list of employees and colleagues attesting to this special feature of Donal's character goes on. (Patrick Holden (vol. III, tab 248), Corey Hunt (vol. III, tab 249), Joseph Iacovelli (vol. III, tab 250), Jesse Jaroszewski (vol. III, tab 253), Marcelito Jordan (vol. III, tab 256), Garry Kelly (vol. III, tab 258), Olan Kenneally (vol. III, tab 260), David King (vol. III, tab 262), Michael King (vol. III, tab 263), Conor Leen (vol. III, tab 269), Saurabh Munot (vol. III, tab 294), Evelyn O'Byrne (vol. III, tab 296), Colm O'Connell (vol. III, tab 298), Conor O'Sullivan (vol. III, tab 312), Marcos Suliveres, vol. III, tab 333)).

Moreover, Donal provides opportunities to employees regardless of the person's age, race or ethnicity, sexual preference, disability, or gender.  Examples abound:

**a.     Gender:**  Regrettably, women have historically had a hard time entering and advancing in the New York City construction industry.  But not with Donal.  To the contrary, he goes out of his way to be supportive of his female employees – as well as other non-employee, female participants in the industry.  As one contractor puts it, "[u]nlike others in the industry, Donal

18

has never commented on my gender and always treated me with the utmost respect as a businessperson." (Linda Gisonda, vol. II, tab 149).

As another veteran contractor states, "I have visited hundreds of construction projects over the years and I was surprised at how many women [Donal] had in responsible charge of different projects…I personally saw numerous times the effort that Donal put in to mentor, teach and provide any necessary assistance to women supervisors." (Roy Weinstein, vol. II, tab 189).  Donal "has created a welcoming environment for the women at Navillus." (Palak Trivedi, vol. III, tab 337).

And although the industry has a reputation for being the "least inclusive of women," Donal's company "is nothing but inclusive.  There is no glass ceiling at Navillus.  Navillus is a particularly inclusive company that embraces diversity and gives each and every person the opportunity to be successful in life." (Kate Clancy, vol. III, tab 210).  Ms. Clancy, a Navillus project manager, was nominated by Donal and other executives as a Top 20 Under 40 Outstanding Women In Construction.  When she was chosen, Donal attended the award ceremony,

**b.    Sexual orientation**:  A former Navillus law intern, who is openly gay, confirms the supportive and "inclusive culture" at Navillus. (Timothy Fabio, vol. III, tab 233).  He describes how Donal gave him a job after his mother died of ovarian cancer and he was struggling at law school, thereby giving the employee "hope in the darkest period of my life." (*Id*.).  Even a discrete gesture by Donal – offering him a day off from work so he could attend New York City's Pride celebration – was most appreciated; the employee states that he "can't properly express in words what this meant to me as a gay man." (*Id*.).

**c.    Nationality**:  Still others attest to Donal's providing opportunities regardless of national origin.  As one long-time employee writes, "[b]eing an immigrant from India…I was told that I would not be able to develop professionally in the company because of my nationality.  However, I was and am convinced that this is an erroneous perception from people who do not

know Mr. O'Sullivan.  He is a professional and fair person who values people based on their talent and hard work, regardless of their nationality." (Nikhil Jain, vol. III, tab 252).

Business colleagues vouch for Donal in the same way.  For example, the owner of ARK Systems Electric Corp. writes that Donal is "incredibly supportive of" his company's growth as an emerging minority electrical contractor. (Raj Lodaya, vol. II, tab 161).  Likewise, the founder of Kanta Electric states that despite there being historically few opportunities for Indian contractors in the commercial construction industry, Donal's "willingness to give my firm a chance….has been of immeasurable consequence… He has repeatedly shown good faith and good intentions in trying to level the playing field by giving equal access and opportunity to the entire Kanta family." (Prakash Kapadia, vol. II, tab 154).

**d.**    **Disability and Age**:   Donal hires and promotes regardless of an employee's physical challenges.  For example, he gave a job to a profoundly deaf carpenter, promoting him when others did not.  Donal "saw past my inability to hear and only saw my ability to do great things." (Joseph Gagliardi, vol. III, tab 235).  Donal did the same for several of the employee's deaf friends, helping them join the union and giving them jobs at his company. (*Id.*).

Donal also hired Pampilo Berganos as a carpenter, despite his relatively advanced age for the industry (65) and history of serious medical conditions (diabetes and open-heart surgery) – thereby enabling Mr. Berganos to support his family and fund his daughter's education.  Mr. Berganos attests to the fact that Donal "embraced me for who I am and what I am.  Donal means the world to me and my family." (Pampilo Berganos, vol. III, tab 197).

Donal also goes out of his way to help his employees with their financial needs, in numerous ways that often go well beyond an employer's duty.  These individual acts of generosity include:

- Paying (with his sister Helen) the funeral expenses of an employee's father (Randolf Aldaba, vol. III, tab 191);

- Buying first-class plane tickets for an employee's honeymoon (Vanessa Baez, vol. III, tab 193);

- Hiring an employee's daughter so she could pay her college expenses (Riane Bawala, vol. III, tab 195);

- Lending (with his sister Helen) money to an employee for family weddings (Babar Boota, vol. III, tab 198);

- Paying an employee's tuition so he could learn to be an estimator (Sher Boota, vol. III, tab 199);

- Helping to raise money to pay the funeral and burial expenses of an Allied payroll employee's three-year-old daughter (Jonathan Bravo, vol. III tab 201);

- Paying (with his sister Helen) for an employee and his wife to fly to Ireland upon the sudden death of the employee's brother – and then helping the employee through the difficult period of winding down his family farm (David Caldwell, vol. III, tab 305).

- Spearheading a fundraising campaign to pay the medical expenses of an employee's five-year-old daughter who had suffered serious brain injuries that left her paralyzed and mentally impaired (Michael Carmody, vol. III, tab 209));

- Paying for a master's degree program for an employee to enable her to become a project manager (Kate Clancy, vol. III, tab 210);

- Paying for an employee's flight to Texas to see his sick grandfather (Celeste Clark, vol. III, tab 211);

- Helping an employee travel to Ireland to see his sick father (Patrick Corkery, vol. III, tab 216);

- Hiring an employee so he could pay the expenses associated with his wife's long-term illness (Donnchadh Costello, vol. III, tab 217);

- Paying for an employee's flight home to Ireland in the wake of his uncle's sudden death (Micheal Cronin, vol. III, tab 218);

- Paying for the repairs to an employee's damaged car (Jack Demler, vol. III, tab 224);

- Getting an employee, who was injured and became drug-addicted, into a clinic and paying for his rehabilitation (Garry Kelly, vol. III, tab 258);

- Giving a local homeless man a job for 14 years and a place to live, and paying for his food and medical care (Randolf Aldaba (vol. III, tab 191), Liam McDonnell,vol. III, tab 282));

- Organizing (with his sister Helen) a fundraiser for an employee whose uncle suffered a severe stroke (Wilmer Encalada, vol. III, tab 231);

- Paying for an employee's flight to Ireland to see his sick grandmother (Paul Garvey, vol. III, tab 238);

- Paying for an employee's flight to Ireland to attend his father's funeral (David Hegarty, vol. III, tab 245);

- Lending money to an employee to buy a new car after his old car was totaled, and paying for that same employee to fly to the Philippines to attend his murdered sister's funeral (Apollo Jordan (vol. III, tab 254), Marcelito Jordan (vol. III, tab 256));

- Paying for the funeral and burial of an employee's mother (Marcelito Jordan, vol. III, tab 256);

- Paying for an employee's flight to attend his grandmother's funeral (Nikhil Jain, vol. III, tab 252);

- Paying for the funeral and medical expenses of an employee who passed away (Garry Kelly, vol. III, tab 258);

- Helping pay for a high-quality bicycle for an employee who was a triathlete raising money for cancer research (Mike Kelly, vol. III, tab 259);

- Paying for an employee's flight to Poland so she could see her father, who had lung cancer (Beata Kuzma, vol. I, tab 265);

- Paying for flights to Mexico for an employee and his wife, for their wedding (Conor Leen, vol. III, tab 269);

- Paying for funeral expenses and grief counseling for an employee who lost his son (Desmond Lloyd, vol. III, tab 270);

- Paying for an employee's flight to India for that employee's wedding (Yajurved Mangukia, vol. III, tab 274);

- Giving an employee's wife a job when the couple could not afford food or rent and then lending money to them for a down payment on a house (Gilmer Pereira, vol. III, tab 320); and

- Giving a loan to that same couple, and to another employee, for an investment opportunity which enabled the couple to pay down much of their mortgage, and the other employee to establish a college fund for his child. (Gilmer Pereira (vol. III, tab 320), Rong Tan (vol. III, tab 334)).

Even outside the financial generosity that Donal has given his employees, a common refrain from current and former employees is that Donal treats them like family members.  For example, Donal:

- Invites employees, and sometimes their families, to his house for July 4, Thanksgiving, and Christmas – especially employees who didn't have families of their own in New York with whom to celebrate (Michael and Bridget Brennan (vol. III, tab 202), Patrick Corkery (vol. III, tab 216), Patrick Holden (vol. III, tab 248), Marcelito Jordan (vol. III, tab 256), Brian McGill (vol. III, tab 284), Nitza Barreto-McGill (vol. III, tab 194), John McGrath (vol. III, tab 287), Katie O'Sullivan (vol. I, tab 31), Gilmer Pereira (vol. III, tab 320));

- Attends employees' family events, both happy and sad (Shane Coffey (vol. III, tab 212), Michael Collins (vol. III, tab 213), Stanley Conroy (vol. III, tab 215), Victor Escobar (vol. III, tab 237), David Hegarty (vol. III, tab 245), Marcelito Jordan (vol. III, tab 256), Robert McDonald (vol. I, tab 16), Colm O'Connell (vol. III, tab 298));

- Calls to console employees experiencing personal tragedy, such as one whose brother drowned (Mick Cunningham, vol. III, tab 220);

- Visits sick and injured employees in the hospital (William Harrigan (vol. III, tab 243), Selina Maddock (vol. I, tab 78));

- Advised an employee who was single-parenting his daughter, in the wake of the employee's divorce (Shane Harte, vol. III, tab 244);

- Visited an employee who was battling cancer every Friday, visits which "meant the world to her" (Deirdre Lawlor, vol. I, tab 74); and

- Called a new employee every day when he (along with his parents) was home suffering from COVID, to see how they were doing (Frederic Schuler, vol. III, tab 325).

As one company vendor describes it, "I've worked with other smaller companies as well and nothing comes close to [Navillus'] warmth. There is no such thing in the Big Apple like that, at least not that I've ever heard. They are one of a kind." (Buster Timg, vol. II, tab 185).  According

to a Navillus worker, "[v]ery few bosses these days even remember their employees' names but

with Mr. Donal that is different. He treats us as family." (Jannet Soto Garcia, vol. III, tab 332).  A

recently-hired Navillus executive asked why everyone "loves" Donal – and was told, "he talks to

us, he cares about us, and he is there for us when we need him." (Loukas Georgiou, vol. III, tab

239).

As one of his former executive assistants aptly summarizes it, Donal's acts of generosity

for Navillus employees "were endless and I know they made a huge impact." (Celeste Clark, vol.

III, tab 211).  Donal's other employees recognize this, too.  One stated that Donal "has always

made sure that all his employees are treated with equality and respect, no matter what position they

work for." (Karan Patel, vol. III, tab 317.  Another (who was on the Allied payroll for a time) wrote,

"[i]f the measure of Donal O'Sullivan's character is in the metrics of goodness, generosity, and his

treatment of others, the measure would be unquantifiable." (David McGrath, vol. III, tab 285).  A

long-time employee (and Allied payroll recipient) put it succinctly:  Donal is "one in a million.  I

LOVE MY BOSS!" (Apollo Jordan, vol. III, tab 254) (emphasis in original).  Donal's brother

Leonard aptly describes Donal's treatment of his employees as follows:

> While their salaries and roles may vary, one thing remains constant.  And that is the
> respect they get from Donal.  As CEO, he has many responsibilities.  But high on
> that list is the obligation of ensuring that all who work for him are treated with the
> reverence and courtesy they are deserving of.  Sometimes, there is inequality, but in
> almost all cases, this inequality is in favour of those with jobs less prized.

(Leonard O'Sullivan, vol. I, tab 33).

Donal's support doesn't end with an employee's tenure at Navillus.  Even when they leave,

Donal remains supportive – encouraging them, offering advice, and leaving the door open for them

to return if they choose to.  As one such long-term employee puts it, he was "blown away" by

Donal's support when he left to start his own business. (Martin Dooley (vol. III, tab 225); *see also*

Jack O'Sullivan, vol. I, tab 29)).

24

Given the many ways that Donal has nurtured, inspired and supported the Navillus work force, it's no surprise that employee after employee describes Navillus as the best company they ever worked for. Sean O'Shea, a carpenter who worked for Navillus for two of the 16 years he's been in the industry, says that Navillus is "the best company I worked for in this city." (Sean O'Shea, vol. III, tab 310). Brendan O'Sullivan (no relation), a cement/concrete worker who worked for Navillus for 12 of the 36 years he's been in the industry, writes that his years at Navillus "were the happiest years of my construction career." (Brendan O'Sullivan, vol. III, tab 311). Jannet Soto Garcia, another Navillus worker, says that "[o]ut of all companies I can truly say that this is the best company to work for." (Jannet Soto Garcia, vol. III, tab 332).

One particularly poignant example says it all: Muhammad Aslam, a former employee, died of cancer late last year. When Donal, Helen, and others visited him in the hospital to say good-bye, Mr. Aslam had a "Navillus jacket hanging on his hospital bed, and could not stop expressing his thanks and crying." (Jack O'Sullivan, vol. I, tab 29).

### 4. Donal's generosity extends to business associates

Donal's generosity, financial and otherwise, doesn't end with his employees; it extends to business associates as well. For example, Donal:

- Renovated workspace for free for a friend starting a new business (Liam Benson, vol. I, tab 45);

- Lent $50,000 to a construction company colleague to enable him to pay the debt on his house and save his family home (Raymond Bouderau, vol. II, tab 126);

- Lent money to a real estate developer to enable him to save his business (John Dunne, vol. II, tab 140);

- Gave advice to a business colleague regarding the colleague's son (who was applying for a medical internship) and the colleague (when his business was in trouble) (John Heckel, vol. II, tab 152);

- Supported a not-for-profit organization (the Nephcure Foundation), whose president was a Navillus sub-contractor whose son suffered from a very rare kidney

disease (Michael Levine, vol. II, tab 160). (Donal has been "an angel on our shoulders for my son, myself, and the Nephcure Foundation");

- Helped a couple start their own construction company (Larry and Carmelina Oliveira, vol. II, tab 172);

- Helped the General Counsel of his brother Kevin's company, when her husband was diagnosed with lymphoma, by connecting her to doctors and checking in with her regularly to offer his help (Iryna Sukhnatska, vol. II, tab 184); and

- Helped several new and small businesses with opportunities, enabling them to launch and grow. (Donald Radeljic (vol. II, tab 176), Arthur Reis (vol. II, tab 178), Brett Ripka (vol. II, tab 179), Buster Timg (vol. II, tab 185), Roy Weinstein (vol. II, tab 189)).

Indeed, time and again Donal has invested in other people's start-up ventures, without expecting or receiving any financial return of his own. (Selina Maddock, vol. I, tab 78).  And, as with his employees, Donal provides help regardless of the person's background.  For example, Donal went into partnership (for self-storage facilities) with a struggling Indian-American businessman, who writes that "I don't sound like Donal, I don't look like Donal, we are not of the same religion," but Donal took a chance on him and they have been business partners ever since. When asked by others to explain how this happened, the partner tells them that Donal "believes in people – he underwrites the human being, not the deal or the opportunity.  In this city, in this world, that is rare.  I fear a world without the Donal O'Sullivan's in it." (Mehul Patel, vol. II, tab 174).

### 5.  Donal's reputation in the business community

Along with Donal's seemingly boundless capacity for empathy and support, what also comes through to those he works with are his ethics and integrity.  As one ex-employee recalls, Donal "valued honesty and integrity and led by example." (Stanley Conroy, vol. III, tab 215).  A 40-year veteran of the construction industry says that Donal "is one of the most honorable, honest, and well-intentioned men I know." (Steven DellaSalla, vol. II, tab 135).  A plumbing contractor with 25-years' experience recounts that Donal's "honesty, integrity and character are like no other

26

General Contractor I have worked with before." (Nicholas Katragis, vol. II, tab 155).   A fellow construction company owner relates that Donal is "very honest" and "of exceptionally strong moral character," and his advice "lead[s] me down the more ethical and honest path." (Jack Dooley, vol. I, tab 139).   Donald's neighbor for over 20 years who also works in the construction industry says that he can "strongly attest to" Donal's "resilient ethical compass" – based on what the neighbor has learned from particularly independent sources including former Navillus employees (both executives and laborers), and Navillus clients. (Peter Segal, vol. I, tab 112).   As a current Navillus employee puts it, "Donal inspires and motivates honesty, integrity and a strong commitment to meeting the needs of his workers and clients." (Kate Clancy, vol. III, tab 210).

### 6.   Donal's acts of generosity towards friends and strangers alike

Donal's generosity, of resources and spirit, extends to lending his helping hand to myriad other individuals – not only friends, but also those with whom he has no particularly strong connection, such as relatives of people known to him and, in some cases, complete strangers.   This started way back in the 1980s, soon after he arrived in the United States – at a time when Donal himself was struggling to establish a new life and make ends meet.   After a friend passed away, Donal spearheaded an effort to raise the funds needed to transport the body back to Ireland.   He organized a musical fundraiser, with over 400 people paying $10 each to attend, thereby raising the necessary funds. (Leonard O'Sullivan, vol. I, tab 33).   Donal's random acts of kindness, both large and small, have continued throughout his life.   Here are some examples:

- Inviting young people to stay at his home – giving them advice, clothes, meals, money, and a place to stay (Susan Barker (vol. II, tab 122), Katie O'Sullivan (vol. I, tab 31));

- Mentoring an at-risk young adult, helping to save his life (Susan Barker, vol. II, tab 122);

- Paying for brain cancer treatment for his sister-in-law's 28-year-old friend, including bringing him from Ireland to New York for the treatment; when the

27

friend was unable to travel and later passed away, Donal donated equipment to the school where the friend taught (Lorraine Callan (vol. I, tab 2), Brid Dineen-Riney, vol. I, tab 54);

- Donating money for medical expenses of a local resident's daughter, who was suffering from stage 4 leukemia (Michael and Aileen Carmody, vol. III, tab 209);

- Helping a young homeless man whom he saw on the street, giving him food and a bus ticket home to Pennsylvania (Kate Clancy, vol. III, tab 210);

- Giving money to homeless people on the subway (Paul Garvey, vol. III, tab 238);

- Taking out ads in United States newspapers in order to locate the estranged son of a dying woman in Ireland and, once the son was located, paying for his flight to visit his mother and grant her dying wish to see her son (Eileen Horgan, vol. I, tab 8);

- Providing "massive support," both personally and financially, when a former employee's two cousins died of cancer within a couple of years of each other (Mark Humbles, vol. I, tab 71);

- Donating materials for a playground in Pennsylvania (Apollo Jordan, vol. III, tab 254);

- Donating (with his sister Helen) to a benefit event for a two-year-old girl with a brain disorder (James Mulvey, vol. III, tab 293);

- Paying for two long-time family friends (men in their 40s), both of whom had stage 4 cancer, to fly to Dublin and then to Memorial Sloan Kettering in New York City, helping them find doctors, and searching worldwide for a cure (Bridget O'Carroll (vol. I, tab 90), Katie O'Carroll (vol. I, tab 92));

- Donating to a local hospital in Ireland where a neighbor's wife was treated before dying of a terminal illness and then (with Helen) paying for the neighbor's daughter and family to travel from Australia to Ireland to say good-bye to her mother (Des Farrington, vol. I, tab 56);

- Arranging for hospital treatment for an Ireland-based friend's son, who was injured in New York and had no health insurance and "would have lost his leg" without Donal's help (Katie O'Carroll, vol. I, tab 92); and

- Attending the funeral of a business associate's mother during COVID, much to the surprise of the associate: "seeing him there more than anyone else truly warmed my heart" (Bruce Watterson, vol. II, tab 188).

28

Donal has also extended a helping hand to the community closest to him – his neighbors in Queens.  This help includes:

- Helping take care of a neighbor's family when their eight-year-old son was diagnosed with leukemia (John Duggan, vol. I, tab 55);

- Helping clean up the neighborhood of trees destroyed after a storm (Kieran Higgins, vol. I, tab 67);

- Providing jobs of all kinds to neighborhood children (Mary Higgins, vol. I, tab 68);

- Making a large contribution for a neighbor's friend's baby, who was dying from a brain condition (Geraldine Lucid, vol. I, tab 76);

- Donating food (over 300 turkeys) to a local tenant's association for Thanksgiving (Vasillios Mastoras, vol. III, tab 276);

- Giving home renovation advice to a neighborhood couple and also giving their son an internship, providing electric fans for a family graduation party on a very hot day, and "overwhelming" and "incredibly meaningful" support while the couple's daughter fell ill and was awaiting a kidney transplant (Anastasia and Paul Mastrogiannis, vol. I, tab 80);

- Allowing his daughter Katie's best friend to live with them for weeks before, and weeks after, the friend's mother died of breast cancer – and then taking her on O'Sullivan family outings and to Ireland for Christmas, and even paying for her mother's funeral (Katie O'Sullivan, vol. I, tab 31);

- Helping a neighbor with acute leukemia, who was out of work for almost a year, with an "extremely generous" contribution (Philip Ragone, vol. II, tab 177);

- Being the first major donor to support community members who lost loved ones on 9/11 (Jane Saffran, vol. I, tab 111);

- Showing "incredible generosity" to the local community neighborhood association for over 20 years (*Id.*);

- Providing emotional support for a neighbor's daughter suffering from anorexia, and then making biannual donations to a not-for-profit organization (Project HEAL) formed by the daughter in the wake of her recovery (*Id.*); and

- Serving as an "amazing role model" for his next-door neighbor's 11-year-old son, after the boy's father suddenly passed away. (Lauretta Mulholland, vol. I, tab 83).

Donal's kindness included smaller gestures too, such as spending two hours fixing the boat of a neighbor's young son so he could race it, rather than being with his own children that day on a family boat trip (John Latella, vol. I, tab 73); bringing gear for disabled children at a local Special Olympics swim meet (Dan O'Byrne, vol. I, tab 89); and, when a neighbor's son was home visiting during his tour of duty with the U.S. Marines and went to Donal's house for Thanksgiving, Donal had a full-sized picture of him, in uniform, hanging at the front entrance (making the neighbor's son "immensely proud"). (Peter Segal, vol. I, tab 112).

### 7. Donal's Commitment to Family

Donal is a family man who prizes his family above all else. And it shows in everything he does for his family.

For a person devoted to so many different people, communities, and causes, the highest cause for him is the health and happiness of his children. While parents are expected to love and support their children, it certainly cannot be taken for granted. Donal's six children – Jack (28), Donal Jr. (27), Katie (25), Caroline (23), Mikey (19), and Kelly (16) – are the pride and joy of his life. And he is their hero. As his best friend puts it, "[h]is children idolize him" and "his whole world revolves around them." (Kieran Higgins, vol. I, tab 67).

Donal's son Jack describes his father as "my first friend, my greatest role model, my math tutor, my nutritionist, my track & field, soccer, lacrosse, swimming & life coach" and "someone whom I aspire to be more like every day." (Jack O'Sullivan, vol. I, tab 29). Donal's unbounded support of his children has always been evident since he became a parent. From the moment his first child, Jack, was born – Donal excitedly exclaimed, "The next President of the United States has been born!" (Eileen O'Sullivan, vol. I, tab 28) – Donal's pride in his children was evident. He regularly, indeed assiduously, attended all of his children's school events – from science fairs (Thomas Arnao, vol. II, tab 121), to school trips (Christine and Michael Arnouse, vol. I, tab 42), to

sporting events (Kieran Higgins, vol. I, tab 67), to concerts, plays and graduations (Jack O'Sullivan, vol. I, tab 29) – no mean feat for a father of six with a demanding full-time job.

As one business colleague has observed, when setting up a business meeting, Donal "went straight to his children's school calendar before his business calendar." (Maria DeGrottole, vol. III, tab 222). Donal's parental devotion is confirmed by the headmaster of his children's school: he describes Donal's "ferocious love for his children," attending parent conferences, athletic contests and other school events, and the "profound positive impact" he has had on their lives. (Michael O'Donoghue, vol. II, tab 170). Donal's love for his children is even manifested physically – Donal has a tattoo on his arm, with the initials of his six children. (Kieran Higgins, vol. I, tab 67). Long-time Navillus employee (and Allied payroll employee) Marcelito Jordan, who has known all six of Donal's children since they were small and is close with the family (leading Mr. Jordan to be referred to as "the seventh kid"), states that Donal is an "amazing father" who "loves his children more than anything else in the world." (Marcelito Jordan, vol. III, tab 256).

Donal's steadfast support of his children manifests in ways both large and small. Small (but touching) gestures include: ironing his daughters' school shirts; turning on the heat in his son's car before he goes to use it; sending his daughter roses every Valentine's Day; and lighting candles at St. Patrick's Cathedral when one of his children is taking a big exam. (Katie O'Sullivan, vol. I, tab 31). As his children have grown, Donal has continued to devote his time and attention to them. For example, he has driven each of his college-age children to school every year – including two who attended Notre Dame University in Indiana. (Jack O'Sullivan, vol. I, tab 29).

Regrettably, events in his children's lives have required big gestures of support too. One major example: three of Donal's six children (Donal Jr., Caroline, and Kelly) are afflicted by achromatopsia, a rare and incurable eye condition that, in layman's terms, has rendered them colorblind, with decreased vision, and an inability to handle bright light. Donal has not only spared

31

no effort to help his children deal with this disorder, but he has gone out of his way to help others afflicted with the disease.

Donal has provided significant financial support for genetic research into this disorder – even though there is no real hope for a cure for his own children. Donal has managed family support groups. He has attended conferences. And he has traveled around the world, with his children, to share their experiences with others living with this condition. (Patrick Boland (vol. II, tab 124), Anne McVeigh (vol. II, tab 167)). Indeed, when one of his daughters questioned why she needed to miss another day of school to get her eyes tested, Donal explained that "as much as he cared about finding a cure for my siblings and me, he was even more devoted to finding a cure for all the people in the future who would be impacted." (Caroline O'Sullivan, vol. I, tab 27). Caroline goes on to describe that conversation as "one of the first moments I realized that he put so much time and effort into this research not solely for his own children but for the children of future parents who may not have the same means as we did in terms of seeing specialists both domestically and abroad." (*Id*.). Donal also makes small gestures to help his children cope with their limited visions – everything from going shopping with his daughter to helping her pick out matching outfits, to checking a running route for bumps before his daughter ran on it. (*Id*.).

Another example involved his daughter Katie, who endured extensive medical treatment due to a physical deformity with her mouth. As Katie recounts this difficult experience, she observes that her father never missed a medical appointment; he held her hand as she fell asleep before her surgery and as she awoke after it; slept in a chair next to her bed for a week after, so he would be nearby if she needed help; and called and visited her constantly after she returned to college. Even simple gestures – like Donal telling his daughter that she was beautiful – "meant the world to me during that period in my life. Looking back, I couldn't have gotten through it without

him." (Katie O'Sullivan, vol. I, tab 31). Given this and the many other things that Donal does for his children, it's no surprise that Katie says that "the best gift God ever gave me was my dad." (*Id.*).

Donal's efforts to teach his children by example, has manifested itself in their own activities and life choices. As one colleague observes, Donal's children are all "polite, hardworking and charitable individuals, following their father's excellent example." (Evan Georgiantonis, vol. I, tab 64). Their own warmth and generosity takes various forms – for example, his adult children help organize fundraisers for people in need; participate in food drives for the homeless; and celebrate family events with company employees. (Kate Clancy, vol. III, tab 210). As noted above, his daughter Katie's experience volunteering in Haiti as part of her father's exceptional efforts to aid in its recovery led her to volunteer for the Peace Corps. (Katie O'Sullivan, vol. I, tab 31). Indeed, this is an especially commendable feature of Donal's character – that he not only devotes himself to the betterment of others less fortunate, but also has inspired many others to follow his example – be they employees, would-be donors to charitable causes, friends, neighbors, and his own children. It should be no surprise that each of his four adult children has chosen to work for Navillus.

Donal's devotion to his children is by no means the only way he has taken care of his family. Indeed, since his childhood, Donal has been nothing less than a loving, loyal, and supportive son to his parents. As a child, he worked hard on the family farm to help support his family. And even after moving to the United States as a young adult, he continued to visit his parents regularly and help out on the farm. (Marian O'Sullivan, vol. I, tab 35). His support from afar started from the moment he arrived in this country. At that time, his parents had an undrivable car. Because Donal wanted to buy them a new one but couldn't afford it, he borrowed money from a bank in Ireland (after being turned down by U.S. banks) and bought a new car for them, arranging to have it delivered to his parents' house on Christmas Eve (Donal's first Christmas in America). As Donal's

brother Leonard recounts, "[t]hey were shocked.  My mother said she never felt so proud as she did that night, driving to mass in her new car bought by her son in America who hadn't forgotten them.  He didn't have the money to buy the car, but he knew he could work harder and longer hours so that the car could be paid off.  And three years later it was."  All the while, Donal himself was driving an "[a]lmost undrivable" car he bought for $450. (Leonard O'Sullivan, vol. I, tab 33). Thereafter, Donal continued to do "everything possible for [his] parents to improve their quality of life and provide them every comfort." (Marian O'Sullivan, vol. I, tab 35).

Unfortunately, Donal's father Jack passed away many years ago – though Donal had a hand in extending his life beyond what was expected.  His older sister Marian describes how their father was about to die and the doctor advised he would not survive the long trip to the hospital.  But when the family called Donal to share the bad news, he replied, "call the ambulance anyway and give him a chance."  They did – and their father not only survived but lived for another two years. As Marian states, "[t]hese years were very precious to us – we were all aware that Dad was on borrowed time, and we got the chance to spend more time with him and to say our goodbyes.  We are forever indebted to Donal." (Marian O'Sullivan, vol. I, tab 35).

Donal has remained extremely devoted to his mother, both in the United States and through his frequent trips to Ireland.  Donal speaks to his mother regularly, with each of them checking up on the other. (Julie O'Meara, vol. III, tab 306).  And many times, Donal has brought his mother to the United States to visit.  She never had a vacation until she was in her 60s – but then Donal brought her to visit New York City – as well as on trips to Jamaica, Cuba, and the Hoover Dam. (Marian O'Sullivan, vol. I, tab 35).

Donal's trips to Ireland were no easy endeavor.  In addition to an obviously demanding life (as the father of six, running a large and growing company), each trip entailed a several-hour flight, plus a several-hour drive from the airport to the family home. (Anne Quirke and Joe Cahill, vol. I,

tab 48).  And yet he made that trip, every year – a number of times a year – often taking one or more of his children with him. (Kieran Higgins (vol. I, tab 67), Hanna O'Donoghue (vol. I, tab 96), Katie O'Sullivan (vol. I, tab 31), Marian O'Sullivan, vol. I, tab 35)).  While there, Donal would spend countless hours with his mother – taking her to see friends and family (Anne Coffey, vol. I, tab 3); taking her shopping at the supermarket (Jack Fitzpatrick, vol. II, tab 145); and taking her out to Sunday dinner and Sunday drives. (Ronan O'Connell, vol. I, tab 21).  He'd remind her to take medicine.  Donal's best friend writes that "[h]e's never as happy as he is when I've seen him sitting in the kitchen of her farmhouse organizing her pills and her pill box for her…" (Kieran Higgins, vol. I, tab 67).  Donal's mother is still living in Ireland, alone, at the age of 95.

Donal's caring and generous nature has extended to his siblings as well.  One notable example is his brother, John D., who is intellectually disabled and has a speech impediment.  John D. has been and remains an important part of Donal's life – and vice versa.  Growing up, and then as adults, Donal and his siblings included John D. in their everyday lives, despite his disabilities and despite a local cultural aversion to mainstreaming the disabled.  They took him to the local pub, to nightclubs, and to play on the local football team. (Stephen O'Sullivan, vol. I, tab 37).  Over the years, Donal and John D. have remained "extremely close" (Ciaran Lynch, vol. I tab 77), with Donal being a "central figure" in John D.'s life. (Katie O'Sullivan, vol. I, tab 31).  Donal has brought John D. to visit in the United States (Stephen O'Sullivan, vol. I tab 37), and Donal visits him during his trips to Ireland.  One fellow resident of Ballinskelligs writes that, when Donal visits his home village, he and John D. are "inseparable." (Ciaran Lynch, vol. I, tab 77).

Donal's good friend Walter O'Sullivan (no relation), a retired senior officer with the Irish State Police who also lives in Ballinskelligs, writes:

> Donal has looked out for John all his life, supported him financially and emotionally, and ensured that he has employment locally.  When John visits my home, he will always talk about Donal.  He looks up to him and wears his Navillus

ensigned jacket, T-shirt and New York GAA football jersey with pride… Donal quite simply is his idol.

(Walter O'Sullivan, vol. I, tab 108).

Donal's support extends to his other siblings, too.  For example, Donal helped pay for his sister Helen's cancer treatment (Patrick Boland, vol. II, tab 124); and helped his sister Marian with her son's mental health issues, with her home (on one visit to her Ireland home, "instead of relaxing, he tiled my bathroom"), and with her car (making sure she had a dependable car for her six-hour trip to visit their parents). (Marian O'Sullivan, vol. I, tab 35).

Donal has also offered help and support to more his distant relatives, not only financially, but also with his time giving personal advice and emotional support.  For example, Donal:

- Arranged various forms of medical help for a first cousin's son after he was the victim of an unprovoked assault, and helped furnish the home of the first cousin's orphaned, illiterate neighbor (Margaret Donnelly, vol. I, tab 5);

- Paid medical, travel and lodging expenses for a first cousin who underwent major brain surgery (Jacintha King (vol. I, tab 9), Declan Kirby (vol. I, tab 10));

- Financially supported the funeral of distant relatives' son – for which he also helped to raise funds – who died suddenly of a heart attack (John Walsh, vol. I, tab 39);

- Travelled to Ireland to visit a nephew, who was in the hospital due to mental health issues and later paid for that nephew's wedding (David O'Connell, vol. I, tab 19);

- Helped his sister-in-law when she became a single mother with three children and was at a very low emotional point in her life – ultimately helping her return to college and become a nurse (Alice O'Keeffe, vol. I, tab 22);

- Traveled to attend a niece's championship basketball game, despite having recently been in a terrible skiing accident (Lindsay O'Sullivan (vol. I, tab 34), Eileen O'Sullivan (vol. I, tab 28)); and

- Visited and helped his now 100-year-old aunt Kitty, including completely refurbishing and improving her home in Ireland. (Anne Coffey, vol. I, tab 3).

### 8.  Donal's acts of charity are genuine and often performed anonymously

Donal's acts of generosity are generally carried out with an insistence on anonymity, and not for recognition. (Michael Brewster, vol. II, tab 127).  As his nephew writes, "[t]hey are done on the quiet.  Not for social capital, not for political praise, but for the sole reason that they are the right thing to do." (Stephen O'Sullivan, vol. I, tab 37).  His son Jack writes that his father helps others because he "cares about this city and its people.  He cares about his community and heritage. He cares about his family.   He cares." (Jack O'Sullivan, vol. I, tab 29).   As a former subcontractor/project manager puts it: "I heard Donal did a lot of charity work but he never told me.  That's how Donal is.  Money or success never changed Donal." (Mick Cunningham, vol. III, tab 220).  A long-time friend describes his hometown generosity: "Not one for taking the limelight, indeed the direct opposite, Donal would run a mile from any public acknowledgment of his philanthropist activities" there. (Maurice Fitzgerald, vol. I, tab 61).  The creator of a not-for-profit heavily supported by Donal confirms that, though Donal contributed very generously to many worthy causes, he would "insist I not publicize his generosity." (Michael Brewster, vol. II, tab 127).

Donal's brother Leonard eloquently summarizes the point:

> Though Your Honor will hear of some of the deeds, there are others no one will ever hear of.  They are safeguarded from the public by an understanding and respect for the recipients.  There will never be any public acknowledgements for these deeds, but privately Donal believes he was paid in abundance, paid with the currency of knowledge that he was able to help.

(Leonard O'Sullivan, vol. I, tab 33).

Given all that, it's no surprise that – as a close friend puts it – the "world will be a better place if everybody was a little bit more like Donal O'Sullivan." (Kieran Higgins, vol. I, tab 67). Or as a neighborhood friend says – "If I was asked to name a better person, I would certainly be hard pressed." (Evan Georgiantonis, vol. I, tab 64).

The words of a long-time friend sum it up well: "I recall Wordsworth's wise words when I think of Donal, which my Dad quoted freely, 'On that best portion of a good man's life, his little, nameless, unremembered acts of kindness and of love.'" (Brid Dineen-Riney, vol. I, tab 54). To his credit, Donal has carried out many such acts,

## IV.     THE APPROPRIATE ADVISORY GUIDELINES CALCULATION

We acknowledge that the starting point for the Court's analysis is to calculate the applicable, albeit advisory, federal Sentencing Guidelines range. The Probation Department's Guidelines calculation produces a preposterous result of 57 to 71 months of incarceration (PSR ¶ 85)—a sentence that would fit neither the offender nor the offense.

Mr. O'Sullivan has no criminal history. PSR ¶¶ 52-53. The appropriate Guidelines calculation for his offense level proceeds as follows:  The offenses of conviction are grouped together for Guideline calculation purposes. U.S.S.G. § 3D1.2(d), PSR ¶ 40. The base offense level is 7 pursuant to U.S.S.G. § 2B1.1(a)(1).  PSR ¶ 41. The loss amount remains to be determined by the Court, as of the date of this Sentencing Memorandum. We submit that the government abdicated its burden to establish a loss amount with reliable evidence, let alone a preponderance under U.S.S.G. § 2B1.1(b)(1)(F). Thus, the Total Offense Level should be 7.  Level 7 in Criminal History Category I yields an advisory Guidelines range of 0 to 6 months.

The trial record does not support enhancements for aggravating role under U.S.S.G. § 3B1.1(c), which is advocated by Probation (PSR ¶ 28) and the government, nor for sophisticated means, which only the government advocates.

Leadership role under the U.S. Sentencing Guidelines refers to leadership in the offense, not leadership in the corporate structure.  One cannot presume Donal to have been a leader in the

offenses of conviction merely by virtue of his title at Navillus; vicarious liability is a civil law concept.

That the charged offense conduct happened when Donal held the title of President and had a large ownership stake in Navillus is undeniable—but it is also insufficient to establish a factual basis for a role enhancement. Donal was not shown to have had any significant role in the Allied business relationship after its inception in 2011. Any upward role adjustment is unwarranted.

The government's advocacy of the "sophisticated means" enhancement under U.S.S.G. § 2B1.1(b)(10), is also a stretch. There was nothing sophisticated about the offense. The "sophisticated means" enhancement, under the Application Note to this enhancement, Application Note 9 ("Application of Subsection (b)(10)") states at subsection (B) that "for purposes of subsection (b)(10)(C), "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." The offenses here—shortchanging the benefit funds—were really quite simple.

Nor was Navillus' relationship with Allied kept secret: no trickery, no hidden or foreign transactions. Allied was not even an open secret – it was not a secret at all. Union workers and officials at the Navillus yards knew workers there were doing non-covered, non-union work. For example, three union workers, having worked a full 40-hour week or more (with paid overtime) of union (covered) work for Navillus, requested to work additional hours in the yard on Saturdays, to earn extra money. For their extra hours working in the yard, the Navillus workers received Allied paychecks.

Allied was also no secret to the union benefit funds. From 2011 through 2016, the benefit funds conducted no fewer than 15 payroll audits of Navillus's books and records. The general ledgers of Navillus were among the records inspected during the payroll audits. An examination of the general ledgers for the period from 2011 through 2016 reveals nearly **4,000** entries showing

39

transfers of funds from Navillus to Allied (2,847) and DEM (1,127) for payroll.  Hardly a sophisticated scheme—and certainly a sufficient basis for the auditors to inquire further if they were concerned about these payments.

Even without the role and sophisticated means upward adjustments, the Guidelines range that would result from Probation's calculation would be Level 23 instead of Level 25.  The resulting range would then be 46 to 57 months—truly draconian when considered in light of Section 3553(a)'s sentencing factors.  Such a sentence would be draconian.  Routinely in fraud cases, courts in this Circuit have sentenced defendants to more appropriate and sensible sentences, ranging from probation to sentences of one to three years' imprisonment.  The facts of this case present a paradigmatic candidate for the Court's mercy and a modest sentence.  Given Donal's background, characteristics, and family circumstances, he clearly has much more to give society—lengthy incarceration would only take Donal out of contact with his family and community to which he contributes so much and would not further materially any of the objectives of sentencing under 18 U.S.C. § 3553.

### V.    A SUBSTANTIALLY BELOW-GUIDELINES SENTENCE OF PROBATION WITH A CONDITION OF RIGOROUS COMMUNITY SERVICE IS APPROPRIATE.

Whether or not the Court adopts the Probation Department's Guidelines analysis, a substantially below-Guidelines sentence is appropriate in this case. A sentence of multiple years of imprisonment would be far harsher than necessary to satisfy the § 3553(a) factors and contrary to the interests of justice. We respectfully submit that a sentence of probation and rigorous community service is sufficient but not greater than necessary to accomplish the purposes of sentencing under 18 U.S.C. § 3553(a).

**A.** **Substantial Departures from the Guidelines Are Permitted, Appropriate, and Commonplace in Fraud Cases**

The United States Sentencing Guidelines are only the starting point of sentencing analysis: "they are truly advisory." *United States v. Preacely*, 628 F.3d 72, 79 (2d Cir. 2010) (citation omitted). Indeed, "[a] district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors …." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). The Court has wide latitude to vary from the Guidelines based upon the factors enumerated in 18 U.S.C. § 3553(a), in order to ensure that the punishment "fit[s] the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487–88 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)). The Court should exercise that discretion here.

It is no surprise that the United States Supreme Court has noted that a district court may issue a non-Guidelines sentence "based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (citation omitted). The Court of Appeals has similarly stated that allowing loss amounts to become "the principal determinant of the adjusted offense level and hence the corresponding sentencing range", an approach "unknown to other sentence systems, was one the Commission was entitled to take, but its unusualness is a circumstance that a sentencing court is entitled to consider." *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) (citation omitted); *see also United States v. Johnson*, No. 16-cr-457 (NGG), 2018 WL 1997975, at *4 (E.D.N.Y. Apr. 27, 2018) (Garaufis, J.) ("Many in the legal community have urged the Sentencing Commission to right this grievous wrong, and today I add my name to that lengthy list of judges, practitioners, scholars, and other commentators. The problems with the loss enhancement have been evident since the inception of the Guidelines.").

41

Numerous courts in the Second Circuit have found significant departures from the Guidelines were warranted, especially in cases involving financial crimes.  For example, in *United States v. Tuzman*, 15-cr-536 (PGG) (S.D.N.Y. 2021), Kaleil Isaza-Tuzman was convicted on two counts of conspiracy to commit securities fraud and one count of conspiracy to commit wire fraud, for which the government sought a sentence between 17.5 and 22 years' imprisonment under the Guidelines.  On September 10, 2021, Judge Gardephe sentenced Mr. Isaza-Tuzman to time served. *See* ECF No. 1211.

Similarly, in *United States v. Adelson*, 05-cr-325 (JSR) (S.D.N.Y. 2006), a case in which a company's Chief Operating Officer had materially overstated a company's financial results, the Guidelines range was 85 years, capped only by the statutory maximum. *See Adelson*, 441 F.Supp.2d, 506, 507-11 (S.D.N.Y. 2006).  Judge Rakoff sentenced the defendant to 42 months, noting that this "is one of those cases in which calculations under the Sentencing Guidelines lead to a result so patently unreasonable as to require the Court to place greater emphasis on other sentencing factors to derive a sentence that comports with federal law." *Id.* at 506-07.  In *United States v. Parris*, though the Guidelines recommended 360 months for defendants' "pump and dump" stock scheme, Judge Block sentenced them to sentences of 60 months—a 300-month downward variance—despite a stock drop that resulted in large losses to hundreds of investors. *Parris*, 573 F. Supp. 2d 744, 745 (E.D.N.Y. 2008).

And in *United States v. Petrossi*, a registered broker manipulated a publicly traded stock to make it look as if there was more interest in the stock than actually existed by paying kickbacks to promotors of the stock. *See* Gov't Sentencing Submission at 2, 16-cr-234 (BMC) (E.D.N.Y.), ECF No. 375.  Despite an intended loss amount of $3.5 million and a Guidelines range of 151–188 months (*id.* at 12), Judge Cogan sentenced the defendant to 44 months' imprisonment. *See* ECF Nos. 406 & 407.

In *United States v. Cervino*, the defendant was convicted following a three-week jury trial for his role in a complex scheme to profit from the manipulation of the price of securities and for lying to the SEC during the course of the investigation. His Guidelines range was 135–168 months. *See* 15-cr-171 (S.D.N.Y. 2016), ECF Nos. 367 at 3, 362 at 3–8.  Judge Carter sentenced the defendant to one year and one day, more than a 90% percent reduction from the Guidelines. *See* 15-cr-171 (S.D.N.Y. 2016), ECF No. 367.

In *United States v. Petit*, the defendants, the CEO and COO of a publicly-traded company, were convicted following a three-week trial in the Southern District of New York.  The CEO, who was convicted of securities fraud, and the COO, who was convicted of conspiracy to commit securities fraud and submit false statements to the Securities and Exchange Commission, each received a one-year sentence. *See* Petit, 19-cr-850 (JSR) (S.D.N.Y. 2020), ECF Nos. 153, 154.

Together these cases illustrate that judges frequently impose sentences substantially below the applicable Guidelines ranges.[2] Following these principles and precedents, the sentencing factors enumerated in Section 3553(a) warrant a substantially below-Guidelines sentence in this case as well.

### B.      This Prosecution is an Outlier

The prosecution of Donal, his sister Helen, and co-defendant Padraig Naughton is unprecedented. We are unaware of any case in which an individual has been sentenced for crimes relating to a failure to make full remittances to union benefit funds. Indeed, the only case in which individuals were charged with such offenses was in the District of Massachusetts. *United States v.*

---

[2]   According to the Interactive Data Analyzer of the United States Sentencing Commission, during the fiscal years 2020, 2021, and 2022, 206 individuals, all of whom were in Criminal History Category I, were sentenced in the Eastern District of New York for offenses having § 2B1.1 as the primary applicable Guideline. Of the 206 individuals, 15% received a sentence other than incarceration and of those who were sentenced to incarceration, 60.3% were sentenced to 24 or fewer months.  https://ida.ussc.gov/analytics/saw.dll?Dashboard Some of the nation's largest financial crimes are prosecuted in the Eastern District of New York. We respectfully submit that the offense prosecuted in this case is far less serious than those typical of the district.

*AQB, Inc.*, No. 16-cr-14 (PBS) (D. Mass). *AQB* was resolved by a post-indictment corporate plea by which the charges against the two charged construction company executives were dismissed. *AQB*, ECF No. 180 (February 1, 2017). Although we can only speculate as to why such cases have not been pursued, the *Fatico* hearing and briefing offers a clue: the collective bargaining agreements and project labor agreements that would underpin such a prosecution are subject to interpretation and dispute, and there is a well-established civil mechanism for contractors, unions, and union benefit funds to work out their differences. In sentencing the defendants in this case, the Court is in uncharted territory.

Even when considering other criminal conduct within the construction industry in the Eastern District of New York, it is clear that this case, for reasons that are known only to the prosecutors, is being treated far more harshly than any other case in recent history. Over the past thirteen years, the U.S. Attorney's Office for the Eastern District of New York resolved at least five such cases through through corporate pleas, non-prosecution agreements, and deferred prosecution agreements. Out of the five cases, only one individual was charged, and he received a sentence of 2 years' probation.

That case involved a large construction firm, Lend Lease, which was indicted on charges of mail fraud, wire fraud, and conspiracy to commit the same, for fraudulently billing clients for hours not worked by Mason Tenders' labor foreman and for falsely representing that MWBEs were performing work when they were not. *United States v. Lend Lease (US) Construction Constr. LMB Inc. (f/k/a Bovis Lend Lease LMB Inc.)*, 12-cr-288 (ARR) (E.D.N.Y. 2012). Lend Lease was permitted to enter into a deferred prosecution agreement (DPA) on April 24, 2012, in which it accepted responsibility, paid financial penalties, and agreed to take remedial measures. ECF No. 2. On that same day, James Abadie, the former Principal in Charge of the company, entered a plea

of guilty to a single count of conspiracy.  He was sentenced to 2 years' probation, community service, and a $175,000 fine.

The other four construction cases in this district involved the construction companies only; no individuals were prosecuted.

On November 29, 2010, the U.S. Attorney's Office in this district resolved an investigation into Schiavone Construction Co. LLC, which was alleged to have fraudulently overstated by $20,000,000 the amount of work performed by disadvantaged- and minority- and women-owned business (DBEs and MWBEs) on federal contracts. The company was permitted to enter into a non-prosecution agreement (NPA) in which it accepted responsibility, agreed to take remedial measures, and paid forfeiture and investigative costs.  No individuals were charged.

The Hunter Roberts Construction Corp. was under investigation in this district for billing clients $7 million for work that was not performed and at rates that were higher than contracted. On May 18, 2015, the U.S. Attorney's Office entered into an NPA with the company which accepted responsibility for mail fraud, wire fraud, and conspiracy; paid restitution and a penalty; and agreed to take remedial measures.  No individuals were charged.

On November 27, 2015, the U.S. Attorney's Office resolved the case of *United States v. Tishman Construction Corp.* with a DPA. *Tishman*, No. 15-cr-617 (CBA) (E.D.N.Y. 2015).  ECF No. 11. Tishman had been charged with mail fraud, wire fraud, and conspiracy to commit the same, because the company allegedly defrauded its clients by charging them $5.65 million for unworked time and at rates higher than those bargained for by their clients. The U.S. Attorney's Office resolved the case with a DPA, which required Tishman to accept responsibility, pay restitution and a penalty, and take remedial measures.  No individuals were charged.

On October 16, 2016, another large construction company was charged in this district with mail fraud, wire fraud, and conspiracy, in connection with a scheme to overbill its clients by more

45

than $2.2 million.  In *United States v. Plaza Construction LLC*, the U.S. Attorney's Office entered into a DPA with the company, which accepted responsibility, paid forfeiture, restitution, and a penalty, and agreed to take remedial measures.  *Plaza Constr.*, No. 16-cr-532 (NGG) (E.D.N.Y. 2016), ECF No. 11. No individuals were charged.

What this survey of resolutions of similar cases demonstrates is the highly unusual nature of this prosecution against Donal and his co-defendants. The unremitting aggressiveness of the government, from the lack of opportunity for counsel to meet with the AUSAs pre-indictment, to the failure to offer surrender rather than a dawn arrest in front of his children, to the gross exaggeration of the underpayments that was presented to the jury, to their propounding an unsupported and absurd loss amount, is uncharacteristic of the general professionalism and even-handedness of the U.S. Attorney's Office. It also shows that imposition of a Guidelines sentence, let alone a sentence on the order of what the government is urging, would result in grossly disparate treatment for Donal in violation of the spirit of the Guidelines and the mandate of 18 U.S.C. § 3553(a)(6).

### C.   Donal's History and Characteristics Militate Against Incarceration.

The "history and characteristics of the defendant," a sentencing factor enumerated in 18 U.S.C. § 3553(a)(1), support a below-Guidelines sentence.

As discussed in great detail above, Donal's life has been one of hard work and dedication to caring for and helping his family, community, and countless others. He has succeeded as an entrepreneur after having emigrated to the United States with little in his pocket. Donal, who was accustomed to hard work on the family farm, worked hard when he arrived in this country and built a thriving business employing thousands. There is no hint of criminality anywhere in Donal's upbringing, education, career, or family life. Donal has received strong, widespread support from family, friends, business associates, employees, leaders of the community, and strangers, whose

lives he has touched with immeasurable goodness. They have written to the Court to testify to Donal's good moral character, kindness and generosity. And as this Court has recognized by having granted permission to Donal to be with family in Ireland (for which he is eternally grateful), Donal has demonstrated his commitment to total compliance with the Court's instructions and has been a model pre-trial and post-trial detainee. (*See* PSR ¶ 10).

Donal has so much more to give to society.  Incarceration is not a sentence commensurate with the person or the offense.

### D.    Incarceration Is Not Required to Reflect the Nature, Circumstances, and Seriousness of the Offense or to Provide Just Punishment for the Offense

The "nature and circumstances of the offense" and the "need for the sentence imposed … to reflect the seriousness of the offense … and to provide just punishment for the offense"—two additional sentencing factors set out by Section 3553(a)—also support a below-Guidelines sentence. *See* 18 U.S.C. § 3553(a)(1) & (a)(2)(a).

Donal is not accused of a crime of violence nor has he ever committed any violence whatsoever. Physically separating Donal from society is not needed.

Nonetheless, the Probation Department recommends a custodial sentence of 57 to 71 months. (PSR ⸿ 85). For the reasons stated above, a sentence of such severity is neither appropriate nor just. It would be grossly disproportionate to the harm proximately caused by the offenses of conviction.

Donal has suffered greatly from the moment of his terrifying arrest at his family home in Queens in the early morning hours of July 30, 2020 to this day. Everything has changed; everyone and everything he holds dear has been affected. Donal spent his life building a company that grew from a small subcontractor to an important New York City constuction company, providing employment and opportunities to thousands of working men and women—and since

47

his arrest he can work there no longer. These men and women at Navillus were not simply workers; they were and are Donal's friends. Their families and Donal's family were friends. They celebrated the happy occasions and mourned the sad events together—weddings, funerals, baptisms, graduations, holiday parties, and more. In Donal's words, "Taking this away from me was like taking a child away from its mother; that's what it felt like after my indictment."

These three years since Donal's arrest have been "extremely personally devastating" to him. (Jane Saffran, vol. I, tab 111). And not simply for the consequences to himself, but for the impact it has had, and will continue to have, on so many others. Donal's arrest and trial stressed his marriage to the breaking point. His children worry about their father, and they live with enormous anxiety about what will happen to him, who is the central figure in their lives. Kelly, who is still in high school, has been suffering most acutely, withdrawn and struggling with anxiety about her father. All six of the children have been profoundly affected. (Katie O'Sullivan, v. I, tab 31). Some are receiving regular mental health treatment. The three children with achromatopsia face the absence of their father's constant support should he be sent to prison. And then there is Donal's family back in Ireland, most especially his elderly, unwell mother and his special-needs brother John D., both of whom count on Donal's frequent visits back home and miss him beyond words.

Remarkably, Donal continues to put the needs of others before his own—still offering to help others with their problems and personal lives rather than dwelling on his own predicament. (Ronan Hession (vol. III, tab 246), Kieran Higgins (vol. I, tab 67), Roisin Higgins (vol. I, tab 70), James Smith (vol. III, tab 329), Anthony Tsaloglou (vol. III, tab 338)). When Donal does talk about the case, "all he talks about is Padraig and Helen. He is devastated for them." (Kieran Higgins, vol. I, tab. 67). Donal feels an acute sense of personal responsibility for what they have

endured because the Allied paymaster arrangement grew out of a discussion Donal had with Kieran Lambe.

In short, Donal has felt the heavy weight of this case bearing on his body and soul every single day since July 30, 2020. The additional punishment of a custodial sentence is simply not necessary to reflect the nature, circumstances, and seriousness of the offenses in this case.

### E.   Neither Specific nor General Deterrence Is Best Served by a Sentence of Imprisonment Nor is it Needed to Protect the Public and to Promote Respect for the Law

A non-incarceratory sentence would reflect the needs for "adequate deterrence to criminal conduct," to "protect the public from further crimes of the defendant," and to "promote respect for the law," as required by 18 U.S.C. § 3553(a)(2)(A)–(C).

First, Donal is extraordinarily unlikely to commit future offenses. This is his first and only conviction for any offense in his lifetime. He has suffered extreme public shame and upheaval and will carry the burden of his conviction for the rest of his life.

Moreover, defendants over age 40, like Donal (who is over 60 years old), are particularly suited for non-Guidelines sentences, given that they "exhibit markedly lower rates of recidivism in comparison to younger defendants." *United States v. Carmona-Rodriguez*, No. 04-cr-667 (RWS), 2005 WL 840464, at *4 (S.D.N.Y. Apr. 11, 2005) (imposing below-Guidelines sentence in part because defendant was a 55-year-old and first-time offender); *see also United States v. Ruiz*, No. 04-cr-1146 (RWS), 2006 WL 1311982, at *4 (S.D.N.Y. May 10, 2006) (citing U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation Of The Federal Sentencing Guidelines* 28 (2004)), U.S. Sentencing Comm'n, *Recidivism Among Federal Offenders: A Comprehensive Overview* 23 (2016), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf (analyzing all federal offense types, including fraud offenses). And empirical evidence indicates that even short sentences send a

strong message to potential white-collar offenders. *See Adelson*, 441 F. Supp. 2d at 514 (describing the "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders"); Richard S. Frase, *Punishment Purposes*, 58 Stan. L. Rev. 67, 80 (2005); Elizabeth Szockyj, *Imprisoning White Collar Criminals?*, 23 S. Ill. U.L.J. 485, 492 (1999); U.S. Sentencing Comm'n, *Fifteen Years of Guidelines Sentencing* 56 (2004), https://www.ussc.gov/research/research-and-publications/research-projects-and-surveys/fifteen-years-guidelines-sentencing (noting that the Sentencing Guidelines were written, in part, to "ensure a *short but definite* period of confinement for a larger proportion of these 'white collar' cases, both to ensure proportionate punishment and to achieve deterrence" (emphasis added)). *Cf. United States v. Tomko*, 562 F.3d 558, 573, 582 (3d Cir. 2009) (declining to adopt government's argument that district court's probation-only sentence in complex securities fraud case, which government described as a "100% downward variance," would harm general deterrence).

### F.    A Sentence of Incarceration Is Likely to Result in Unwarranted Sentencing Disparities

The Court must also consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), and sentence of substantial additional incarceration here is likely to cause the kind of disparities proscribed by Section 3553.

The Second Circuit has repeatedly noted that a sentencing court's obligation to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of Section 3553(a) includes the need to avoid unwanted sentencing disparities. *See, e.g.*, *United States v. Dorvee*, 616 F.3d 174, 182–83 (2d Cir. 2010); *Cavera*, 550 F.3d at 188–89; *United States v. Brennan*, 395 F.3d 59, 69 (2d Cir. 2005). In this regard, the Court must consider both co-defendants in this case and similarly situated defendants in other cases.

As discussed in detail above, numerous courts in the Second Circuit have given significant departures from the Guidelines for financial crimes that have had many more victims, resulted in very serious victim impact, and caused massively greater losses than in this case. *See* Section V.A. And closer to home, in the Eastern District of New York, this case stands out for the heavy hand the government wielded in this prosecution, especially when compared with the most closely analogous cases we have found. *See* Section V.B.  Accordingly, this case warrants a significantly below-Guidelines sentence to avoid unwarranted sentencing disparities.

### G.  The Court Should Consider Alternatives to Incarceration

Finally, the Court should independently consider whether a non-custodial sentence—such as home detention and rigorous community service—would best serve the requirements of 18 U.S.C. § 3553(a) and the ends of justice in this case. *See* 18 U.S.C. § 3553(a)(3) (requiring the sentencing courts to consider "the kinds of sentences available").

There is growing recognition by the U.S. Sentencing Commission, commentators, the Department of Justice, and the courts that alternatives to incarceration warrant greater consideration generally, and in the white-collar context particularly. In 2009, the Sentencing Commission issued a report on alternative sentencing that recognized that "[e]ffective alternative sanctions are important options for federal, state, and local criminal justice systems. For the appropriate offenders, alternatives to incarceration can provide a substitute for costly incarceration."[3] Similarly, the 2014 ABA Shadow Guidelines for Economic Offenses concluded that "a sentence other than imprisonment is generally appropriate" for defendants charged with

---

[3]    U.S. Sentencing Comm'n, *Alternative Sentencing in the Federal Criminal Justice System* 20 (2009), https://www.ussc.gov/sites/default/files/pdf/researchand-publications/research-projects-and-surveys/alternatives/20090206_Alternatives.pdf

non-serious economic offenses that have no criminal history.[4] And in October 2014, then-Deputy Attorney General Sally Yates noted that "[w]hile it's true that there are dangerous defendants from whom society needs to be protected, there are others … for whom alternatives to incarceration make a lot more sense." *United States v. Dokmeci*, No. 13-cr-455 (JG), 2016 WL 915185, at *10 (E.D.N.Y. Mar. 9, 2016).

Courts have long recognized the need to consider alternative sentences. *See United States v. Murphy*, 108 F.R.D. 437, 439 (E.D.N.Y. 1985) ("For most crimes of white collar corruption it may not be necessary to provide substantial prison terms."); *see also United States v. Pippin*, 903 F.2d 1478, 1484 (11th Cir. 1990) (noting that, after "extensive study," the Sentencing Commission recommended leeway for the sentencing judges to impose non-custodial sentences in white collar cases with low Guidelines ranges).

Former Judge Gleeson has written at length in two opinions on the virtues of alternatives to incarceration. *See Dokmeci*, 2016 WL 915185; *United States v. Leitch*, No. 11-cr-609, 2013 WL 753445 (E.D.N.Y. Feb. 28, 2013). Judge Gleeson lamented how "every theft, tax evasion, antitrust, insider trading, fraud, and embezzlement case is … no more eligible for a sentence of probation, even when committed by a first-time offender, than would a crime of violence." *Leitch*, 2013 WL 753445, at *1. Judge Gleeson recognized that probation is itself "significant punishment" and that there are "an array of alternative sanctions—home confinement, community service, and fines, for example—that allow judges to impose enhanced (and sometimes even constructive) punishment without sending the defendant to prison." *Id*. at *12.

---

[4]     Am. Bar Ass'n Criminal Justice Section, *A Report on Behalf of the American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes* (Nov. 10, 2014), https://www.americanbar.org/content/dam/aba/publications/criminaljustice/economic_crimes.pdf

Judge Oetken in the Southern District of New York reached the same conclusion in a conspiracy to commit securities fraud and honest services wire fraud case, in which he imposed, following a guilty plea, a non-incarceratory sentence for a first-time offender with a total offense level of 30: an offense level that would have produced a Guidelines range of 97 to 121 months, but for a five-year statutory maximum that capped the Guidelines range at 60 months. See *United States v. Kang,* No. 16-cr-837 (JPO) (S.D.N.Y. 2017).

\* \* \*

In sum, the application of the § 3553(a) sentencing factors to the circumstances of this particular defendant and this particular case justify a substantially below-Guidelines sentence that credits Donal's good history and character, the low likelihood of his offending in the future, and the lack of any personal pecuniary gain to Donal from the offenses of conviction. We respectfully submit that the Court should impose a sentence that relies heavily on alternatives to incarceration.

## VI.    NO FINANCIAL PENALTY IS WARRANTED

Although the Court is authorized to impose a fine, the Probation Department correctly recommends that no fine is warranted here.  (PSR ¶ 83).

Nor should the Court impose restitution or forfeiture obligations in this case. None of the putative victim union benefit funds have submitted affidavits of loss when requested by the Probation Department. (PSR ¶ 35).  The government failed to produce persuasive evidence of actual loss, either at the trial or the *Fatico* hearing.

## VII.    CONCLUSION

Donal O'Sullivan respectfully requests that this Court adopt an advisory Guidelines range of 0 to 6 months.  Alternatively, should the Court adopt a Guidelines range that is higher, Donal respectfully request that the Court find his case appropriate for a downward variance and impose a sentence of probation and rigorous community service. A proposed downward variance of this

nature is sufficient but not greater than necessary to accomplish all the purposes of sentencing under 18 U.S.C. § 3553(a).

Date:   June 23, 2023
          New York, New York

Respectfully submitted,

ELLIOTT KWOK LEVINE & JAROSLAW LLP

ILENE JAROSLAW
ijaroslaw@ekljlaw.com

565 Fifth Avenue, 7th Fl.
New York, NY 10017
Telephone: (212) 321-0510

*Attorneys for Defendant Donal O'Sullivan*